No. 12-15737

_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____


MICHAEL E. DAVIS, aka Tony Davis, et al.,

*Plaintiffs–Appellees,*

v.

ELECTRONIC ARTS INC.,

*Defendant–Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of California
The Honorable Richard Seeborg
Case No. 10-cv-03328 RS

_____

## APPELLANT'S OPENING BRIEF

_____

Alonzo Wickers IV (SBN 169454)
Karen Henry (SBN 229707)
Kathleen Cullinan (SBN 287604)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Robert Van Nest (SBN 84065)
R. James Slaughter (SBN 192813)
Adam Lauridsen (SBN 243780)
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, California 94111-1899
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant-Appellant
ELECTRONIC ARTS INC.

# CORPORATE DISCLOSURE STATEMENT

Defendant Electronic Arts Inc. ("EA"), a nongovernmental corporate party, provides the following statement to comply with Federal Rule of Appellate Procedure 26.1:

EA has no parent corporation or publicly held corporation that owns 10% or more of its shares.

DWT 22968422v9 0058278-000029

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ..........................................................................1

ISSUES PRESENTED ...........................................................................................2

1.  STATEMENT OF THE CASE ...............................................................3

2.  STATEMENT OF FACTS ......................................................................3

     A.  EA's *Madden NFL* Video Game ........................................3

     B.  The Lawsuit ...............................................................................8

     C.  EA's Anti-SLAPP Motion ....................................................9

3.  STANDARD OF REVIEW ..................................................................10

4.  SUMMARY OF ARGUMENT ............................................................10

5.  PLAINTIFFS' CLAIMS SHOULD BE STRICKEN. ...................12

     A.  The Claims Are Subject To A Special Motion to Strike.....................12

          1.  Plaintiffs' Claims Arise From EA's Acts In Furtherance Of Its Free-Speech Rights.....................14

          2.  *Madden NFL* Relates To An Issue Of Public Interest.........................................................................15

     B.  Plaintiffs Cannot Demonstrate A Probability Of Prevailing..............17

          1.  As Applied To Expressive Works, The Right Of Publicity Is A Content-Based Regulation That Is Presumptively Invalid And Does Not Survive Strict Scrutiny. .......................................................18

          2.  The First Amendment Bars Any Right-Of-Publicity Claim Based On EA's Use Of Plaintiffs' Alleged Likenesses. ...............................................21

DWT 22968422v9 0058278-000029

a.    The Incidental-Use Doctrine ..........................................21

b.    The Constitutional Public-Interest Defense ..................27

c.    The Transformative-Use Test........................................33

d.    The *Rogers/Restatement* Test .........................................41

3.    Civil Code Section 3344(d)'s Public-Affairs Exemption Defeats Plaintiffs' Claims. ....................................44

4.    Plaintiffs' Ancillary Claims Also Fail. ....................................48

C.    Conclusion ............................................................................49

DWT 22968422v9 0058278-000029

# TABLE OF AUTHORITIES

Page

**Cases**

*Aligo v. Time Life Books*,
    1994 U.S. Dist. Lexis 21559 (N.D. Cal. Dec. 19, 1994) .......................21, 22, 24

*Arkansas Writers' Project v. Ragland*,
    481 U.S. 221 (1987).................................................................................18

*Ashcroft v. ACLU*,
    535 U.S. 564 (2002).................................................................................19

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001).................................................................................18

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ...................................................................1

*Briggs v. Eden Council for Hope & Opportunity*,
    19 Cal. 4th 1106 (1999) .........................................................................13

*Brown v. Entm't Merchants Ass'n*,
    131 S. Ct. 2729 (U.S. 2011).............................................................*passim*

*C.B.C. Distribution v. Major League Baseball Advanced Media*,
    505 F.3d 818 (8th Cir. 2007) ..........................................................31, 32

*CBS Interactive v. NFL Players Ass'n.*,
    259 F.R.D. 398 (D. Minn. 2009) ..............................................................31

*Chaplinsky v. New Hampshire*,
    315 U.S. 568 (1942).................................................................................19

*Christoffersen v. Washington State Air Nat'l Guard*,
    855 F.2d 1437 (9th Cir. 1988) .................................................................22

*Chuy v. Philadelphia Eagles Football Club*,
    431 F. Supp. 254 (E.D. Pa. 1977), aff'd, 595 F.2d 1265 (3rd Cir. 1979)
    (en banc)......................................................................................17, 47

DWT 22968422v9 0058278-000029

*Club Members for an Honest Election v. Sierra Club*,
  45 Cal. 4th 309 (2008) ........................................................................13

*Comedy III Prods., v. Gary Saderup, Inc.*,
  25 Cal. 4th 387 (2001) ...................................................................*passim*

*Crater v. Galaza*,
  491 F.3d 1119 (9th Cir. 2007) ...........................................................12

*Dora v. Frontline Video*,
  15 Cal. App. 536 (1993) ................................................................*passim*

*ETW Corp. v. Jireh Publ.*,
  332 F.3d 915 (6th Cir. 2003) ........................................................35, 36

*Gionfriddo v. Major League Baseball*,
  94 Cal. App. 4th 400 (2001) ...........................................................*passim*

*Guglielmi v. Spelling-Goldberg Prods.*,
  25 Cal. 3d 860 (1979) ........................................................................11

*Hart v. Electronic Arts Inc.*,
  717 F.3d 141 (3d Cir. 2013) ..........................................11, 36, 37, 39

*Hill v. NCAA*,
  7 Cal. 4th 1 (1994) .............................................................................24

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010) .......................................................*passim*

*Hoffman v. Capital Cities/ABC*,
  255 F.3d 1180 (9th Cir. 2001) ...........................................................48

*In re Mercury Interactive Corp. Securities Litig.*,
  618 F.3d 988 (9th Cir. 2010) ............................................................21

*Ingels v. Westwood One Broadcasting*,
  129 Cal. App. 4th 1050 (2005) .........................................................16

*Johnson v. Harcourt, Brace, Jovanovich*,
  43 Cal. App. 3d 880 (1974) .........................................................21, 24

iv

*Keller v. Electronic Arts Inc.*,
　　724 F.3d 1268 (9th Cir. 2013) .................................................................*passim*

*Kimes v. Stone*,
　　84 F.3d 1121 (9th Cir. 1996) ..............................................................22

*Kirby v. Sega of America*,
　　144 Cal. App. 4th 47 (2006) .......................................................25, 48

*Ladany v. William Morrow & Co.*,
　　465 F. Supp. 870 (S.D.N.Y. 1978) ...................................23, 24, 25, 27

*Lohan v. Perez*,
　　924 F. Supp. 2d 447 (E.D.N.Y. 2013) .............................................24

*Man v. Warner Bros.*,
　　317 F. Supp. 50 (S.D.N.Y. 1970) ..................................................24

*Matthews v. Wozencraft*,
　　15 F.3d 432 (5th Cir. 1994) ..........................................................42

*Mindys Cosmetics v. Dakar*,
　　611 F.3d 590 (9th Cir. 2010) ........................................................10

*Miranda B. v. Kitzhaber*,
　　328 F.3d 1181 (9th Cir. 2003) ......................................................12

*Montana v. San Jose Mercury News*,
　　34 Cal. App. 4th 790 (1995) .................................................*passim*

*Montgomery v. Montgomery*,
　　60 S.W.3d 524 (Ky. 2001) ...........................................................42

*Nat'l Football League Properties v. New Jersey Giants*,
　　637 F. Supp. 507 (D.N.J. 1986) ...............................................17, 47

*Navellier v. Sletten*,
　　29 Cal. 4th 82 (2002) ...................................................................13

*New Kids on the Block v. News America Pub.*,
　　971 F.2d 302 (9th Cir. 1992) ........................................................45

DWT 22968422v9 0058278-000029

*No Doubt v. Activision*,
   192 Cal. App. 4th 1018 (2011) ................................................................15, 25, 36

*Nygard v. Uusi-Kerttula*,
   159 Cal. App. 4th 1027 (2008) ..........................................................................16

*Parks v. LaFace Records*,
   329 F.3d 437 (6th Cir. 2003) .............................................................................42

*Planned Parenthood v. Casey*,
   505 U.S. 833 (1992) ...........................................................................................12

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ...........................................................................................19

*Regan v. Time, Inc.*,
   468 U.S. 641 (1984) ...........................................................................................19

*Robertson v. Rodriguez*,
   36 Cal. App. 4th 347 (1995) ..............................................................................18

*Rogers v. Grimaldi*,
   875 F.2d 994 (1989) .....................................................................................41, 42

*Romantics v. Activision Publ.*,
   574 F. Supp. 2d 758 (E.D. Mich. 2008) ............................................................42

*Ruffin-Steinback v. De Passe*,
   82 F. Supp. 2d 723 (E.D. Mich. 2000), aff'd, 267 F.3d 457 (6th Cir.
   2001) ...................................................................................................................42

*Seale v. Gramercy Pictures*,
   949 F. Supp. 331 (E.D. Pa. 1996) ......................................................................42

*Seelig v. Infinity Broadcasting*,
   97 Cal. App. 4th 798 (2002) ..............................................................................16

*Simmons v. Allstate*,
   92 Cal. App. 4th 1068 (2001) ............................................................................18

*Singh v. Gonzales*,
   502 F.3d 1128 (9th Cir. 2007) ....................................................................12, 37

DWT 22968422v9 0058278-000029

*Smith v. Pro Football*,
 593 F.2d 1173 (D.C. Cir. 1978).................................................................17, 47

*Somerson v. World Wrestling Entm't*,
 2013 U.S. Dist. Lexis 106028 (N.D. Ga. March 7, 2013)..................................30

*Sullivan v. Nat'l Football League*,
 839 F. Supp. 6 (D. Mass. 1993)................................................................17, 47

*United States v. Alvarez*,
 132 S. Ct. 2537 (U.S. 2012)......................................................................19, 20

*United States v. Stevens*,
 559 U.S. 460 (2010)..................................................................................19, 20

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
 425 U.S. 748 (1976)........................................................................................44

*White v. Samsung*,
 971 F.2d 1395 (9th Cir. 1992) ..........................................................................9

*Winter v. DC Comics*,
 30 Cal. 4th 881 (2003) ...........................................................................*passim*

*Zacchini v. Scripps-Howard*,
 433 U.S. 562 (1977)..................................................................................22, 29

*Zamani v. Carnes*,
 491 F.3d 990 (9th Cir. 2007) ............................................................................1

## Statutes

28 U.S.C.
 § 1332(a) .........................................................................................................1
 § 1332(d).........................................................................................................1

California Civil Code
 § 3344.....................................................................................................*passim*
 § 3344(d)................................................................................................*passim*

California Code of Civil Procedure
    § 425.16.................................................................................*passim*
    § 425.16(a) .......................................................................13
    § 425.16 (b)(1) ................................................................15
    § 425.16(b)(1) .................................................................13
    § 425.16(b)(1) .................................................................14
    § 425.16(e) ......................................................................14
    § 425.16(e)(4) ..................................................................15

## Rules

Federal Rule of Appellate Procedure (4)(a)(1)(A) ....................................1

Federal Rule of Civil Procedure 12(b)(6) ................................................3

## Constitutional Provisions

United States Constitution, First Amendment ..................................*passim*

## Other Authorities

Diane Leenheer Zimmerman, *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503 (2009) .............................................................................43

E. Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903 (2003) ...............................................................19, 42, 43, 49

F. Jay Dougherty, *All the World's Not a Stooge: The 'Transformativeness' Test for Analyzing a First Amendment Defense to a Right of Publicity Claim Against Distribution of a Work of Art*, 27 Colum. J.L. & Arts 1 (2003) .............................................................................43

http://www.merriam-webster.com/dictionary/publish............................................32

1 J. Thomas McCarthy, *The Rights of Publicity and Privacy* (2d ed. 2000)...........20

Letter from Christine Minnehan, Senior Assistant to Assem. John Vasconcellos, to Don D. Sessions (on file in Cal. State Archives, 1971 reg. sess., Assem. B. 826, Author's File) ...........................................46

2 McCarthy, *Rights of Publicity* § 8:72 ................................................43

DWT 22968422v9 0058278-000029

2 McCarthy, *Rights of Publicity* § 8:82 ...................................................................42

Press Release, Assem. John Vasconcellos, "Deceptive Advertising and Contests" (Mar. 8, 1971) (on file in Cal. State Archives, 1971 reg. sess., Assem. B. 826, Author's File) ..............................................................46

*Restatement (Third) of Unfair Competition*, § 46 ...................................................41

*Restatement (Third) of Unfair Competition*, § 47, cmt. c ........................................42

S. Comm. on Judiciary, Analysis of "AB 826 (Vasconcellos) as amended October 20," at 3 (Oct. 20, 1971) (on file in Cal. State Archives, 1971 reg. sess., Assem.. B. 826, S. Comm. on Judiciary File) ....................................46

Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn from Trademark Law*, 58 Stan. L. Rev. 1161 (2006) .........................................43

DWT 22968422v9 0058278-000029

# JURISDICTIONAL STATEMENT

**1.** **District court jurisdiction.** The district court properly exercised diversity jurisdiction under 28 U.S.C. § 1332(a). EA reserves the right to contest class-action jurisdiction under 28 U.S.C. § 1332(d).

**2.** **Appellate jurisdiction.** An order denying a special motion to strike filed under California's anti-SLAPP statute is immediately appealable. *See, e.g., Batzel v. Smith*, 333 F.3d 1018, 1024-1026 (9th Cir. 2003); *Zamani v. Carnes*, 491 F.3d 990, 994 (9th Cir. 2007).

**3.** **Timeliness of appeal.** The district court denied EA's anti-SLAPP motion on March 29, 2012. Excerpts of Record ("ER") 1. EA filed its notice of appeal from that order on April 2, 2012. *See* Fed. R. App. P. (4)(a)(1)(A). ER 69.

1

**ISSUES PRESENTED**

1.     Does the incidental-use doctrine protect EA's inclusion of avatars allegedly depicting the three plaintiffs in its *Madden NFL* video game, which includes thousands of other avatars and countless other creative elements?

2.     Does the constitutional public-interest defense bar the plaintiffs' right-of-publicity and related claims, which are based on EA's alleged use in *Madden NFL* of accurate biographical information about the plaintiffs?

3.     Does the transformative-use test defeat the plaintiffs' claims?

4.     Does the *Rogers/Restatement* test defeat their claims?

5.     Does California Civil Code § 3344(d), which protects expressive works that relate to "public affairs," exempt *Madden NFL* from liability?[1]

---

[1] The text of pertinent constitutional provisions and statutes is set forth in an addendum to this brief.  Fed. R. App. P. 28(f).

DWT 22968422v9 0058278-000029

## 1.

## STATEMENT OF THE CASE

Three retired NFL players, Michael Davis, Vince Ferragamo, and Billy Joe Dupree ("Plaintiffs"), sued Electronic Arts Inc. ("EA"), claiming that its alleged use of their "likenesses" in EA's *Madden NFL* video game violates their rights of publicity under California Civil Code § 3344 and the common law, and constitutes conversion, trespass to chattels, and unjust enrichment. ER 77-97. EA filed an anti-SLAPP motion and a Rule 12(b)(6) motion to dismiss each of the claims. The district court denied both motions. EA now appeals the order denying the anti-SLAPP motion.

## 2.

## STATEMENT OF FACTS

### A.  EA's *Madden NFL* Video Game

EA is a leading developer and publisher of video games, including *Madden NFL*, which EA has published annually for over twenty years. ER 74. Combining technically advanced computer and software engineering and creative audiovisual elements, the game allows users to experience the excitement and challenge of NFL football. *Id.* Users may compete against an opponent controlled by the game

3

itself, against a person connected to the same game system, or against a person connected over the Internet. *Id.*[2]

EA's work does not use Plaintiffs' names, photographs, or literal images. ER 72; Motion for Leave to Submit Video-Game Consoles, Controllers and Video Game ("Motion") at Exs. 1-2. Instead, Plaintiffs complain that *Madden NFL 09* uses publicly available, historical information about them – namely, their height, weight, years of playing experience, and relative skill level – to create digital in-game characters (called "avatars") that allegedly conjure up their identities. ER 83. The avatars at issue are among more than 7,500 avatars that appear in the game as members of the NFL's 32 current teams, 146 "historic" NFL teams chosen by EA, and 31 all-time all-star teams in *Madden NFL 09*. ER 2, 72, 84, 99-101; Motion at Exs. 1-2. Users can enjoy the game without ever encountering the avatars that Plaintiffs complain of; indeed, users would encounter these avatars only if they bypass the current NFL teams, select the historic-teams function, and

---

[2] EA lodged copies of *Madden NFL 09* for Xbox and Sony PlayStation2 below, as well as Xbox and PlayStation2 game consoles and controllers, so that the district court could review the game first-hand. ER 107. In case those materials are not transferred to this Court from the district court, EA has filed a concurrent motion for leave to lodge the same materials with this Court. *See* Motion for Leave to Lodge Game Consoles, Controllers, and *Madden NFL 09* Video Game. In this brief, EA cites to the copies of *Madden NFL 09* that it proposes to lodge with the Court (and that were part of the record below) as "Motion at Exs. 1-2." At the Court's request, EA is willing to send a technician to the Court to provide a game-play demonstration at the Court's convenience.

then select one of the eight teams that Plaintiffs played on from among the 177 historic teams.  ER 74-76, 84-86; Motion at Exs. 1-2.

As a review of the game shows, the virtual world of *Madden NFL* is constructed from an array of video graphics, audio features, and data.  ER 74-75; Motion at Exs. 1-2.  After a user chooses two teams to compete against each other, the game assigns a stadium for the match-up and populates it with virtual players, coaches, referees, mascots, cheerleaders, and fans – all designed and rendered by EA's graphic artists.  *Id.*  In the Xbox and PlayStation 2 versions of *Madden NFL 09* – the only annual edition at issue in this lawsuit (ER 71-72) – players may choose to play current or historic teams.  Of the 177 historic teams in the game, users can select eight that include Plaintiffs' alleged likenesses:  the 1979 Tampa Bay Buccaneers team that plaintiff Anthony Davis alleges includes his "likeness," the 1979 and 1984 Los Angeles Rams teams that plaintiff Vince Ferragamo alleges include his "likeness," and the 1975, 1977, 1978, 1979, and 1981 Dallas Cowboys teams that plaintiff Billy Joe Dupree alleges include his "likeness."  ER 74-76, 84-87; Motion at Exs. 1-2.

The historic teams differ from the current teams in important ways:  the historic teams do not include photographs or images of actual players; the historic teams do not include the names of actual players who played on those teams; and the uniform numbers of virtual players on the historic teams do not correspond to

5

those worn by the actual players. ER 75-76; Motion at Exs. 1-2. Instead, the virtual players on the historic teams are identified by a number and a player "name" combining their position and number (for example, the avatar that Davis contends evokes his likeness is designated a halfback wearing the number 37 – "FB#37"). Motion at Exs. 1-2.

Although the virtual players' characteristics (such as height, weight, ability, and experience) and other variables (including crowd noise and weather) affect the teams' performances, the individual users most directly influence the game's outcome through their play-calling (*e.g.*, whether to run, pass, or kick and which defensive scheme to employ) and their ability to use hand-held controllers to manipulate the virtual players' actions on the field. ER 75. Because of these numerous variables and the creative input of the users, the game experience changes each time it is played.

The user's control over the action and the development of the storyline of each game is enhanced by his or her ability to make changes to the virtual players or to other elements of the game. Users may alter the abilities, appearances, and biographical information of the virtual players in various ways, and may even create custom virtual players from scratch for their teams. *Id.* For example, a user may change a player's physical characteristics (such as his height or weight), his accessories (such as his helmet, visor, or wristband), the player's physical abilities

6

(such as speed and agility, arm strength, or passing accuracy), or a player's biographical details, thus creating the user's own custom players and teams. *Id.* The users experience the game audio-visually through real-time, television-like animation and action-specific, play-by-play commentary. *Id.* The game also includes realistic original sounds, such as the crunch of players' pads as contact is made, the audible of a quarterback changing a play at the line of scrimmage, and the roar of the crowd. *Id.*

*Madden NFL* does not recreate or recount actual historical games. *Id.* The action of the game and the results achieved are fictional, and are driven by the user's creativity and skill. In addition, EA's game designers have created functions that enable users to create their own counterfactual, interactive historical narratives. For example, "Franchise Mode" allows users to take on the role of an NFL team's general manager over as many as thirty seasons, with the ability to draft college players, trade players to other teams, run a team's training camp, fire coaches, navigate the league's salary cap, and manage all player personnel matters. *Id.*; Motion at Exs. 1-2. It is, as Judge Thomas described EA's college-football video game, "a work of interactive historical fiction." *Keller v. Electronic Arts Inc.*, 724 F.3d 1268, 1285 (9th Cir. 2013).

Interactive historical works of this sort are not limited to sports video games. There are video games that allow users to lead armies in historic battles, run real-

7

life presidential campaigns, and even rebuild empires. In *Patton v. Rommel*, for instance, gamers wage battles between two famous World War II generals who never actually faced one another. In *The Political Machine 2012* and *President Elect*, users manage the campaigns of real-life U.S. presidential candidates, and of some politicians who never actually ran for the presidency. Expressive works like these – and *Madden NFL* – are entertaining and informative.

**B.     The Lawsuit**

On July 29, 2010, Anthony Davis filed a complaint against EA. ER 105. On November 8, 2010, he served the original complaint and simultaneously filed and served a first amended complaint, adding Vince Ferragamo and Billy Joe Dupree as plaintiffs.

Plaintiffs allege, on behalf of themselves and others who purportedly are similarly situated, that EA misappropriated their "likenesses" by including avatars that supposedly depict them in the historic-teams function in *Madden NFL 09*. ER 78. Again, Plaintiffs do not allege that EA used their names, photographs, or uniform numbers, and EA does not use any of those elements in the game. ER 72; Motion at 1-2. Instead, Plaintiffs allege that EA uses certain publicly available information about them – specifically, their "position, years in the NFL, height, weight, 'skin tone,' as well as each player's relative skill level in different aspects of the game." ER 83. Plaintiffs assert claims for: (1) violation of their statutory

8

right of publicity under California Civil Code § 3344; (2) violation of their common-law right of publicity, (3) conversion, (4) trespass to chattels, and (5) unjust enrichment.  ER 91-96.[3]

## C.    EA's Anti-SLAPP Motion

On June 9, 2011, EA filed an anti-SLAPP motion and a motion to dismiss the first amended complaint.  ER 71.  The district court denied both motions on March 29, 2012.  ER 1.  With respect to the anti-SLAPP motion, the court held that EA met its initial burden under Code of Civil Procedure § 425.16, but concluded that Plaintiffs met their burden of establishing a probability of prevailing on their claims.  ER 16.  EA filed a timely notice of appeal on April 2, 2012, and the matter was stayed while *Keller v. Electronic Arts Inc.*, 724 F.3d 1268 (9th Cir. 2013), was pending before this Court.

---

[3] It is unlikely that the characteristics that supposedly constitute Plaintiffs' "likenesses" – their age, height, weight, speed, skin tone, and skill  – are legally recognized as a protectable "likeness" within the meaning of Civil Code § 3344. ER 83; *see also White v. Samsung*, 971 F.2d 1395, 1397 (9th Cir. 1992) (dismissing Section 3344 claim based on robot that allegedly looked like plaintiff). Solely for purposes of its anti-SLAPP motion, however, EA accepted Plaintiffs' allegation that the game includes their likenesses.

## 3.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of an anti-SLAPP

motion under California Code of Civil Procedure § 425.16.  *See, e.g., Keller*, 724

F.3d at 1272 n.3; *Mindys Cosmetics v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010).

## 4.

## SUMMARY OF ARGUMENT

The California Supreme Court has warned that "[t]he right of publicity has a

potential for frustrating" constitutionally protected expression.  *Comedy III Prods.,*

*v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 397 (2001) (internal quotations omitted).

This lawsuit exemplifies that risk; it pits three retired NFL players' rights of

publicity against EA's First Amendment right to create an expressive work – its

*Madden NFL* video game – about professional football.

As the Court considers these interests, it should be guided by the United

States Supreme Court's holding that video games "are as much entitled to the

protection of free speech as the best of literature."  *Brown v. Entm't Merchants*

*Ass'n*, 131 S. Ct. 2729, 2737 n.4  (2011) ("*EMA*").  Any differences between video

games and other forms of expression are "cultural and intellectual differences …

not *constitutional* ones."  *Id.*  (emphasis in original).  Courts in California long

have recognized serious First Amendment concerns when right-of-publicity claims

10

target the use of celebrities' names and likenesses in films, books, and similar expressive works. *See, e.g.*, *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 869-872 (1979). Strong constitutional protection is vital to allow films like *The Social Network* and books like *Game Change* to be created without the approval of Mark Zuckerberg, Sarah Palin, or other historical figures. Neither the public's right to enjoy these works nor their creators' right to publish them should depend upon the permission of the historical figures who are depicted. If Plaintiffs had sued EA for including their likenesses (or their biographical information) in a film or a book about professional football, their claims unquestionably would be dismissed. The outcome cannot be different just because the expressive work uses a different medium.

Unfortunately, the collision between video-game publishers' First Amendment rights and athletes' publicity rights has vexed courts. In both *Keller* and *Hart v. Electronic Arts Inc.*, 717 F.3d 141 (3d Cir. 2013), sharply divided panels have held that the First Amendment does not protect EA's substantially similar *NCAA Football* game against right-of-publicity claims by former college athletes. The dissenting judges in both cases pointed out that the majorities have adopted either an unconstitutional "medium-specific metric that provides less protection to video games than other expressive works," as Judge Ambro feared in *Hart* (717 F.3d at 174), or a rule that "all realistic depictions of actual persons, no

11

matter how incidental, are protected by a state law right of publicity, regardless of the creative context," which "jeopardizes the creative use of historic figures in motion pictures, books, and sound recordings," as Judge Thomas warned in *Keller* (724 F.3d at 1290).

Here, EA raises five defenses to Plaintiffs' claims:  the incidental-use doctrine, which was not discussed in the *Keller* opinion; the constitutional public-interest defense; the transformative-use test; the *Rogers/Restatement* test; and California Civil Code § 3344(d)'s public-affairs exemption.  Properly applied, each of these defenses bars Plaintiffs' claims as a matter of law.[4]

## 5.

## PLAINTIFFS' CLAIMS SHOULD BE STRICKEN.

### A.    The Claims Are Subject To A Special Motion to Strike.

California's anti-SLAPP statute, Code of Civil Procedure Section 425.16, grants defendants the right to "early dismissal of unmeritorious claims" that are

---

[4] The doctrine of horizontal stare decisis ordinarily prevents a subsequent panel of this Court from overruling a previous panel's holding.  *See, e.g., Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1185 (9th Cir. 2003).  This Court has recognized that the doctrine "is not an inexorable command, and certainly it is not in every constitutional case."  *Crater v. Galaza*, 491 F.3d 1119, 1126 n.8 (9th Cir. 2007), quoting *Planned Parenthood v. Casey*, 505 U.S. 833, 854 (1992).  This case implicates critical First Amendment interests.  EA's brief addresses the defenses that were at issue in *Keller*, both because of the importance of the constitutional rights at stake and to preserve these issues for *en banc* or Supreme Court review. *See Singh v. Gonzales*, 502 F.3d 1128, 1129 (9th Cir. 2007).

filed "to interfere with the valid exercise of the constitutional rights of freedom of speech and petition." *Club Members for an Honest Election v. Sierra Club*, 45 Cal. 4th 309, 315 (2008). Under the statute, any "cause of action against a person arising from any act … in furtherance of the person's right of … free speech … in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. Proc. Code § 425.16(b)(1).

Reacting to court rulings that interpreted the statute too narrowly and did not go far enough to quash lawsuits that targeted the exercise of free speech, the Legislature amended Section 425.16 to ensure that it "shall be construed broadly." *Id*., § 425.16(a). The California Supreme Court subsequently declared that the "broad construction expressly called for in [Section 425.16] is desirable from the standpoint of judicial efficiency," and cautioned that a narrow construction "would serve Californians poorly." *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1121-1122 (1999).

The California Supreme Court has set forth a two-step process for determining whether a cause of action must be stricken under Section 425.16. *Navellier v. Sletten*, 29 Cal. 4th 82, 88 (2002). "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." *Id*. To make this showing, the defendant

13

must demonstrate that the plaintiff's claim arises from actions by the defendant that "fit[] one of the categories spelled out in … section 425.16, subdivision (e)." *Id.* Under subdivision (e)(4), the statute protects "any … conduct [by the defendant] in furtherance of the exercise of the constitutional right … of free speech in connection with … an issue of public interest." Second, if the defendant meets this threshold showing, the burden shifts to the plaintiff to establish, with competent evidence, "a probability that [he] will prevail on the claim[s]." Cal. Civ. Proc. Code § 425.16(b)(1). If the plaintiff cannot meet that burden, his claims must be dismissed with prejudice. *Id.*

1.  **Plaintiffs' Claims Arise From EA's Acts In Furtherance Of Its Free-Speech Rights.**

As the district court correctly found (ER 16), EA met its initial burden of showing that Plaintiffs' claims target EA's acts in furtherance of its free-speech rights. In *Hilton v. Hallmark Cards*, 599 F.3d 894, 904 (9th Cir. 2010), this Court observed that "the courts of California have interpreted this piece of the defendant's threshold showing rather loosely." Although this Court noted that the "California Supreme Court has not drawn the outer limits of activity that furthers the exercise of free speech rights [under the anti-SLAPP statute,]" "[i]t seems to suffice … that the defendant's activity is communicative[.]" *Id.* at 903-904. To meet its initial burden under Section 425.16, therefore, a defendant only needs to

14

show that the plaintiff's claims arise from the defendant's "communicative" or speech activity, or from acts in furtherance of that activity.

The right-of-publicity and related claims here arise from the use of Plaintiffs' alleged likenesses in EA's *Madden NFL* video game. ER 72. That conduct indisputably constitutes an act in furtherance of EA's free-speech rights within the meaning of Section 425.16. The United States Supreme Court emphatically has held that video games are forms of expression that are entitled to same First Amendment protection as books, plays, and movies. *EMA*, 131 S. Ct. at 2733. Consequently, even the *Keller* majority found that the creation of video games that use celebrity likenesses falls within the scope of the anti-SLAPP statute. *Keller*, 724 F.3d at 1273 ("Keller's suit arises from EA's production and distribution of *NCAA Football* in furtherance of EA's protected right to express itself through video games"); *see also No Doubt v. Activision*, 192 Cal. App. 4th 1018, 1027 (2011) ("the use of No Doubt's likenesses in the *Band Hero* video games meet the first requirement of the anti-SLAPP statute").

### 2. *Madden NFL* Relates To An Issue Of Public Interest.

Under the anti-SLAPP statute, a defendant also must show that it exercised its speech rights "in connection with a public issue" or an "issue of public interest." Cal. Civ. Proc. Code § 425.16 (b)(1), (e)(4). In *Hilton*, this Court instructed that courts "must construe … 'issue of public interest' … broadly" to include any

15

"topic of widespread, public interest" or "person … in the public eye." 599 F.3d at 906-907. Applying those definitions, the Court held that a birthday greeting card poking fun at Paris Hilton's reality-television persona met the statute's public-interest requirement. *Id.* Similarly, in *Nygard v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (2008), the California Court of Appeal held that statements about a Finnish designer's beach house related to an issue of "public interest" within the meaning of anti-SLAPP statute because the Finnish public – the primary audience for the defendant's publication – took an interest in him. The court in *Nygard* reiterated that "the issue need not be 'significant' to be protected by the anti-SLAPP statute – it is enough that it is one in which the public takes an interest." *Id.*[5]

In a variety of contexts, courts have recognized that professional sports are matters of significant public interest – both because of their broad impact on popular culture and because of the particular attention paid to sporting events and athletes' performances. In *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 411 (2001), for example, the court noted that professional baseball "is

---

[5] *See also Seelig v. Infinity Broadcasting*, 97 Cal. App. 4th 798, 807-808 (2002) (finding that deejay's on-air criticism of reality-show contestant related to issue of public interest under anti-SLAPP statute); *Ingels v. Westwood One Broadcasting*, 129 Cal. App. 4th 1050, 1064 (2005) (holding that exchange on talk-radio show about dating related to an issue of public interest under anti-SLAPP statute).

followed by millions of people across this country on a daily basis," and concluded that information about baseball players "command[s] a substantial public interest." In *Montana v. San Jose Mercury News*, 34 Cal. App. 4th 790, 795-796 (1995) the court held that these "public interest considerations … apply with equal force to professional football." *See also Chuy v. Philadelphia Eagles Football Club*, 431 F. Supp. 254, 267 (E.D. Pa. 1977), aff'd, 595 F.2d 1265 (3rd Cir. 1979) (en banc) (affirming "the proposition that interest in professional football must be deemed an important incident among many incidents, of a society founded upon a high regard for free expression"); *Smith v. Pro Football*, 593 F.2d 1173, 1200 (D.C. Cir. 1978) (same); *Sullivan v. Nat'l Football League*, 839 F. Supp. 6, 7 (D. Mass. 1993) (same)*; Nat'l Football League Properties v. New Jersey Giants*, 637 F. Supp. 507, 511 (D.N.J. 1986) (same).

As these authorities confirm, EA's expressive work about NFL football plainly relates to a matter of public interest within the meaning of the anti-SLAPP statute. Because EA has satisfied its initial burden under the statute, the burden shifts to Plaintiffs to demonstrate a probability of prevailing on each of their claims. They cannot meet this burden.

## B. Plaintiffs Cannot Demonstrate A Probability Of Prevailing.

To satisfy their burden under the anti-SLAPP statute, Plaintiffs must "'state and substantiate a legally sufficient claim,'" *Hilton*, 599 F.3d at 908 (citations

omitted), and must "meet [EA's] constitutional defenses." *Robertson v. Rodriguez*, 36 Cal. App. 4th 347, 359 (1995). This "requires an evidentiary showing[,]" "like a summary judgment motion." *Simmons v. Allstate*, 92 Cal. App. 4th 1068, 1073 (2001). *See also Hilton*, 580 F.3d at 902 ("anti-SLAPP inquiry … is similar to the one courts make on summary judgment, though not identical").

Plaintiffs cannot carry their burden because their right-of-publicity and related claims are barred as a matter of law by several independent defenses.

## 1. As Applied To Expressive Works, The Right Of Publicity Is A Content-Based Regulation That Is Presumptively Invalid And Does Not Survive Strict Scrutiny.

When applied to expressive works like *Madden NFL*, the right of publicity penalizes constitutionally-protected speech based on its content. A regulation is content-based when it cannot be "justified without reference to the content of the speech," *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001), or where "authorities must necessarily examine the content" of the publication to determine whether it is subject to the regulation, *Arkansas Writers' Project v. Ragland*, 481 U.S. 221, 230 (1987).

A right-of-publicity claim requires a court to examine the content of an expressive work – indeed, the gist of the claim is that a defendant's work incorporates a celebrity's name or likeness without permission. As Professor

Eugene Volokh has observed, "[t]he right of publicity is clearly content-based: It prohibits the unlicensed use of particular content (people's name or likenesses)." E. Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903, 912 n.35 (2003). The Supreme Court has directed, however, that content-based regulations of speech are presumptively invalid and are subject to strict constitutional scrutiny. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *accord Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002); *Regan v. Time, Inc.,* 468 U.S. 641, 648 (1984).

The Supreme Court has recognized limited exceptions to this speech-protective rule, in the form of a few historic categories of expression that are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). These categories include obscenity, defamation, fraud, fighting words, and true threats; the Supreme Court repeatedly has been asked in recent years to enlarge the list, and steadfastly has refused. *See United States v. Alvarez*, 132 S. Ct. 2537, 2547 (2012); *United States v. Stevens*, 559 U.S. 460, 482 (2010); *EMA*, 131 S. Ct. at 2741. "Before exempting a [new] category of speech from the normal prohibition on content-based restrictions … the Court must be presented with persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition

19

of proscription." *Alvarez*, 1332 S. Ct. at 2547. False statements on military achievements did not suffice in *Alvarez*. *Id.* In *Stevens*, the Court declined to create a new category for depictions of animal cruelty. 559 U.S. at 482. In *EMA*, the Court declared that "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated." 131 S. Ct. at 2734.

As a "relatively raw and brash newcomer" in American jurisprudence, 1 J. Thomas McCarthy, *The Rights of Publicity and Privacy* (2d ed. 2000), the right of publicity is not and should not be exempt from the normal prohibition on content-based restrictions. Even if it had deeper historical roots, its concern with "exploiting the value to be obtained from merchandising the celebrity's image," *Comedy III Prods. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 400 (2001), pales as a state interest, even in comparison to the injuries raised in *Alvarez* and *Stevens*.

Because the right of publicity – when targeting an expressive work – is a content-based restriction on speech, it is presumptively invalid and should trigger the most exacting (and almost always fatal) level of constitutional scrutiny. At a minimum, courts should broadly interpret the constitutional defenses that insulate expressive works against right-of-publicity claims. Yet, the court in *Keller* did the opposite: narrowly cabining the public-interest defense and transformative-use

defenses designed to prevent the right of publicity from frustrating constitutionally protected expression. 724 F.3d at 1276, 1282.

Here, EA raises four distinct defenses rooted in the First Amendment: the incidental-use doctrine; the public-interest defense; the transformative-use test; and the *Rogers/Restatement* test. Each defeats Plaintiffs' claims.

### 2. The First Amendment Bars Any Right-Of-Publicity Claim Based On EA's Use Of Plaintiffs' Alleged Likenesses.

#### a. The Incidental-Use Doctrine

Although not raised below, this Court may on its own consider whether EA's use of Plaintiffs' alleged likenesses was so incidental as to preclude their claims. In the Ninth Circuit, an appellate panel "may consider issues not presented to the district court … when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *In re Mercury Interactive Corp. Securities Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).

The incidental-use defense may be decided as an issue of law. *See, e.g., Aligo v. Time Life Books*, 1994 U.S. Dist. Lexis 21559, at *12 (N.D. Cal. Dec. 19, 1994) (finding use of likeness "too fleeting and inconsequential as a matter of law to give rise to liability" under Section 3344); *Johnson v. Harcourt, Brace, Jovanovich*, 43 Cal. App. 3d 880, 895 (1974) (affirming order sustaining

demurrer); *see also Christoffersen v. Washington State Air Nat'l Guard*, 855 F.2d 1437, 1443 (9th Cir. 1988) ("whether speech is constitutionally protected is an issue of law"). Whether the defense bars Plaintiffs' claims can be determined by reviewing the video game; it does not require any further development of the factual record. *See Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996). Nor would it prejudice Plaintiffs, as EA emphasized to the district court that the avatars they complain about were merely "a few of the thousands of virtual athletes in its *Madden NFL* video game." ER 72.

Where the use of the plaintiff's name or likeness is incidental in relation to the defendant's work as a whole, the use is not actionable under the right of publicity. As the United States Supreme Court explained, "the mere incidental mention of the plaintiff's name in a book or a motion picture is not an invasion of his privacy; nor is the publication of a photograph or a newsreel in which he incidentally appears." *Zacchini v. Scripps-Howard*, 433 U.S. 562, 575 n.11 (1977). This doctrine is grounded in the First Amendment, and prevents "unconstitutional interference" with the exercise of free speech. *Id.* Indeed, if the creators of an expressive work had to pay "anyone briefly depicted or referred to … , [it] would unduly burden expressive activity." *Aligo*, 1994 U.S. Dist. Lexis 21559 at *6-7. Drawing a crowded courtroom scene, painting a mural of a military battle, or writing a comprehensive account of a presidential campaign, all would

22

require bargaining with each participant for permission to use his likeness. This would impose an intolerable burden on writers, artists, and others who create expressive works that incorporate multitudes of people.

*Ladany v. William Morrow & Co.*, 465 F. Supp. 870 (S.D.N.Y. 1978), illustrates this risk – and the legal solution. The plaintiff was an Israeli athlete who survived the 1972 Munich Olympic massacre. *Id.* at 871. He sued an author who wrote a book about the attack, alleging that his right of publicity was violated by the author's 13-page account (in a 458-page book) of his escape from the Olympic Village. *Id.* at 872. Ladany was one of 101 people identified by name in the work. *Id.* To prevent the "uncalled-for burden" that would be imposed on the author if he had to get consent from each subject or face a right-of-publicity claim, the court turned to the incidental-use defense. *Id.* at 880. Because "[t]he book concerns itself with the entire tragedy," the court observed that it "refer[red] to virtually every individual who played any part in any aspect of the drama: athletes, terrorists, Olympic administrators, politicians, police, soldiers, airline personnel, diplomats[.]" *Id.* at 881. In that context, the court held that "the references to Ladany" – who was a participant in the real-life events – were "incidental" and thus nonactionable.

California courts follow the same rule, and have decided the issue as a matter of law. In 1974, for example, the Court of Appeal affirmed an order

sustaining a demurrer to a right-of-publicity claim on the grounds that the brief mention of the plaintiff in a textbook was incidental. *Johnson*, 43 Cal. App. 3d at 895. The California Supreme Court endorsed the defense in 1994. *Hill v. NCAA*, 7 Cal. 4th 1, 25 n.6 (1994). Later that year, the court in *Aligo* – relying heavily on *Ladany* – focused its incidental-use analysis on whether the defendant's use of the plaintiff's name or likeness has a unique quality or value that would result in commercial profit to the defendant; the duration or prominence of the name or likeness relative to the defendant's overall work; whether the use contributes something of significance to the defendant's work; and the relationship between the reference to the plaintiff and the purpose and subject of the work. 1994 U.S. Dist. Lexis 21559 at *7-9. The court held that the defendant's fleeting use of the plaintiff's image in an infomercial was not actionable and granted a motion to dismiss. *Id.* at *12. *Accord Lohan v. Perez*, 924 F. Supp. 2d 447, 455-456 (E.D.N.Y. 2013) (dismissing right-of-publicity claim because, among other things, the "isolated nature of the use" of plaintiff's name in a song was incidental); *Man v. Warner Bros.*, 317 F. Supp. 50, 53 (S.D.N.Y. 1970) (finding incidental use where film about Woodstock included 45 seconds of plaintiff's performance).

Although the *Keller* court did not address the incidental-use defense, Judge Thomas focused in his dissent on the insubstantial role that any single virtual athlete plays in the overall work. He noted that "[a]s a quantitative matter, *NCAA*

24

*Football* is different from other right of publicity cases in the sheer number of virtual actors involved. … [The game] includes not just [plaintiff] Sam Keller, but thousands of virtual actors . . . [t]he sheer number of athletes involved inevitably diminish[es] the significance of the publicity right at issue." 724 F.3d at 1287. "*Comedy III*," he pointed out, "involved literal depictions of the Three Stooges on lithographs and T-shirts. *Winter* involved characters depicted in a comic strip. *Kirby* and *No Doubt* involved pivotal characters in a video game. The commercial image of the celebrities in each case was central to the production, and its contact with the consumer was *immediate and unavoidable*." *Id.* at 1288 (emphasis added). "In contrast," he emphasized, "one could play *NCAA Football* thousands of times without ever encountering a particular avatar. In context of the collective, an individual's publicity right is relatively insignificant." *Id.*

Judge Thomas' observation that "[t]he quantity of players involved dilutes the commercial impact of any particular player" (*id.* at 1289) goes to the heart of the incidental-use defense. This doctrine is essential to protect the ability of authors, filmmakers, video-game publishers, and others to create expressive works that include large numbers of individuals who participated in real-life or historical events. Consider, for example, the book at issue in *Ladany* or *Game Change*, the book (and film) about the 2008 presidential campaign. If the creators of these works had to negotiate a license with each individual depicted, the burdens would

25

have been prohibitive. In addition to the challenge of locating those individuals (or their estates), the creators would have had to pay each individual a fee. Some individuals might have held out for a higher fee or an unrealistically favorable portrayal, or demanded that a rival be portrayed unflatteringly. Others might have refused to consent altogether, preventing the creators from accurately depicting the events at issue. The principle that an individual may control how history is depicted in any medium is antithetical to the First Amendment. The incidental-use defense prevents that undesirable result.

EA's use in *Madden NFL* of the avatars that allegedly depict Plaintiffs easily qualifies as incidental. To begin with, their likenesses do not appear on the cover or in promotions for EA's work. Motion at Exs. 1-2. To locate the avatars that supposedly depict Plaintiffs, a user would have to bypass all options to play using a current NFL team and select the historic-teams mode. The user then would have to choose one of the eight historic teams – out of 177 in the game – that include generic avatars based on biographical and historical facts that correlate to Plaintiffs. ER 2, 72; Motion at Exs. 1-2. Each of those teams has a roster of roughly 50 players. ER 84, 99-101; Motion at Exs. 1-2. In other words, Plaintiffs' right-of-publicity claims are based on the inclusion of *eight avatars out of roughly 7,500* in *Madden NFL*. Motion at Exs. 1-2. Under these circumstances, it is implausible to argue that EA's alleged use of their likenesses has any unique

26

value, contributes significantly to the work, or has any special relationship to its purpose. The avatars about which they complain exist in *Madden NFL* because they are each part of an historically significant team, just like the Israeli Olympian appeared in the book because he was part of an historically significant event. As in *Ladany*, the incidental-use doctrine defeats Plaintiffs' right-of-publicity and related claims.

### b. The Constitutional Public-Interest Defense

According to the operative complaint, EA violated Plaintiffs' rights of publicity not by using their names, photographs, or literal likenesses, but instead by using publicly-available biographical and statistical data about them: their "position[s]"; "years in the NFL"; their "height" and "weight" at that time; their "skin tone"; and their "relative skill level." ER 83. In fact, they emphasize in their first amended complaint that the biographical data used by EA is identical to the information found in the media guides that each NFL team publishes before each season. ER 84-85. Plaintiffs' argument is that no one can use this historical information in an expressive work (or at least in a video game) without first obtaining their consent (and presumably paying them a fee).

The case law does not support their argument. To the contrary, courts have held that the public interest in sports protects a publisher's right to use historical and biographical information in an expressive work, without liability for violating

27

an athlete's right of publicity. And under *EMA*, video games cannot receive any less protection. 131 S. Ct. at 2733, 2737 n.4.

*Gionfriddo* is instructive. There, the court held that the First Amendment permitted the defendants to use the names and images of four retired professional baseball players in game programs, web features, and other works without the players' permission. 94 Cal. App. 4th at 410. The court explained that the right of publicity "does not provide relief for every publication of a person's name or likeness"; in most cases, the right to disseminate and to receive information about issues of public interest must prevail over the celebrity's economic interest. *Id.* at 409.

The information conveyed by the defendants' works in *Gionfriddo* constituted "bits of baseball's history: names of players … ; descriptions of memorable performances from former games … ; photographs and video clips taken of plaintiffs [and] … made available to the public through Web sites, home videos, and other programs presenting historic events from long ago." *Id.* The court emphasized the "*substantial public interest*" in baseball generally and in "factual data concerning the athletic performance of the plaintiffs" specifically. *Gionfriddo*, 94 Cal. App. 4th at 411 (emphasis added). This public interest was not diminished by the fact that the information was communicated through game programs and websites, rather than books or newspapers, or by the fact that the

plaintiffs had retired from the sport decades earlier. As the court emphasized, "entertainment features receive the same constitutional protections as factual news reports," and "the public interest is not limited to current events; the public is also entitled to be informed and entertained about our history." *Id.* at 411; *see also Zacchini*, 433 U.S. at 578 ("[t]here is no doubt that entertainment, as well as news, enjoys First Amendment protection"). In contrast to the "substantial" public interest in the dissemination of information about professional baseball, the players had only a "negligible" economic interest at stake because the alleged appropriation of their names and likenesses involved "historical fact[s], descriptions of these facts, and video depictions of them," used in expressive works. *Id.* at 415.

In the end, the case was easy for the court to decide. Because "the public interest favoring the free dissemination of information regarding baseball's history *far outweigh[ed]* any proprietary interests at stake," the court dismissed the right-of-publicity claims. *Id.* (emphasis added).

Earlier California authorities confirm that the public interest in the dissemination of information – through news accounts or works of entertainment – ordinarily trumps the right of publicity. In *Dora v. Frontline Video*, 15 Cal. App. 4th 536, 540 (1993), for example, a legendary surfer filed a right-of-publicity lawsuit against the producers of a surf film that included audio recordings and

video footage of him.  The court began by noting that that "every publication of someone's name or likeness does not give rise to an appropriation action[,]" and reiterated the rule that "[p]ublication of matters in the public interest … is not ordinarily actionable." *Id.* at 542.  Then, the court observed that "matters in the public interest are not restricted to current events; magazines and books, radio and television may legitimately inform and entertain the public with reproduction of past events … and biographies." *Id.* at 543 (citations and internal quotations omitted).  Even though surfing is less popular than professional football or baseball, the court easily found the sport's history was a matter of public interest. *Id.*  Dismissing the plaintiff's arguments that he had shunned the spotlight in recent years and had not consented to the use of his name, likeness, and voice in the documentary, the court held that his interests did not come close to outweighing the public interest at stake.

Subsequently, the court in *Montana v. San Jose Mercury News* held that the public interest in professional football trumped former San Francisco 49ers quarterback Joe Montana's right of publicity in a case arising from the sale of posters featuring his image.  34 Cal. App. 4th at 796-798.  There, the court did not even consider Montana's supposed economic interests; the fact that his image was used on a poster that related to a matter of public interest – one of the 49ers' Super

30

Bowl triumphs – alone entitled the work to constitutional protection. *Id.* at 794-795.[6]

The Eighth Circuit's decision in *C.B.C. Distribution v. Major League Baseball Advanced Media*, 505 F.3d 818, 823 (8th Cir. 2007), underscores that these constitutional protections extend to nontraditional forms of expression, and even to information for which the publisher previously had paid a license fee to the plaintiff. In that case, the court held that Major League Baseball players' names, biographies, and statistics were matters of public interest and were insulated from right-of-publicity claims, even when disseminated through online fantasy-baseball-game websites. *Id.* at 822-823. The court explained that "the information used in C.B.C.'s fantasy baseball games is all readily available in the public domain, and it would be strange law that a person would not have a first amendment right to use information that is available to everyone." *Id.* at 823. *See also CBS Interactive v. NFL Players Ass'n.*, 259 F.R.D. 398, 417 (D. Minn. 2009) ("like in *C.B.C. Distribution*, the package of information used here [names, statistics, injury

---

[6] *See also Somerson v. World Wrestling Entm't*, 2013 U.S. Dist. Lexis 106028, at *19 (N.D. Ga. March 7, 2013) (relying on *Gionfriddo*, recognizing defendant's constitutional right to disseminate through web features the name and persona of a retired and "highly successful professional wrestler and entertainer[]"; "[t]he history of professional wrestling is integral to the full understanding and enjoyment of the current professional matches and current wrestlers").

reports, pictures, images, and biographical data] comes within the ambit of the First Amendment").

Plaintiffs' own allegations and the game itself confirm that these First Amendment protections defeat their claims. Their positions, the number of years they had played in the NFL, their height and weight, their ages, their skin tones, and their skills – as Plaintiffs point out, the very same information that is found in NFL media guides (ER 84-85) – constitute "bits" of professional football's history, just like the biographical and statistical information at issue in *Gionfriddo*. There is a substantial public interest in that information. And what economic interest do Plaintiffs have in that information? Little, if any. Like the athletes in these other cases, Plaintiffs' right of publicity simply does not grant them control over biographical and historical information about their football careers or entitle them to payment for the use of such information in a video game or any other expressive work.[7]

---

[7] The majority in *Keller* limited the public-interest defense to works that involve "reporting" or "publishing," and held that EA's *NCAA Football* game involved neither. 724 F.3d at 1282. That limitation is not constitutionally valid. *See EMA*, 131 S. Ct. at 2733. But regardless, *Madden NFL* is published – under any reasonable definition of that term. *See, e.g.,* http://www.merriam-webster.com/dictionary/publish (defining "publish" as "to make generally known," "to disseminate to the public," or "to produce or release for distribution").

### c. The Transformative-Use Test

In an effort to reconcile the tension between the First Amendment and the right of publicity, the California Supreme Court in 2001 announced another defense to right-of-publicity claims: the transformative-use test. *Comedy III*, 25 Cal. 4th at 404.

In *Comedy III*, the owner of The Three Stooges' publicity rights sued an artist who sold t-shirts and prints featuring literal images of the comic trio. *Id.* at 393-394. The California Supreme Court upheld a judgment against the artist. *Id*. at 394, 409-410. In reaching its decision, the court formulated "what is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." *Id*. at 391. The court explained that "when an artist is faced with a right of publicity challenge to his or her work, he or she may raise an affirmative defense that the work is protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of the work does not derive primarily from the celebrity's fame." *Id*. at 407. The Court emphasized that "the inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question." *Id.* at 406. "We ask, in other

DWT 22968422v9 0058278-000029

words, whether a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness." *Id.* The Court emphasized that "[t]he inquiry is in a sense more quantitative than qualitative, asking whether the literal and imitative or the creative elements predominate in the work." *Id.* at 407. Applying its test, the Court found that since the defendant's t-shirts and prints contained only a literal representation of The Three Stooges – without any other creative or artistic elements or commentary – the First Amendment did not foreclose liability. *Id.* at 410.

While the test may have been more straightforward to apply to the unadorned t-shirts and prints in *Comedy III*, it has proved difficult to apply in other cases. Just two years after *Comedy III*, the California Supreme Court had to revisit the test in *Winter v. DC Comics*, reversing a unanimous intermediate appellate panel. 30 Cal. 4th 881, 888-892 (2003). In that case, noted musicians Johnny and Edgar Winter sued a publisher of comic books that featured characters named "Johnny and Edgar Autumn." The characters' faces resembled the Winter Brothers, but they were depicted as "villainous half-worm, half-human offspring born from the rape of their mother by a supernatural worm creature[.]" *Id.* at 886. The Court reaffirmed that the crucial issue is "whether the work is transformative" and whether the defendant's work "contain[s] significant creative elements that transform [it] into something more than mere celebrity likenesses." *Id.* at 885. To

34

underscore the breadth of this protection, the Court pointed out that transformative works "can take many forms, from factual reporting to fictionalized portrayal" – both of which involve literal portrayals of individuals – and "from heavy-handed lampooning to subtle social criticism." *Id.* at 888 (citations omitted). Turning to the defendants' comic books, the Court stated that "[a]pplication of the test to this case is not difficult." *Id.* at 890. While the comic books' phantasmagoric physical transformation of the plaintiffs' likenesses may have been sufficient by itself to entitle the works to First Amendment protection, it was not necessary to the Court's holding. The transformative-use test shielded the works because the plaintiffs' likenesses were "merely part of the raw materials from which the comic books were synthesized[.]" *Id.*

The California Supreme Court made clear in *Comedy III* and *Winter* that proper application of the transformative-use test requires an evaluation of the defendant's work as a whole, not just an examination of the celebrity's depiction within the work. *Comedy III*, 25 Cal. 4th at 406-407; *Winter*, 30 Cal. 4th at 886. The Sixth Circuit recognized this principle in another right-of-publicity case involving an athlete, *ETW Corp. v. Jireh Publ.*, 332 F.3d 915 (6th Cir. 2003). The work at issue in *ETW* was a painting featuring a literal likeness of Tiger Woods playing golf at The Masters, with several former champions in the background. *Id.* at 918. The Sixth Circuit found that the artist's "work does not capitalize solely on

35

a literal depiction of Woods. Rather, [the] work consists of a collage of images in addition to Woods's image which are combined to describe, in artistic form, a historic event in sports history[.]" *Id.* at 938. "Because [the] work has substantial transformative elements" and "consists of much more than a mere literal likeness of Woods," the court concluded that "Woods's right of publicity must yield[.]" *Id.* at 938.

Focusing only on the alleged depiction of Plaintiffs, and not on EA's work as a whole, the district court below resolved the transformativeness inquiry against EA. ER 5-9. The court concluded that because they "are shown engaged in the activity – playing football – which earned them fame[,]" EA's use of their alleged likenesses in *Madden NFL* is not transformative. ER 9. The district court's interpretation of the test followed *No Doubt*, and subsequently has been echoed by the majorities in *Keller* and *Hart*. In each case, the majority focused exclusively on the depiction of the plaintiff or plaintiffs, and ignored the games' other creative elements. Faulting the game designers for depicting the plaintiffs too realistically, the majorities denied First Amendment protection. In *Keller*, the majority concluded that the use of the plaintiff's identity was not transformative because he was depicted in EA's *NCAA Football* video game "as what he was: the starting quarterback for Arizona State University[,]" and because "the game's setting is identical to where the public found Plaintiff during his collegiate career: on the

football field." 724 F.3d at 1276. The *Hart* majority did the same. 717 F.3d at 166. These courts effectively replaced the transformative-use test, which focuses on the defendant's work *as a whole*, with an "altered-likeness" test that focuses only on physical alterations to the plaintiff's likeness.

In his dissent in *Keller*, Judge Thomas explained how far his colleagues – and the majority in *Hart* – had strayed from the California Supreme Court's instructions in *Comedy III* and *Winter*. "The majority confines its inquiry to how a single athlete's likeness is represented in the video game," he noted, "rather than examining the transformative and creative elements in the video game as a whole. In my view, this approach contradicts the holistic analysis required by the transformative use test." *Keller*, 724 F.3d at 1285. Under the California Supreme Court's formulation of test, "the salient question is whether the entire work is transformative, and whether the transformative elements predominate, rather than whether an individual person or image has been altered." *Id.* [8]

Turning to EA's *NCAA Football* video game, which is similar to *Madden NFL*, and "[a]pplying the *Comedy III* considerations … in proper holistic context," Judge Thomas concluded that "the considerations favor First Amendment protection." *Id.* at 1286. In words that apply with equal force here, he observed

---

[8] EA raises these arguments here to preserve them for *en banc* review in this Circuit and/or United States Supreme Court review. *See Singh*, 502 F.3d at 1129.

that "[t]he athletic likenesses are but one of the raw materials from which the broader game is constructed. The work, considered as a whole, is primarily one of EA's own expression. The creative and transformative elements predominate over the commercial use of likenesses. The marketability and economic value of the game comes from the creative elements within, not from the pure commercial exploitation of a celebrity image. The game is not a conventional portrait of a celebrity, but a work consisting of many creative and transformative elements." *Id.* at 1286. He found EA's game to be a "work of interactive historical fiction" chock-full of EA's own creative expression, as well as opportunities for the user to make further changes. *Id.* A player can "create a virtual image of himself as a potential college football player" deciding "which position he would like to play," being "ranked and [made] available to play at select colleges[,]" and choosing "a major, the amount of time he wishes to spend on social activities, and practice[.]" *Id.* at 1285-1286. Certain modes of the game permit players to "engage in a competition for the Heisman Trophy" or "become[] a virtual coach[,]" recruiting and developing fictional players for his own team. *Id.* at 1286. On the field, the user "controls not only the conduct of the game, but the weather, crowd noise, mascots, and other environmental factors." *Id.*

Judge Thomas warned the majority that the "stakes are not small." *Id.* at 1290. He declined to "punish EA for the realism of its games and for the skill of

the artists who created realistic settings for the football games. That the lifelike roar of the crowd and the crunch of pads contribute to the gamer's experience demonstrates how little of *NCAA Football* is driven by the particular likeness of Sam Keller[.]" *Id.* at 1287. Looking beyond video games to other works that incorporate celebrity likenesses, Judge Thomas cautioned that the *Keller* and *Hart* majorities' "logic jeopardizes the creative use of historic figures in motion pictures, books, and sound recordings." *Id.* at 1290.

Judge Thomas is correct. *Keller*'s and *Hart*'s take on the transformative-use test would have perverse consequences for freedom of expression across the board – protecting, for instance, a Cubist but not a Realist painting of Barack Obama, or a fantastical depiction of Barbra Streisand on *South Park*, but not a tell-all biography of the entertainer. This cannot be the rule. Constitutional protections for free speech cannot turn on extraneous alterations to the celebrity's likeness, much less *disfavor* the more accurate depiction. Documentarians, biographers, filmmakers, novelists, photographers, songwriters, and many others do exactly what the majorities suggest is not protected: they create expressive works that realistically depict individuals or refer to them by their actual names. How can the film *The Social Network* avoid depicting Mark Zuckerberg "doing exactly what" he did – creating the social-networking website Facebook – and in his real-life settings – Harvard and the Silicon Valley?

39

The *Keller* majority tried to dismiss Judge Thomas' concerns in a footnote, suggesting that documentaries, biographies, and other works may still be protected because "one of the factors identified in *Comedy III* 'requires an examination of whether a likely purchaser's primary motivation is to buy a reproduction of the celebrity, or to buy the expressive work of that artist.'" *Id.* at 1279, n.10. First Amendment protection cannot depend on something so fickle, and inscrutable, as a "likely purchaser's primary motivation." The majority simply has no answer to Judge Thomas' point that their interpretation of the transformative-use test, if applied to other forms of expression, would threaten the long-established right of filmmakers, authors, and others to create works that realistically depict historical figures in the context in which they garnered public attention.

The only real answer to Judge Thomas' point is to adhere to the transformative-use test *as announced by the California Supreme Court in Comedy III and Winter*, and to focus on the defendant's entire work, not just on the depiction of the plaintiff. Had the district court done so, it would have found that *Madden NFL* is transformative for all the reasons Judge Thomas identified in his discussion of *NCAA Football*. The game allows users to build their own teams, their own players, and their own games. ER 75; Motion at Exs. 1-2. EA's creative expression abounds in the details of the game – the graphics, the sounds, and the movements. ER 74-75; Motion at Exs. 1-2. Even the narratives are creative: users

40

can match up current teams against historic teams; they can choose to interact with characters including a barber, a tattoo artist and a sports agent; or they can run a franchise for up to thirty years as its general manager. Motion at Exs. 1-2. The avatars about which the Plaintiffs complain are only a miniscule part of the work, which includes roughly 7,500 virtual athletes and an array of other features. Under these circumstances, no reasonable trier of fact could find that they are the "sum and substance" of *Madden NFL*, or that EA's work is a "conventional portrait" of them or a "mere celebrity likeness or imitation," akin to the t-shirt in *Comedy III*. Indeed, even the district court conceded that *Madden NFL* unquestionably "encompasses significant expressive elements" besides the virtual representations of Plaintiffs. ER 8. Under the transformative-use test announced by the California Supreme Court in *Comedy III*, the First Amendment would bar Plaintiffs' claims.

### d. The *Rogers/Restatement* Test

While the transformative-use test has proven difficult for many courts to apply, the *Rogers/Restatement* test is more predictable, and more protective of free expression. This test was formulated by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (1989). Under the test, the First Amendment defeats a right-of-publicity claim arising from an expressive work, unless the use of the celebrity's name or likeness is "wholly unrelated" to the work or is "simply a disguised commercial advertisement for the sale of goods or services." *Id.* at 1004. *Rogers*

41

is consistent with the approach taken by the *Restatement (Third) of Unfair Competition*, § 46, which restricts the right of publicity to the unauthorized appropriation of the commercial value of a person's identity "for purposes of trade." The *Restatement* provides that "use in entertainment and other creative works is permitted," unless "the name or likeness is used solely to attract attention to a work that is not related to the identified person." *Id.*, § 47, cmt. c.

The *Rogers/Restatement* test has been adopted by numerous courts as a defense to right-of-publicity claims. *See, e.g., Parks v. LaFace Records*, 329 F.3d 437, 461 (6th Cir. 2003); *Matthews v. Wozencraft*, 15 F.3d 432, 440 (5th Cir. 1994); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 336-338 (E.D. Pa. 1996); *Romantics v. Activision Publ.*, 574 F. Supp. 2d 758, 766 (E.D. Mich. 2008); *Ruffin-Steinback v. De Passe*, 82 F. Supp. 2d 723, 730 (E.D. Mich. 2000), aff'd, 267 F.3d 457 (6th Cir. 2001); *Montgomery v. Montgomery*, 60 S.W.3d 524, 529 (Ky. 2001). This approach also has been endorsed by leading commentators. *See, e.g.*, 2 McCarthy, *Rights of Publicity* § 8:82; Volokh, *Freedom of Speech*, at 908 (noting that "courts have consistently held – correctly, in my view – that the right of publicity may not restrict … movies, novels, plays, or songs that use people's names or likeness"; citing *Rogers* with approval).[9]

---

[9] At the same time, commentators have criticized the transformative-use test because it rests on a subjective, aesthetic review of a work and understandably causes unpredictable results. McCarthy, for example, observed that the test is

Both the *Keller* court and the district court below declined to apply the *Rogers/Restatement* test. The *Keller* court reasoned that the test was announced in a case involving Oregon's common-law right-of-publicity, and suggested – incorrectly – that only one circuit court has followed the *Rogers/Restatement* approach. 724 F.3d at 1281.

To preserve its *Rogers/Restatement* argument, EA again proposes that this test is more appropriately protective of First Amendment rights. Unlike the transformative-use test, the *Rogers/Restatement* approach would properly confine the right-of-publicity tort to situations in which speakers have used a depiction of, or reference to, a celebrity to sell something – either by falsely claiming a celebrity commercial endorsement or by including a celebrity image in a publication gratuitously.

Confined to these circumstances, the right-of-publicity does not raise constitutional concerns because speech that falsely claims a commercial

---

"extremely difficult to predict and apply because it requires a court to make an aesthetic judgment" about "the degree of the artistic transformation" required for a work to qualify for First Amendment protection. 2 McCarthy, *Rights of Publicity* § 8:72. *See also* Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn from Trademark Law*, 58 Stan. L. Rev. 1161 (2006); E. Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. at 917-923; Diane Leenheer Zimmerman, *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503 (2009); F. Jay Dougherty, *All the World's Not a Stooge: The 'Transformativeness' Test for Analyzing a First Amendment Defense to a Right of Publicity Claim Against Distribution of a Work of Art*, 27 Colum. J.L. & Arts 1 (2003).

43

endorsement is analogous to the category of fraudulent speech that the government has long regulated without any First Amendment concerns. *See, e.g., Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771 (1976) (noting that fraudulent speech generally falls outside the protections of the First Amendment). Likewise, the gratuitous use of a celebrity's image to attract attention, unrelated to any expressive content in the work, falls outside First Amendment protection altogether. Thus confined, the right-of-publicity tort would raise far less constitutional concern.

Under the *Rogers/Restatement* test, the First Amendment would defeat Plaintiffs' claims. Plaintiffs (who are retired professional football players) clearly are not "wholly unrelated" to the subject of EA's work about professional football, and the use of their "likenesses" is not a disguised commercial advertisement for *Madden NFL* or anything else. Thus, the *Rogers/Restatement* test would provide another barrier to Plaintiffs' right-of-publicity claims.

### 3. Civil Code Section 3344(d)'s Public-Affairs Exemption Defeats Plaintiffs' Claims.

When the California Legislature enacted the state's right-of-publicity statute for living individuals, it expressly exempted from liability any use of an individual's likeness in an expressive work that relates to a matter of "public affairs." Cal. Civ. Code § 3344(d). Before *Keller*, the Ninth Circuit had held that

44

this defense applies to both statutory and common-law right-of-publicity claims, and that it affords even broader protection than the First Amendment. *New Kids on the Block v. News America Pub.*, 971 F.2d 302, 310 n.10 (9th Cir. 1992). The *Keller* majority's opinion conflicts with *New Kids*, suggesting that the exemption applies only to statutory right-of-publicity claims, and treating it as co-extensive with the constitutional public-interest defense. 724 F.3d at 1282. Most problematic, the *Keller* majority held that the statutory public-affairs exemption (and the constitutional public-interest defense) protect only expressive works that involve "publishing or reporting." *Id.*

Neither the statutory language, the case law, nor the legislative history supports that interpretation. Section 3344(d) provides that no consent is needed to use an individual's name or likeness "in connection with any news, public affairs, or sports broadcast or account[.]" The statute does not contain any "publishing" or "reporting" limitation, and no California state appellate court has imposed the limitations proposed by the *Keller* majority. Instead, courts have held that the exemption applied to a poster promoting the *San Jose Mercury News*' Super Bowl coverage (*Montana*, 34 Cal. App. 4th at 797), a film about surf culture (*Dora*, 15 Cal. App. 4th at 543), and baseball game programs and web features (*Gionfriddo*, 94 Cal. App. 4th at 414) – none of which necessarily qualify as traditional "reporting" or "publishing." EA is unaware of anything in the legislative history

45

that supports the "publishing or reporting" rule.  The legislative history makes clear that Section 3344 was not intended to restrict realistic depictions of public figures in expressive works, but rather to address manufacturers' and retailers' practices of hawking goods and services by deceptively suggesting a celebrity endorsement.  *See* S. Comm. on Judiciary, Analysis of "AB 826 (Vasconcellos) as amended October 20," at 3 (Oct. 20, 1971) (on file in Cal. State Archives, 1971 reg. sess., Assem. B. 826, S. Comm. on Judiciary File).  The bill's author repeatedly explained that it "was prompted by abuse of the unsolicited use of a person's name in a magazine promotional mailing," and was part of a legislative package intended "to halt certain deceptive, mass-mailing advertising practices." Letter from Christine Minnehan, Senior Assistant to Assem. John Vasconcellos, to Don D. Sessions (on file in Cal. State Archives, 1971 reg. sess., Assem. B. 826, Author's File); Press Release, Assem. John Vasconcellos, "Deceptive Advertising and Contests" (Mar. 8, 1971) (on file in Cal. State Archives, 1971 reg. sess., Assem. B. 826, Author's File).  That narrow legislative focus underscores the need to read the "public affairs" exception broadly, and to avoid imposing liability on expressive works.

Consistent with the legislative purpose, courts have interpreted the public-affairs exemption expansively, and have recognized that it applies to much more than just traditional news reports.  In *Dora*, for example, the court rejected the

plaintiff's argument that the film about surfing did not relate to "public affairs" within the meaning of Section 3344(d).  *Id.*  Noting that "Civil Code section 3344, subdivision (d) distinguishes between news and public affairs," the court held that "the Legislature intended that the category of public affairs would include things that would not necessarily be considered news."  *Id.* at 545.  Because "the public is interested in and constitutionally entitled to know about things, people, and events that affect it," the court concluded that "we cannot limit the term 'public affairs' to topics that might be covered on public television or public radio."  *Id.* at 546. Following *Dora*, the Court of Appeal specifically found that professional football is a matter of "public affairs" within the meaning of Section 3344(d).  *Montana*, 34 Cal. App. 4th at 801; *see also Gionfriddo*, 94 Cal. App. 4th at 416 (holding that, "in view of baseball's pervasive influence on our culture," the defendants' game programs and web sites were "public affairs uses exempt from consent under Section 3344").  Courts across the nation have echoed the *Montana* court's holding that professional football is a matter of significant public interest.  *See*, *e.g.*, *Chuy*, 431 F. Supp. at 267; *Smith*, 593 F.2d at 1200; *Sullivan*, 839 F. Supp. at 7*; Nat'l Football League Properties*, 637 F. Supp. at 511.

*Madden NFL* should be exempt from liability under Section 3344(d), even if the Court applies the *Keller* majority's "publishing or reporting" restriction.  The majority assumed, without discussion, that EA was not reporting or publishing

47

information, and that its use of information about professional football was solely for purposes of a game. 724 F.3d at 1283. As noted above, *Madden NFL* is published and, more importantly, it communicates information about an issue of public affairs. The game has a virtual trainer that informs users about the rules of the game. Motion at Exs. 1-2. Users are educated about current NFL teams' rosters and playbooks, the league's draft, its salary cap, and its history. And, as Plaintiffs emphasize in their complaint, their alleged likenesses are based on EA's use of publicly available, historical data: how many years each had played in the league, his height and weight, his skin tone, and his relative skill level. ER 83. Plaintiffs go so far as to attach an exhibit to their complaint to show that the information used by EA is identical to the information that NFL teams publish in their annual media guides. ER 99-101. Because EA likewise is publishing information about a matter of undisputed public importance, its expressive work should be exempt from liability under Section 3344(d).

### 4. Plaintiffs' Ancillary Claims Also Fail.

Because Plaintiffs' claims for conversion, trespass to chattels, and unjust enrichment are duplicative of their right-of-publicity claims (*compare* ER 91-93 *with* ER 94-96), they are barred by the same defenses and also should be stricken. *See, e.g., Kirby v. Sega of America*, 144 Cal. App. 4th 47, 61-62 (2006) (where First Amendment barred plaintiff's right-of-publicity and Lanham Act claims, it

48

also barred her ancillary claims); *Hoffman v. Capital Cities/ABC*, 255 F.3d 1180, 1183 (9th Cir. 2001) (same). Plaintiffs' other state-law claims are predicated on the same conduct that underlies their right-of-publicity claims, and fail for the same reasons.

## C.     Conclusion

One commentator has observed that, although "[t]he notion that my name and likeness are my property seems to make sense," when it comes to freedom of expression, "'my property' is another way of saying 'legally forbidden to be another's speech.'" Volokh, 40 Hous. L. Rev. at 929. That is why right-of-publicity claims present such a serious threat to free expression. *See Comedy III*, 25 Cal. 4th at 397.

To curb that threat, courts routinely have rejected right-of-publicity claims arising from the use of real-life individuals' names and likenesses in expressive works. And as the California Supreme Court emphasized in *Winter*, right-of-publicity claims against publishers of expressive works "can often [be] resolve[d] … as a matter of law simply by viewing the [defendant's] work in question" and applying the transformative-use (or other applicable) test. *Winter*, 30 Cal. 4th at 891 (emphasis added). By doing so, such claims are "often properly resolved on summary judgment or … even on demurrer[,]" or, by logical extension, on an anti-SLAPP motion. *Id.* at 892 (emphasis added).

No matter which defense is applied in this case – the incidental-use doctrine,
the constitutional public-interest defense, the transformative-use test, the
*Rogers/Restatement* test, or the statutory public-affairs exemption – Plaintiffs'
claims should be dismissed.

Accordingly, EA respectfully requests that this Court reverse the district
court's ruling, grant EA's anti-SLAPP motion, and dismiss Plaintiffs' claims
against EA with prejudice.

RESPECTFULLY SUBMITTED this 25th day of November, 2013.

> DAVIS WRIGHT TREMAINE LLP
> ALONZO WICKERS IV
> KAREN HENRY
> KATHLEEN CULLINAN
>
>
> By: /s/ Alonzo Wickers IV
>      Alonzo Wickers IV
>
> Attorneys for Defendant-Appellant
> ELECTRONIC ARTS INC.

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, appellant-defendant Electronic Arts Inc. is unaware of any related cases currently pending in this Court.

DWT 22968422v9 0058278-000029

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1. The brief is proportionately spaced in Times New Roman 14-point type. According to the word processing system used to prepare the brief, the word count of the brief is 11,594 words, not including the corporate disclosure statement, table of contents, table of authorities, certificate of service, and certificate of compliance.

DATED this 25th day of November, 2013.

DAVIS WRIGHT TREMAINE LLP
ALONZO WICKERS IV
KAREN HENRY
KATHLEEN CULLINAN


By: /s/ Alonzo Wickers IV
        Alonzo Wickers IV

Attorneys for Defendant-Appellant
ELECTRONIC ARTS INC.

**ADDENDUM OF PERTINENT CONSTITUTIONAL
PROVISIONS AND STATUTES**

DWT 23001323v1 0058278-000029

## TABLE OF CONTENTS

**Page**

First Amendment to the United States Constitution ....................................................1

Art. I, Sec. 2(a) of the California Constitution .........................................................1

California Civil Code Section 3344....................................................................1

California Code of Civil Procedure Section 425.16 ...................................................4

Restatement (Third) of Unfair Competition, § 46 ....................................................8

Restatement (Third) of Unfair Competition, § 47 ....................................................8

i

**First Amendment to the United States Constitution**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

**Art. I, Sec. 2(a) of the California Constitution**

Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.

**California Civil Code Section 3344**

(a) Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent, or, in the case of a minor, the prior consent of his parent or legal guardian, shall be liable for any damages sustained by the person or persons injured as a result thereof. In addition, in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a

1

result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages.  In establishing such profits, the injured party or parties are required to present proof only of the gross revenue attributable to such use, and the person who violated this section is required to prove his or her deductible expenses. Punitive damages may also be awarded to the injured party or parties.  The prevailing party in any action under this section shall also be entitled to attorney's fees and costs.

(b)  As used in this section, "photograph" means any photograph or photographic reproduction, still or moving, or any videotape or live television transmission, of any person, such that the person is readily identifiable.

(1)  A person shall be deemed to be readily identifiable from a photograph when one who views the photograph with the naked eye can reasonably determine that the person depicted in the photograph is the same person who is complaining of its unauthorized use.

(2)  If the photograph includes more than one person so identifiable, then the person or persons complaining of the use shall be represented as individuals rather than solely as members of a definable group represented in the photograph.  A definable group includes, but is not limited to, the following examples:  a crowd at

2

any sporting event, a crowd in any street or public building, the audience at any theatrical or stage production, a glee club, or a baseball team.

(3)  A person or persons shall be considered to be represented as members of a definable group if they are represented in the photograph solely as a result of being present at the time the photograph was taken and have not been singled out as individuals in any manner.

(c)  Where a photograph or likeness of an employee of the person using the photograph or likeness appearing in the advertisement or other publication prepared by or in behalf of the user is only incidental, and not essential, to the purpose of the publication in which it appears, there shall arise a rebuttable presumption affecting the burden of producing evidence that the failure to obtain the consent of the employee was not a knowing use of the employee's photograph or likeness.

(d)  For purposes of this section, a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under subdivision (a).

(e)  The use of a name, voice, signature, photograph, or likeness in a commercial medium shall not constitute a use for which consent is required under subdivision (a) solely because the material containing such use is commercially

3

sponsored or contains paid advertising.  Rather it shall be a question of fact whether or not the use of the person's name, voice, signature, photograph, or likeness was so directly connected with the commercial sponsorship or with the paid advertising as to constitute a use for which consent is required under subdivision (a).

(f)  Nothing in this section shall apply to the owners or employees of any medium used for advertising, including, but not limited to, newspapers, magazines, radio and television networks and stations, cable television systems, billboards, and transit ads, by whom any advertisement or solicitation in violation of this section is published or disseminated, unless it is established that such owners or employees had knowledge of the unauthorized use of the person's name, voice, signature, photograph, or likeness as prohibited by this section.

(g)  The remedies provided for in this section are cumulative and shall be in addition to any others provided for by law.

### California Code of Civil Procedure Section 425.16

(a)  The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.  The Legislature finds and declares that it is in the public interest to

4

encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

(b) (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

(2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

(3) If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding.

(c) (1) Except as provided in paragraph (2), in any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be

entitled to recover his or her attorney's fees and costs.  If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5.

(2)  A defendant who prevails on a special motion to strike in an action subject to paragraph (1) shall not be entitled to attorney's fees and costs if that cause of action is brought pursuant to Section 6259, 11130, 11130.3, 54960, or 54960.1 of the Government Code.  Nothing in this paragraph shall be construed to prevent a prevailing defendant from recovering attorney's fees and costs pursuant to subdivision (d) of Section 6259, 11130.5, or 54690.5.

(d)  This section shall not apply to any enforcement action brought in the name of the people of the State of California by the Attorney General, district attorney, or city attorney, acting as a public prosecutor.

(e)  As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written

6

or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

(f)  The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper.  The motion shall be scheduled by the clerk of the court for a hearing not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing.

(g)  All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section.  The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion.  The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision.

(h)  For purposes of this section, "complaint" includes "cross-complaint" and "petition," "plaintiff" includes "cross-complainant" and "petitioner," and "defendant" includes "cross-defendant" and "respondent."

(i)  An order granting or denying a special motion to strike shall be appealable under Section 904.1.

(j) (1) Any party who files a special motion to strike pursuant to this section, and any party who files an opposition to a special motion to strike, shall, promptly upon so filing, transmit to the Judicial Council, by e-mail or facsimile, a copy of the endorsed, filed caption page of the motion or opposition, a copy of any related notice of appeal or petition for a writ, and a conformed copy of any order issued pursuant to this section, including any order granting or denying a special motion to strike, discovery, or fees.

(2) The Judicial Council shall maintain a public record of information transmitted pursuant to this subdivision for at least three years, and may store the information on microfilm or other appropriate electronic media.

**Restatement (Third) of Unfair Competition, § 46**

**Appropriation of the Commercial Value of a Person's Identity: the Right of Publicity**

One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability for the relief appropriate under the rules stated in §§ 48 and 49.

**Restatement (Third) of Unfair Competition, § 47**

**Use for Purposes of Trade**

8

The name, likeness, and other indicia of a person's identity are used "for purposes of trade" under the rule stated in § 46 if they are used in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user. However, use "for purposes of trade" does not ordinarily include the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses.

COMMENTS & ILLUSTRATIONS:  Comment:

a.  Use in advertising.  The use of a person's identity for the purpose of advertising goods or services marketed by the user is a use "for purposes of trade" under the rule stated in § 46.  The interest of a seller in attracting attention to a commercial solicitation is not sufficient to overcome the personal and economic interests protected by the right of publicity.  Proof that prospective purchasers are likely to believe that the identified person endorses or sponsors the user's goods or services is not required for the imposition of liability.  Thus, the unauthorized use of another's name or likeness in newspaper or magazine advertisements, in television or radio commercials, or in other solicitations of prospective purchasers will ordinarily subject the user to liability for infringement of the other's right of publicity.  Appropriation of another's identity for use as a trademark or trade name is similarly actionable.  Unauthorized use of a person's identity in solicitations for

9

contributions or memberships by nonprofit entities such as charitable, educational, governmental, fraternal, and religious organizations also constitutes a use for purposes of trade.

In some circumstances the use of another's identity in advertising may not be actionable because of consent or other privilege. See § 46, Comment f. For example, use of a person's name or likeness for the purpose of identifying that person as the author or creator of the advertised goods is ordinarily permissible. Thus, a bookstore may include in its advertising the name and photograph of the author of an advertised book, and a movie theater may display the names and photographs of the actors appearing in the advertised motion picture. Use of another's name for the purpose of responding to statements made by that person about the user or the user's goods or services is also permissible.

The use of a person's identity in news reporting, commentary, entertainment, or works of fiction or nonfiction is not ordinarily an infringement of the right of publicity. See Comment c. Use of the person's identity in advertising or promoting such uses is also not actionable. Thus, the use of a celebrity's name or photograph in an advertisement for a biography of the celebrity or for a magazine containing an article about the celebrity will not subject the advertiser to liability for infringement of the celebrity's right of publicity. The rule allowing use of a person's identity to advertise a permissible use of the identity has been extended

beyond advertisements for the particular work or issue in which the identity is used to general advertising for the medium in which the use appears. A magazine soliciting subscriptions, for example, may refer to a past article about a particular celebrity as an illustration of the magazine's customary content. Use of another's identity in a manner that falsely suggests an endorsement by the identified person, however, will subject the user to liability for deceptive marketing under the rule stated in § 4.

Illustrations:

1. A is an actress. B, a pharmaceutical company, publishes without consent an advertisement containing a photograph showing A as she appeared in one of her motion pictures, with simulated dialogue discussing one of B's products. B is subject to liability to A for infringement of A's right of publicity under the rule stated in § 46.

2. A is a former child actor. B operates a tavern under a trade name identical to the nickname of A, without A's consent. A recognizable likeness of A appears on a sign outside the tavern and on merchandise and accessories used on the premises. B is subject to liability to A for infringement of A's right of publicity under the rule stated in § 46.

3. A, the conductor of a renowned symphony orchestra, is the subject of a biography published by B, a publishing company. B announces publication of the

book with an advertisement that contains A's name and photograph. B has not infringed A's right of publicity.

b. Use on merchandise. The sale of merchandise bearing a person's name or likeness ordinarily constitutes a use of the identity for purposes of trade under the rule stated in § 46. An unauthorized appropriation of another's name or likeness for use on posters, buttons, or other memorabilia is thus ordinarily actionable as an infringement of the right of publicity. Attempts to defend the sale of such merchandise on first amendment grounds through analogies to the marketing of books, magazines, and other traditional media of communication (see Comment c) have typically been rejected. In some circumstances, however, the informational content of the particular merchandise or its utility to purchasers as a means of expression may justify the conclusion that the use is protected under the first amendment. A candidate for public office, for example, cannot invoke the right of publicity to prohibit the distribution of posters or buttons bearing the candidate's name or likeness, whether used to signify support or opposition.

Illustration:

4. A is a well-known musician. B, a marketer of novelty items, sells posters depicting A performing at a recent concert. The posters were created from a photograph obtained by B from a news magazine. B does not have A's consent to

12

market the posters.  B is subject to liability to A for infringement of A's right of publicity under the rule stated in § 46.

c.  Use in news, entertainment, and creative works.  The right of publicity as recognized by statute and common law is fundamentally constrained by the public and constitutional interest in freedom of expression.  The use of a person's identity primarily for the purpose of communicating information or expressing ideas is not generally actionable as a violation of the person's right of publicity.  The scope of the activities embraced within this limitation on the right of publicity has been broadly construed.  Thus, the use of a person's name or likeness in news reporting, whether in newspapers, magazines, or broadcast news, does not infringe the right of publicity.  The interest in freedom of expression also extends to use in entertainment and other creative works, including both fiction and nonfiction.  The use of a celebrity's name or photograph as part of an article published in a fan magazine or in a feature story broadcast on an entertainment program, for example, will not infringe the celebrity's right of publicity.  Similarly, the right of publicity is not infringed by the dissemination of an unauthorized print or broadcast biography.  Use of another's identity in a novel, play, or motion picture is also not ordinarily an infringement.  The fact that the publisher or other user seeks or is successful in obtaining a commercial advantage from an otherwise permitted use of another's identity does not render the appropriation actionable.  However, if the

13

name or likeness is used solely to attract attention to a work that is not related to the identified person, the user may be subject to liability for a use of the other's identity in advertising. See Comment a. Similarly, if a photograph of the plaintiff is included in the defendant's publication merely for the purpose of appropriating the plaintiff's commercial value as a model rather than as part of a news or other communicative use, the defendant may be subject to liability for a merchandising use of the plaintiff's identity. See Comment b.

Some cases indicate that the right to use another's identity in news reports and similar works may be forfeited if the work contains substantial falsifications. Such cases, however, are more appropriately regarded as actions for defamation or for invasion of privacy by placing the plaintiff in a false light rather than for infringement of the right of publicity. When the imposition of liability turns on the truth or falsity of the defendant's statements, the defendant is also entitled to the constitutional safeguards that have been incorporated into the law of defamation and false light privacy.

Illustrations:

5. A is a well-known actress. B, a magazine publisher, places a photograph of A on the cover of an issue of the magazine. An article about A, consisting of several photographs and brief commentary, is included in the magazine. One of

14

the photographs is taken from a scene in a recent movie in which A appeared partially unclothed. B has not infringed A's right of publicity.

6. A is the subject of an unauthorized biography published by B. The biography is entitled "A" and contains a photograph of A on the dust jacket. The biography contains numerous false statements concerning facts and incidents in A's life. B has not infringed A's right of publicity. Whether B is subject to liability to A for the false statements contained in the biography is determined under the rules governing liability for defamation or invasion of privacy by placing another in a false light.

d. Limits of liability. The right of publicity has been extended in a few cases beyond advertising and merchandising uses to other substantial appropriations of a person's identity. Liability has been imposed, for example, in connection with an unauthorized broadcast of the plaintiff's performance or a sustained imitation of the plaintiff's performing style or performing persona that is marketed by the defendant as a simulation of the plaintiff's performance. If the defendant's appropriation falsely suggests the participation or endorsement of the plaintiff, liability may be imposed under the rules prohibiting deceptive marketing. See § 4. If the defendant has appropriated a work of authorship owned by the plaintiff, liability may be imposed for an infringement of federal statutory or state common law copyright. See § 38, Comment d. Broader restrictions on the use of

another's identity in entertainment, news, or other creative works threaten

significant public and constitutional interests. In an effort to balance the personal

and proprietary interests recognized by the right of publicity with the public

interests in free expression and in the creation of original works, some courts have

engaged in an analysis analogous to the determination of fair use in copyright law.

The substantiality and market effect of the appropriation have been analyzed in

light of the informational or creative content of the defendant's use. In cases of

imitation, the public interest in competition and in avoiding the monopolization of

successful styles, together with the interest in the production of new works

including parody and satire, will ordinarily outweigh any adverse effect on the

plaintiff's market. When the defendant's appropriation consists, not of an

imitation, but of an unauthorized broadcast or other reproduction of an actual

performance by the plaintiff, the greater likelihood of commercial injury to the

plaintiff and the reduced public interest in permitting the use may justify relief in

exceptional circumstances. Since the personal and proprietary interests underlying

the right of publicity (see § 46, Comment c) diminish after death, more substantial

appropriations may be permissible after the death of the identified person even in

jurisdictions in which the right is descendible. Statutes in some states can be

interpreted to permit the use of another's identity in news reporting or other

16

specified works without regard to the substantiality of the use or its effect on the plaintiff.

Illustrations:

7. B, the operator of a television station, broadcasts on its local news program a videotape of a "human cannonball" act performed by A, with favorable commentary. The videotape was made despite A's objection at one of a series of performances by A scheduled throughout the duration of the local county fair. The broadcast by B includes A's entire performance. A court may properly conclude in light of the substantiality and likely market effect of the appropriation that B is subject to liability to A for infringement of A's right of publicity under the rule stated in § 46.

8. The facts being otherwise as stated in Illustration 7, the broadcast by B occurs two years after A's death as part of a feature story on the history of the county fair. A's right of publicity is owned by A's son, C. A court may properly conclude in light of the absence of any injury to the personal interests of A and the minimal market effect of the appropriation on C that B is not subject to liability to C.

e. Liability of retailers and publishers. A retailer or distributor of merchandise that infringes a person's right of publicity has used the appropriated identity "for purposes of trade" under the rule stated in § 46. As in the case of

17

retailers and distributors of goods that infringe another's trademark (see § 36, Comment k), such persons are subject to liability for infringement of the right of publicity without regard to their knowledge or intent. See § 46, Comment e. However, the absence of an intent to infringe on the plaintiff's publicity rights remains relevant in determining appropriate relief. See § 49, Comment c.

Publishers and broadcasters who disseminate infringing advertisements on behalf of others should be subject to liability for infringement of the right of publicity only under conditions analogous to those governing the liability of such persons for trademark infringement. See § 26. Thus, absent knowledge that the advertisement is infringing, the liability of a publisher or broadcaster should not extend beyond an injunction against further publication. Cf. § 32(2) of the Lanham Act, 15 U.S.C.A. § 1114(2).

Ninth Circuit Case No.    12-15737


CERTIFICATE OF SERVICE


I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 25, 2013


I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Signature:  /s/ Carolina Solano