No. 12-15737

_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

MICHAEL E. DAVIS, aka Tony Davis; et al.,

*Plaintiffs – Appellees,*

v.

ELECTRONIC ARTS INC.,

*Defendant – Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of California
The Honorable Richard Seeborg
Case No. 10-cv-03328 RS

_____

## MOTION FOR LEAVE TO SUBMIT VIDEO-GAME CONSOLES, CONTROLLERS, AND VIDEO GAME AT ISSUE IN APPEAL

_____

DAVIS WRIGHT TREMAINE LLP
Alonzo Wickers IV (SBN 169454)
Karen Henry (SBN 229707)
Kathleen Cullinan (SBN 287604)
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

KEKER & VAN NEST, LLP
Robert Van Nest (SBN 84065)
R. James Slaughter (SBN 192813)
Adam Lauridsen (SBN 243780)
633 Battery Street
San Francisco, California 94111-1899
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant-Appellant
ELECTRONIC ARTS INC.

**Motion for Leave to Submit Video-Game Consoles, Controllers, and**

**Video Game at Issue in Appeal**

Pursuant to Federal Rule of Appellate Procedure 27 and Circuit Rule 27-14, defendant-appellant Electronic Arts Inc. ("EA") respectfully moves for leave to submit a Sony PlayStation 2 video-game console and corresponding controllers, a memory card, an Xbox video-game console and corresponding controllers, and three copies of the 2009 editions of EA's *Madden NFL* video game for PlayStation 2 and Xbox, to the Clerk of Court for distribution to the panel in this appeal.[1] Alternatively, pursuant to Circuit Rule 11-4, EA respectfully asks that the Court request transfer of these materials from the district court, where they were submitted as part of EA's request for judicial notice in connection with its special motion to strike.[2]

This appeal arises from the district court's March 29, 2012 Order Denying Defendant's Motions to Dismiss and to Strike Under CCP § 425.16.[3] In support of its motion to strike, EA submitted to the district court two copies of *Madden NFL*

---

[1] A photocopy of the cover of *Madden NFL 09* for Xbox is attached as **Exhibit 1**. A photocopy of the cover of *Madden NFL 09* for PlayStation 2 is attached as **Exhibit 2**. Upon leave from the Court, EA will promptly submit copies of the games.

[2] A copy of EA's request for judicial notice is attached as **Exhibit 3**.

[3] A copy of the district court's Order is attached as **Exhibit 4**.

1

*09*, the video game that is referred to in and forms the basis of Plaintiffs' First Amended Complaint. EA also provided the district court with a Sony PlayStation 2 video-game console and an Xbox game console, so that the court could review the contents of the video game. *See* Ex. 3; *see also* Ex. 4 at n.3; *see also E.S.S. Entm't 2000, Inc. v. Rock Star Videos*, 444 F. Supp. 2d 1012, 1016 n.10 (C.D. Cal. 2005) (declining to take judicial notice of content of video game that formed basis of plaintiff's complaint because defendant failed to provide court with video-game console and controllers for viewing games).

The district court took judicial notice of the PlayStation 2 and Xbox editions of *Madden NFL 09*. *See* Ex. 4 at n.3 ("taking judicial notice of *Madden NFL*'s content is appropriate because the authenticity of the material submitted by EA is not subject to dispute"). The district court's Order relies upon and specifically discusses the content of that video game. *See id.* at 8-9, 11, 13.

Accordingly, EA respectfully requests leave to submit to this Court the same materials that it submitted to the district court and that are part of the record on appeal: namely, the video-game console, controllers, and video game described above and in the district court's Order.[4] EA proposes to package these materials

---

[4] On November 22, 2013, EA's counsel left a voicemail for and sent an email to Plaintiffs' counsel, Brian Henri, inquiring whether Plaintiffs would oppose this Motion. To date, Mr. Henri has not responded to that inquiry.

DWT 22929371v2 0058278-000022

with the standard manufacturer's instructions for use of the game consoles and

controllers, and to deliver them to the Clerk's Office in San Francisco.[5]

RESPECTFULLY SUBMITTED this 22nd day of November, 2013.

DAVIS WRIGHT TREMAINE LLP
ALONZO WICKERS IV
KAREN HENRY
KATHLEEN CULLINAN


By: /s/ Alonzo Wickers IV
        Alonzo Wickers IV

Attorneys for Defendant-Appellant
ELECTRONIC ARTS INC.

---

[5] If this Court would like two additional sets of the materials, EA would be happy to provide them. EA also is willing to provide the Court with technicians to set up the consoles and/or to demonstrate the game at the Court's convenience.

# EXHIBIT 1



# EXHIBIT 2



# EXHIBIT 3

1    KEKER & VAN NEST LLP
     ROBERT A. VAN NEST - #84065
2    rvannest@kvn.com
     R. JAMES SLAUGHTER - #192813
3    rslaughter@kvn.com
     R. ADAM LAURIDSEN - #243780
4    alauridsen@kvn.com
     710 Sansome Street
5    San Francisco, CA  94111-1704
     Telephone:  (415) 391-5400
6    Facsimile:  (415) 397-7188

7    Attorneys for Defendant
     ELECTRONIC ARTS INC.

8

9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                       SAN FRANCISCO DIVISION

13

14   MICHAEL E. DAVIS, aka TONY DAVIS,        Case No. 10-CV-3328-RS
     VINCE FERRAGAMO, and BILLY JOE
15   DUPREE, on behalf of themselves and all  **ELECTRONIC ARTS INC.'S REQUEST**
     other similarly situated,                **FOR JUDICIAL NOTICE IN SUPPORT**
16                                             **OF MOTION TO DISMISS AND**
                              Plaintiffs,      **MOTION TO STRIKE PURSUANT TO**
17                                             **CCP 425.16**
          v.
18                                             Date:      August 25, 2011
     ELECTRONIC ARTS INC.,                     Time:      1:30 p.m.
19                                             Dept:      Courtroom 3, 17th Floor
                              Defendant.       Judge:     Hon. Richard Seeborg
20
                                               Date Comp. Filed:    July 29, 2010
21
                                               Trial Date: None
22

23

24

25

26

27

28

561578.01

1    In connection with its concurrently-filed Motion to Dismiss and Special Motion to Strike,

2   defendant Electronic Arts Inc. ("EA") respectfully requests that this Court take judicial notice of

3   the following materials and facts pursuant to Federal Rule of Evidence 201.

4          1.    The content of the PlayStation 2 and Xbox editions of the videogame *Madden*

5   *NFL 2009*, copies of which are authenticated in the Declaration of Philip Frazier and attached to

6   the Declaration as Exhibits A and B.  *See* Frazier Decl. ¶¶ 4-5; Exs. A & B. [1]

7          2.    The content of paragraphs 7 through 13 of the Frazier Declaration, summarizing

8   the content of the attached editions of *Madden NFL 09*.

9          3.    The "Order Re: Motion to Dismiss and Motion to Strike" issued in *Kent v.*

10   *Universal Studios, Inc. et al.*, United States District Court for the Central District of California,

11   Case No. CV08-2704 GAF, filed August 15, 2008.  A true and correct copy of the Order is

12   authenticated in the Declaration of Adam Lauridsen and attached to the Declaration as Exhibit A.

13          4.    The "Order Granting In Part Defendant's Motion to Dismiss" issued in *Brown v.*

14   *Electronic Arts Inc.*, United States District Court for the Central District of California, Case No.

15   2:09-cv-01598-FMC-RZx, filed September 23, 2009.  A true and correct copy of the order is

16   authenticated in the Declaration of Adam Lauridsen and attached to the Declaration as Exhibit B.

17          5.    The "Memorandum & Order Regarding Motion to Dismiss First Amended

18   Complaint" issued in *Stewart Surfboards, Inc. v. Disney Book Group*, United States District

19   Court for the Central District of California, Case No. CV 10-2982 GAF (SSx), filed May 11,

20   2011.  A true and correct copy of the order is authenticated in the Declaration of Adam

21   Lauridsen and attached to the Declaration as Exhibit C.

22

23

24

25

26

27

---

[1]    In accordance with this Court's electronic filing procedures, EA has manually filed
copies of these *Madden NFL* games and lodged gaming consoles for both platforms.

28

1

561578.01

1  Dated: June 9, 2011                           KEKER & VAN NEST LLP

2

3

4                                        By:  /s/ R. James Slaughter
                                              R. JAMES SLAUGHTER
5                                             R. ADAM LAURIDSEN
                                              Attorneys for Defendant
6                                             ELECTRONIC ARTS INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ELECTRONIC ARTS INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS
AND MOTION TO STRIKE PURSUANT TO CCP 425.16
CASE NO. 10-CV-3328-RS

561578.01

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

Federal Rule of Evidence 201(b) authorizes this Court to take judicial notice of any fact that is "not subject to reasonable dispute in that it is … capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Here, EA asks the Court to take judicial notice of (1) the content of the PlayStation 2 and Xbox editions of the videogame *Madden NFL 2009*; (2) the content of paragraphs 7 through 13 of the Frazier declaration summarizing the content of the attached editions of *Madden NFL 2009*; and (3) orders issued in the Central District of California cases *Kent v. Universal Studios, Inc., et al.*, Case No. CV08-2704 GAF (SHx), *Brown v. Electronic Arts Inc.*, Case No. 2:09-cv-01598-FMC-RZx, and *Stewart Surfboards, Inc. v. Disney Book Group*, Case No. CV 10-2982 GAF (SSx). Because these facts and materials are not subject to reasonable dispute, this Request should be granted.

### II.     ARGUMENT

**A.     The Court Should Take Judicial Notice of the Content of *Madden NFL 09*.**

Under the incorporation by reference doctrine, the Court "may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Dunn v. Castro*, 621 F.3d 1196, 1204 n.6 (9th Cir. 2010) (quotation and citation omitted; alteration in original). In ruling on a Rule 12(b)(6) motion, therefore, a court may consider materials referred to in the complaint, even if the plaintiff neglects to attach them. *See, e.g., In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (superseded by statute on other grounds) (*quoting Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (overruled on other grounds)).

Such materials may be introduced through a request for judicial notice pursuant to Federal Rule of Evidence 201. For example, in *Capcom Co., et. al. v. MKR Group, Inc.*, No. C. 08-0904 RS, 2008 WL 4661479, at *3 (N.D. Cal. Oct. 20, 2008), this Court took judicial notice of the video game "Dead Rising," which formed the basis of plaintiff's Lanham Act claim and was referred to extensively in the complaint. This Court explained that "[w]hile generally a

3

561578.01

1  court cannot consider material outside of the complaint when deciding a motion to dismiss under

2  Rule 12(b)(6), a court may consider … those documents whose contents are alleged in a

3  complaint and whose authenticity no party questions, but which are not physically attached to the

4  pleading." (Internal citations and quotations omitted).  Similarly, in granting a motion to dismiss

5  in *Thomas v. Walt Disney Co.*, No. C-07-4392 CW, 2008 WL 425647, at *2 and n.1 (N.D. Cal.

6  Feb. 14, 2008), *aff'd* 2009 WL 2011388 (9th Cir. 2009), the court took judicial notice of the

7  motion picture *Finding Nemo* based upon reference to the movie's contents in plaintiff's

8  complaint.[2]

9        Like the video game in *Capcom* and the motion picture in *Thomas*, the *Madden NFL 09*

10  game is repeatedly referred to in Plaintiffs' complaint and is central to their claims.  *See, e.g.*,

11  First Am. Compl. ¶¶ 4, 15-25, 75-79.  The complaint describes the content of the videogame, and

12  each of Plaintiffs' claims is premised on the allegation that his likeness, and those of other

13  former NFL players, are used in the game.  *Id.*  The Court, therefore, should take judicial notice

14  of the attached games and may consider the games' content in deciding the motion now before it.

15  **B.    The Court Should Take Judicial Notice of Specific Content and Features of *Madden***
16  **     *NFL 09* as Summarized in the Frazier Declaration.**

17        This Court may take judicial notice of specific content of *Madden NFL 09* as facts

18  "capable of accurate and ready determination by resort to sources whose accuracy cannot

19  reasonably be questioned."  Fed. R. Evid. 201(b)(2).  While the Court may verify the existence

20  of the described game content and features by reference to the works (which have been lodged

21  with the Court and are properly before it for the reasons described above), playing the games to

22  review the content and features could be a time consuming process.  *See, e.g., Capcom*, 2008 WL

23  _____

24  [2]      *See also Burnett v. Twentieth Century Fox*, 491 F. Supp. 2d 962, 966 (C.D. Cal. 2007)
(considering "documents specifically referred to in a complaint, though not physically attached
25  to the pleading," in dismissing plaintiff's common-law and statutory misappropriation claims,
among others, arising from a television program's use of an animated figure allegedly
26  resembling Carol Burnett); *Daly v. Viacom , Inc.*, 238 F. Supp. 2d 1118, 1121-22 (N.D. Cal.
2002) (considering television program referenced in, but not attached to, complaint); *Felix the*
27  *Cat Prods., Inc. v. New Line Cinema*, No. CV 99-9339 FMC (RCx), 2000 WL 770481, at *1-2
(C.D. Cal. April 28, 2000) (taking judicial notice of motion picture as "an authentic document
28  whose content is integral to plaintiff's claims but is not attached to the complaint.").

4

ELECTRONIC ARTS INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS
AND MOTION TO STRIKE PURSUANT TO CCP 425.16
CASE NO. 10-CV-3328-RS

561578.01

1   4661479, at *3; *Thomas*, 2008 WL 425647, at *2 and n.1; *E.S.S. Entm't 2000, Inc. v. Rock Star*

2   *Videos, Inc.*, 444 F. Supp. 2d 1012, 1016 (C.D. Cal. 2005).

3        The game summary provided by EA, found at Paragraphs 7 through 13 of the Frazier

4   Declaration, highlights specific content and features of the judicially noticeable games that are of

5   particular relevance to EA's motion.  The summary aims to save the Court the hours of game-

6   play likely needed to encounter the various content and features in each game.  In this way, the

7   Frazier Declaration serves as a Federal Rule of Evidence 1006 summary of voluminous

8   evidence.  *See* Fed. R. Evid. 1006 ("The contents of voluminous writings, recordings or

9   photographs which cannot be conveniently examined in court may be presented in the form of a

10  chart, summary, or calculation.").  The content of the game summary may be verified by

11  reviewing the underlying works, the games lodged with the Court.  Plaintiffs cannot reasonably

12  question the accuracy of the games as a source for verifying their features, since their own

13  complaint relies upon them for the same purpose.

14       The Court, therefore, should take judicial notice of Paragraphs 7 through 13 of the Frazier

15  Declaration summarizing content and features of the games at issue.

16  **C.    The Court Should Take Judicial Notice of Orders Filed in Cases from Other Courts.**

17       The Ninth Circuit has confirmed that "on a motion to dismiss, [courts] may take judicial

18  notice of matters of public record outside the pleadings."  *MGIC Indem. Corp. v. Weisman*, 803

19  F.2d 500, 504 (9th Cir. 1986) (taking judicial notice of a motion to dismiss and memorandum of

20  points and authorities filed in another action).  Consistent with this rule, courts routinely take

21  judicial notice of pleadings and orders from other proceedings.  *See, e.g.*, *Bhatia v. Corrigan*,

22  No. C. 07-2054 CW, 2007 WL 4365477, at *1 n.3 (N.D. Cal. December 12, 2007) (taking

23  judicial notice of record in another proceeding); *Jimenez v. Domino's Pizza*, 238 F.R.D. 241, 246

24  (C.D. Cal. 2006) (taking judicial notice of award of labor commissioner filed in another case, an

25  opinion letter of the Division of Labor Standards Enforcement, and several bankruptcy

26  petitions); *Schweitzer v. Scott*, 469 F. Supp. 1017, 1020 (C.D. Cal. 1979) (taking judicial notice

27  of court records filed in other civil actions).  The orders issued in *Kent v. Universal Studios*,

28  Lauridsen Decl., Ex. A, *Brown v. Electronic Arts Inc.*, *id.*, Ex. B, and *Stewart Surfboards Inc. v.*

5

1   *Disney Book Group, LLC*, *id.*, Ex. C, are no different than the judicial records that were found to

2   be proper subjects of judicial notice in *MGIC* and the other cases cited above.

3                                    **III.    CONCLUSION**

4         For these reasons, EA respectfully requests that the Court take judicial notice of the

5   materials and facts discussed above.

6   Dated:  June 9, 2011                              KEKER & VAN NEST LLP

7

8

9                                    By:  /s/ R. James Slaughter
                                          R. JAMES SLAUGHTER
10                                        R. ADAM LAURIDSEN
                                          Attorneys for Defendant
11                                        ELECTRONIC ARTS INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ELECTRONIC ARTS INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS
AND MOTION TO STRIKE PURSUANT TO CCP 425.16
CASE NO. 10-CV-3328-RS

561578.01

# EXHIBIT 4

**\*\*E-filed 3/29/12\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL E. DAVIS, aka TONY DAVIS, VINCE FERGAMMO, and BILLY JOE DUPREE, on behalf of themselves and all other similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>ELECTRONIC ARTS INC.,<br><br>      Defendant.<br>_____/ | No. 10-03328 RS<br><br>**ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS AND TO STRIKE UNDER CCP § 425.16** |

## I. INTRODUCTION

Former National Football League ("NFL") players Michael Davis, Vince Ferragamo, and Billy Joe Dupree bring this putative class action against videogame developer Electronic Arts Inc. ("EA"), alleging their likenesses were used without authorization in the EA video game, *Madden NFL*. Defendants move to dismiss the first amended complaint ("FAC") under Federal Rule of Civil Procedure 12(b)(6) and, separately, move to strike the complaint pursuant to California's Anti-SLAPP law. Upon consideration of the briefs, oral argument, and for the reasons explained below, both of defendant's motions must be denied.

## II. FACTUAL & PROCEDURAL BACKGROUND

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

1    EA is a leading developer and publisher of video games. Plaintiffs, three retired NFL

2    players, contend EA used their likenesses in its video game *Madden NFL*. According to plaintiffs,

3    EA's *Madden NFL* franchise is the best-selling sports video game of all time, with sales of more

4    than 85 million copies and revenues in excess of $4 billion. The company has released a new

5    version of *Madden NFL* each year for approximately twenty years, including editions tailored to

6    different gaming systems. The FAC alleges that at least five editions of *Madden NFL*, designed for

7    distinct gaming consoles, and released over a number of years, use plaintiffs' likenesses without

8    authorization.[1] FAC ¶ 75.

9    *Madden NFL* permits users to simulate an NFL football game. The game is elaborate and

10   entails many creative and expressive features, including extensive audiovisual effects. EA itself

11   represents *Madden NFL* as highly realistic. It features depictions of actual stadiums, as well as

12   current teams, with accurate rosters, colors, logos, and uniforms. FAC ¶ 25-27. According to the

13   FAC, many of these game elements are covered by licensing deals. For example, EA has licensed

14   the rights to use active players' likenesses and biographical information, and holds similar licenses

15   covering coaches, announcers, and select retired players. According to the FAC, it was publicly

16   reported that EA paid the licensing division of the NFL Players Association approximately $35

17   million for the use of active players' likenesses.

18   Significantly, for purposes of this action, those playing *Madden NFL* may select specific

19   teams to compete against each other. Plaintiffs allege that some recent versions of the game even

20   permit gamers to choose famous "historical" teams, with rosters populated by players closely

21   resembling NFL retirees, including plaintiffs Davis, Ferragammo, and Dupree. At least in the most

22   recent versions of the game, the avatars allegedly representing former players are not identified by

23   name or jersey number.[2] According to the FAC, however, the representative avatars are

24

25   [1] According to EA, only the editions designed for the Sony Playstation 2 and the Microsoft Xbox
     gaming consoles feature the "historic" players at issue in this action. For purposes of defendant's
26   motion to dismiss, however, the Court must accept plaintiffs' allegations as true. *See also infra* note
     4 (addressing cross-motions for judicial notice).
27   [2] According to plaintiffs, in older versions of *Madden NFL*, EA accurately listed most retired
     players' jersey numbers. It stopped that practice in 2004, listed different numbers, and added
28   functionality permitting gamers to change the historic players' numbers themselves. Players' names
     may now also be edited. *See* Henri Decl. in Supp. of Pls.' Opp'n, Ex. 7 (*Madden NFL* official guide

1  preprogrammed by EA to reflect accurately a variety of individual, physical and biographical

2  characteristics that precisely correspond to the plaintiffs' own profiles as active players – including

3  height, weight, skin tone, position, team, years in the league, and athletic ability (speed, agility,

4  etc.). Notably, for purposes of its present motions, EA accepts plaintiffs' allegations that it used

5  some protectable element of plaintiffs' likenesses in *Madden NFL*.

6        Plaintiffs filed this putative class action on behalf of themselves and approximately 6,000

7  other former NFL players whose likenesses, they claim, appear in certain editions of *Madden NFL*.

8  The FAC advances five claims for relief: (1) violations of California's statutory right of publicity,

9  California Civil Code § 3344, (2) violations of California's common law right of publicity, (3)

10 conversion, (4) trespass to chattels, and (5) unjust enrichment. Discovery is ongoing. Defendants

11 now move to dismiss with prejudice, and separately, to strike under California's Anti-SLAPP law[3]

12 which plaintiffs oppose.[4]

13

14 for the 2007 to 2008 versions noted, with respect to historical players, "[t]he players do not have
   their actual names but you can edit them if you want optimum realism.").

15 [3] In support of its motions, EA requests judicial notice of: (1) the content of the Playstation 2 and
   Xbox editions of *Madden NFL*, (2) ¶¶ 7-13 of the Frazier Declaration, (3) and district court orders

16 disposing of motions to dismiss in *Kent v. Universal Studios, Inc., et al.*, No. C08-2704, *Brown v.*
   *Elec. Arts Inc.*, No. C09-1598, and *Stewart Surfboards, Inc. v. Disney Book group*, No. C10-2982.

17 Although the Court is ordinarily limited to considering the pleadings and any attached exhibits upon
   a motion to dismiss, here, taking judicial notice of *Madden NFL*'s content is appropriate because the

18 authenticity of the material submitted by EA is not subject to dispute. *Keller v. Electronic Arts,*
   *Inc.*, 2010 WL 530108, at *5 n.2. The Court may also take judicial notice of the district court

19 opinions, since they are matters of public record. *See* Fed. R. Evid. 201(b), *and Lee v. City of Los*
   *Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). The Frazier Declaration simply describes *Madden*

20 *NFL* in terms favorable to EA. Plaintiffs oppose judicial notice of the Frazier Declaration because it
   also contains statements that the FAC specifically contradicts. Having reviewed *Madden NFL*, there

21 is no reason to take judicial notice of the contents of the Frazier Declaration, and EA's request is
   denied to that extent.

22 [4] Plaintiffs have also filed a motion requesting judicial notice of: (1) briefs, declarations, and expert
   reports and testimony offered by EA in a number of other cases, (2) two licensing agreements

23 between EA and NFL-related entities, (3) official media guides from several NFL teams, (4)
   numerous screen shots from *Madden NFL*, (5) various printouts from EA's website, and (6) the

24 official EA user guides for *Madden NFL* from 2001 to 2009. EA opposes notice of all but the
   screen shots, which are hereby noticed by the Court because their authenticity is not disputed. The

25 court filings plaintiffs submit are all matters of public record and are therefore also amenable to
   judicial notice. Fed. R. Evid. 201(b). The FAC alleges, and the Court accepts for purposes of the

26 instant motions, that EA has entered into various licensing agreements with the NFL Players
   Association and other NFL entities. It is not necessary to take notice of their contents. The same is

27 true for the NFL team media guides; plaintiffs have alleged, and it is undisputed for purposes of this
   motion, that *Madden NFL* misappropriated plaintiffs' likenesses. While accepting statements by EA

28 alleged in the complaint, the Court need not take judicial notice of other statements made on EA's
   website or in the game user guides to resolve the instant motions because how the *Madden NFL* was

**United States District Court**
For the Northern District of California

### III. LEGAL STANDARD

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555) ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory statements," are not taken as true). In dismissing a complaint, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

### IV. DISCUSSION

A. Motion to Dismiss

    1. California Rights of Publicity

The FAC's first and second claims for relief articulate violations of plaintiffs' California statutory and common law rights of publicity. To state a right of publicity claim under California common law, plaintiffs must allege: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Hilton v. Hallmark Cards*, 580 F.3d 874, 889 (9th Cir. 2009) (quoting *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001)). The statutory right is created by Civil Code § 3344(a), which provides, in relevant part:

---

marketed is legally irrelevant. *See Winter v. DC Comics*, 30 Cal. 4th 881, 891 (2003). As for these materials, the motion is denied.

> Any person who knowingly uses another's name, voice, signature, photograph, or
> likeness, in any manner, on or in products, merchandise, or goods, or for purposes of
> advertising or selling, or soliciting purchases of, products, merchandise, goods or
> services, without such person's prior consent ... shall be liable for any damages
> sustained by the person or persons injured as a result thereof.

To establish the statutory right, plaintiff must show, in addition to the common law elements, a

knowing use of the plaintiff's name or likeness. *Kirby*, 144 Cal. App. 4th at 55.  For purposes of

these motions, however, neither party argues that there is any material distinction between plaintiffs'

statutory and common law claims, and as a result, they rise or fall together.  Rather than challenge

the sufficiency of the pleadings, EA contends that plaintiffs' claims must fail as a matter of law

because they are barred by the First Amendment.[5]  Alternatively, EA contends plaintiff's claims are

barred by California's public interest exception or by the public affairs exception to California's

statutory right of publicity.

> a. Transformative Use Test

Faced with a right of publicity claim based on an expressive work, EA raises the

"affirmative defense that the work is protected by the First Amendment inasmuch as it contains

significant transformative elements or that the value of the work does not derive primarily from the

celebrity's fame."  *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 407 (2001).  The

California Supreme Court first articulated the "transformative" use test in *Comedy III*.  As the Court

explained, under applicable California law, this "transformative" use test "is essentially a balancing

test between the First Amendment and the right of publicity based on whether the work in question

adds significant creative elements so as to be transformed into something more than a mere celebrity

likeness or imitation."  *Id.* at 391.

In *Comedy III*, the Court recognized that because "celebrities take on personal meanings to

many individuals in the society, the creative appropriation of celebrity images can be an important

avenue of individual expression."  *Id.* at 397.  For example, a fictional film based on the life of a

celebrity is afforded First Amendment protection, as against the subject's right of publicity claim.

*See Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 868 (1979) (barring publicity claims

---

[5] Although reaching a constitutional issue or argument is generally disfavored, it is appropriate to
consider the question where, as here, defendant contends that merely proceeding with this litigation
would chill its speech rights. *Winter v. D.C. Comics*, 30 Cal. 4th 881, 891 (2003).

No. C 10-03328 RS
ORDER DENYING MOTIONS TO DISMISS AND TO STRIKE

5

United States District Court
For the Northern District of California

1    brought by putative heirs of Rudolph Valentino based on fictionalized film portraying Valentino's

2    life).  Nonetheless, the Court in *Comedy III* went on to hold, "depictions of celebrities amounting to

3    little more than the appropriation of the celebrity's economic value are not protected expression

4    under the First Amendment." *Id.* at 400.  It further explained, "when an artist's skill and talent is

5    manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to

6    commercially exploit his or her fame, then the artist's right of free expression is outweighed by the

7    right of publicity." *Id.* at 408.  In such cases, "[t]he right-of-publicity holder [may still] enforce the

8    right to monopolize the production of conventional, more or less fungible, images of the celebrity."

9    *Id.* at 405; *see also id.* at 402 ("[The] strongest case for a 'right of publicity'" claim arises where

10   plaintiff's work constitutes "the appropriation of the very activity by which the entertainer acquired

11   his reputation in the first place" (citation omitted)).

12        The essence of the "transformative" use test is: "An artist depicting a celebrity must

13   contribute something more than a merely trivial variation, but create something recognizably his

14   own, in order to qualify for legal protection." *Id.* at 408.  Although courts consistently require some

15   transformation to confer First Amendment protection, the case law makes clear the analysis does not

16   turn on the quality of the accused work, or the message conveyed. *Id.* at 407 ("[I]n determining

17   whether the work is transformative, courts are not to be concerned with the quality of the artistic

18   contribution – vulgar forms of expression fully qualify for First Amendment protection.").

19   Protected transformations of celebrity likenesses "are not confined to parody and can take many

20   forms, from factual reporting to fictionalized portrayal, from heavy-handed lampooning to subtle

21   social criticism." *Id.* at 406 (citations omitted).

22        Consistent with this rubric, in *Comedy III*, the Court permitted the Three Stooges to proceed

23   with claims against defendant for selling lithographs and t-shirts which bore "literal, conventional

24   depictions" of the famous comedians, drawn in charcoal.  Although defendant maintained that his

25   portraiture necessarily involved some creative decisions, and thus could not be considered a literal

26   reproduction of plaintiffs' likenesses, the Court rejected that categorical position. *Id.* at 408-409.

27   Purportedly without judging the quality of the work, it found that defendant was engaged in merely

28   merchandising plaintiffs' images, and distinguished the works from more expressive reproductions

United States District Court
For the Northern District of California

1  of celebrity portraits, such as Andy Warhol's silkscreen portraits of celebrities. *Id.* Noting that the

2  value of the accused works in *Comedy III* derived primarily from plaintiffs' fame, and appeared to

3  be merely "conventional celebrity images," the Court perceived no other transformative element,

4  and as a result, permitted plaintiffs to proceed on their claims. *Id.* at 409-410.

5      On the other hand, in *Winter*, the Supreme Court barred claims brought by country

6  musicians Johnny and Edgar Winter against DC Comics for sale of a comic book featuring "brothers

7  Johnny and Edgar Autumn, depicted as villainous half-worm, half-human offspring born from the

8  rape of their mother by a supernatural worm creature that had escaped from a hole in the ground."

9  *Winter v. DC Comics*, 30 Cal. 4th 881, 886 (2003). According to plaintiffs, they were represented

10  as "vile, depraved, stupid, cowardly, subhuman individuals who engage in wanton acts of violence,

11  murder and bestiality for pleasure and who should be killed." *Id.* The Court easily found that these

12  depictions, though "less than subtle evocations" of the plaintiffs, did not depict them literally and

13  instead were "distorted" caricatures appearing "in a larger story, which is itself quite expressive."

14  *Id.* at 890. While noting that the comic would not impair plaintiffs' ability to market their

15  likenesses, the Court also held it irrelevant that "defendants were trading on plaintiffs' likenesses

16  and reputations to generate interest in the comic book series and increase sales." *Id.* at 891.

17      While the facts in the instant action present a closer case than does either *Comedy III* or

18  *Winter*, a growing number of authorities have now addressed the issue in the context of video

19  games, in circumstances that are materially indistinguishable from the case at bar. In a recent case

20  also before the Northern District of California, the quarterback of Arizona State University sued EA

21  for using his likeness in its *NCAA Football* videogame. *Keller v. Elec. Arts, Inc.*, No. 09-1967, 2010

22  WL 530108, at *5 (N.D. Cal. Feb. 8, 2010). There, as here, plaintiff was represented realistically by

23  EA in both physical and biographical respects. *Id.* As the court noted, "EA does not depict Plaintiff

24  in a different form; he is represented as what he was: the starting quarterback for Arizona State

25  University." *Id.* In addition, "the game's setting is identical to where the public found Plaintiff

26

27

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    during his collegiate career: on the football field." EA has not attempted to explain how that case

2    differs from this one, and instead merely notes that the *Keller* decision is on appeal.[6]

3         EA argues here, as it did in *Keller*, that the videogame, taken as a whole, contains

4    transformative elements. Relying heavily on *Comedy III*, EA characterizes plaintiffs' likenesses

5    merely as the "raw materials" from which *Madden NFL* is fashioned. While there is no question

6    that video games qualify for First Amendment protection, *Video Software Dealers Ass'n v.*

7    *Schwarzenegger*, 556 F.3d 950, 958 (9th Cir. 2009), and *Madden NFL* certainly encompasses

8    significant expressive elements, this basic proposition does not end the inquiry. *Id.* at 408-09. A

9    review of the applicable authority indicates that the "transformative" use test focuses on the

10   reproduction of plaintiff's likenesses, rather than on a canvassing of the larger work. *See Winter*, 30

11   Cal. 4th at 886, *and Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 59 (2006) (plaintiff's likeness

12   was adequately transformed by dissimilar physique, different costumes, and portrayal as a space-age

13   news reporter in the 25th century). It would make little sense for the rule to be otherwise: if, as EA

14   urges, any expressive elements within the larger work were somehow to "transform" an otherwise

15   conventional use of a celebrity's likeness, the right of publicity would effectively be eviscerated.

16   This conclusion is not inconsistent with judicial decisions protecting fictionalized portrayals of

17   celebrities' life stories in film or other media. *See, e.g., Guglielmi*, 25 Cal. 3d at 868. In *Guglielmi*,

18   for example, Rudolph Valentino's likeness was not used within the film for conventional

19   merchandising purposes, but only for the transformative purpose of representing a fictionalized

20   version of Valentino's storied life.

21        It follows that the weight of authority rests with plaintiffs. As in *Keller*, plaintiffs here

22   appear in *Madden NFL* in their conventional role as football players, playing football. If there is

23   any expressive significance inhering in EA's depiction of plaintiffs, defendant has failed to

24   articulate it. Although EA appears to claim that its mere projection of plaintiffs' likenesses into

25   avatar figures, capable of manipulation by gamers, is sufficient to confer constitutional protection,

26

27   _____
     [6] EA's appeal was argued and submitted to the Ninth Circuit in February of 2011. A decision by the
28   governing Circuit Court in that case will no doubt provide important guidance for the pending action
     and, indeed, perhaps for this motion in particular. That said, it would not be fair to the litigants in
     this case to defer a determination on the pending motions indefinitely.

United States District Court
For the Northern District of California

1   another way to see this supposed transformation is as a relatively literal, if skilled, translation of

2   plaintiffs' conventional images into the medium of the video game.  In this sense, EA's use of

3   plaintiffs' likenesses, though highly sophisticated, is the digital equivalent of transferring the Three

4   Stooges' images onto a t-shirt.  *See generally Comedy III*, 25 Cal. 4th at 408-10.  *Guglielmi* does not

5   compel a different result.  25 Cal. 3d at 868.  There, the accused work was a fictionalized film

6   account of Valentino's life story.  Although the opinion does not expressly state as much, had the

7   film at issue instead been an "appropriation of the very activity by which the entertainer acquired his

8   reputation in the first place," such as an uninflected reproduction of some of Valentino's famous

9   performances on screen, there likely would have been a stronger case for plaintiff's publicity claims.

10  *Cf. Comedy III*, 25 Cal. 4th at 402 (quoting *Estate of Presley v. Russen* 513 F. Supp. 1339, 1361 (D.

11  N.J. 1981)).  Here, as noted, plaintiffs' likenesses are shown engaged in the activity—playing

12  football—which earned them fame.  Although it is true that plaintiffs' likenesses, as they appear in

13  *Madden NFL*, may be controlled by gamers playing the video game, this fact, without more, does

14  not change the analysis.

15          Prior cases agree.  As the California Court of Appeal recently explained, addressing the use

16  of celebrity likenesses in the popular video game *Band Hero*:

17          That the avatars can be manipulated to perform at fanciful venues including outer
            space or to sing songs the real band would object to singing, or that the avatars appear
18          in the context of a videogame that contains many other creative elements, does not
            transform the avatars into anything other than exact depictions of [band] members
19          doing exactly what they do as celebrities.

20  *No Doubt v. Activision Pub., Inc.*, 192 Cal. App. 4th 1018, 1034 (2011).  The holding in *No Doubt*

21  thus went well beyond what is required here.  There, the court deemed even fairly significant

22  "distortions" to plaintiffs' likenesses to be non-transformative.  In *Madden NFL*, the depiction of

23  plaintiffs is not altered to nearly the same degree, and in fact, the realistic depiction of plaintiffs

24  achieved by EA appears to be restricted chiefly by the inherent limitations of the medium.  The logic

25  of *No Doubt* applies easily and squarely to the facts at bar.  EA's claim that its alleged use of

26  plaintiffs' likeness is transformative, and thus protected, fails.

27          b. *Rogers* Test

28

1    Alternatively, EA invites adoption of the Second Circuit's *Rogers* test.[7]  *Rogers v. Grimaldi,*

2  875 F.2d 994, 996-97 (2d Cir. 1989).  Under *Rogers,* the first step is to determine whether the use of

3  plaintiffs' image is minimally relevant to the underlying work.  *Id.* at 1100.  If so, the use is

4  permitted so long as it poses no risk of confusion to consumers.  *Id.*  As the substance of the *Rogers*

5  test makes clear, it was primarily formulated in the context of evaluating a Lanham Act claim, and

6  only secondarily, for application to the right of publicity.  Although EA invokes several California

7  federal district court cases that have applied *Rogers'* analysis to the use of trademarks,  *see, e.g.,*

8  *Brown v. Elec. Arts, Inc.*, No. 09-1598 (E.D. Cal. Sept. 23, 2009) (slip op.), no California federal

9  courts have extended its application to California's statutory right of publicity.  It would be fairly

10  extraordinary to do so here.  EA's invitation must be declined.

11    c. Public Interest Test

12    Unable to meet the transformative use or *Rogers* tests, defendant argues that its use of

13  plaintiffs' likenesses in *Madden NFL* is protected because it concerns a matter of public interest.

14  "Under California law, 'no cause of action will lie for the publication of matters in the public

15  interest, which rests on the right of the public to know and the freedom of the press to tell it.'"

16  *Hilton,* 580 F.3d at 892 (quoting *Montana v. San Jose Mercury News, Inc.,* 34 Cal. App. 4th 790,

17  793 (1995)).

18    It is true that the reporting and discussion of factual information about professional sports

19  implicates the public interest.  In *Gionfriddio v. Major League Baseball*, a declaratory action

20  brought by four former professional baseball players against the league itself, the court considered

21  plaintiff's right of publicity claims, as applied to the league's website, which "provides historical

22  information about major league baseball including rosters, box scores, game summaries, lists of

23  award winners, and video clips of historic moments from past games."  94 Cal. App. 4th 400, 405

24  (2001).  The *Gionfriddio* court held that "[t]he recitation and discussion of factual data concerning

25  the athletic performance of these plaintiffs commands a substantial public interest, and therefore

26  [are] a form of expression due substantial constitutional protection."  *Id.* at 411 (citation omitted).

---

[7] EA notes that the Ninth Circuit has expressly reserved the question of whether First Amendment protection may be broader than the California Supreme Court recognized in *Comedy III.  Hilton,* 599 F.3d at 909 n.11.

1   *See also Montana*, 34 Cal. App. 4th at 796 (discussing a poster of the front page of a newspaper

2   which featured the Superbowl-winning quarterback).

3       Here, *Madden NFL* indeed includes some historical facts concerning plaintiffs' biographical

4   information and performance statistics.  The alleged use of plaintiffs' likenesses in the game,

5   however, goes well beyond simply reporting or republishing "statements of historical fact,

6   descriptions of these facts or video depictions of them," and there is very little in the game that

7   resembles any kind of traditional reporting.  *Gionfriddio*, 94 Cal. App. 4th at 415.  Notably, this is

8   not necessarily fatal, even though some courts have assumed the public interest doctrine applies

9   only to reporting.  *See, e.g., Hilton*, 599 F.3d at 912 (public interest defense is limited to

10  "publication of newsworthy items"); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 543

11  (applying exemption to surf documentary).  Defendant accurately states that *Gionfriddio* and other

12  courts have recognized "[e]ntertainment features receive the same constitutional protection as

13  factual news reports."  94 Cal. App. 4th at 410.  *See also Zacchini v. Scropps-Howard Broad. Co.*,

14  433 U.S. 562, 578 (1977) (applying public interest analysis to circus performer).  It is not difficult to

15  conclude that the free speech protections encompass entertainment, and EA argues, persuasively,

16  that videogames are interactive "entertainment."  Yet, "these protections are not absolute" and

17  *Madden NFL* simply does not appear to fulfill the traditional informative role recognized as

18  deserving protection by the court. *Keller*, 2010 WL 530108, at *6; *see generally Dora*, 15 Cal. App.

19  4th at 543, ("[M]atters in the public interest are not 'restricted to current events; magazines and

20  books, radio and television may legitimately inform and entertain the public with the reproduction

21  of past events, travelogues and biographies.'").

22      While EA's publication of plaintiffs' biographical facts and performance statistics might

23  warrant protection under the reporting criterion, the game play of *Madden NFL*, for all its realism,

24  does not "report," or even recreate, recent or historical games.  Rather, as EA itself emphasizes,

25  each game in *Madden NFL* lies within the gamers' control, and is unique and new.  When a gamer

26  selects one of *Madden NFL*'s "historic teams," the only historical aspect of the game that ensues are

27  plaintiffs' likenesses.  Everything else is simply play.

28

*(sidebar, left margin)* United States District Court — For the Northern District of California

1    In an attempt to address this reality, EA invokes *C.B.C. Distributing & Marketing, Inc. v.*

2  *Major League Baseball Advanced Media L.P.*, in which the Eighth Circuit held that defendants'

3  "fantasy" league products were protected under Missouri law.  In fantasy leagues, sports enthusiasts,

4  acting as owners, assemble rosters of professional players and then compete statistically "on paper,"

5  based on their players' actual performances.  The accused fantasy system employed the real names,

6  statistics, and other biographical information, of professional baseball players to facilitate

7  competition.  505 F.3d 818, 823-24 (8th Cir. 2007).

8    Although there are some compelling similarities between fantasy league products and

9  *Madden NFL*, unlike the latter, competition in fantasy leagues actually turns on the players' reported

10  performance, and for this reason much more easily fits as a kind of discourse concerning statistical

11  facts.  In addition, as the *C.B.C.* court held:

> … the facts in this case barely, if at all, implicate the interests that states typically
> intend to vindicate by providing rights of publicity to individuals. Economic interests
> that states seek to promote include the right of an individual to reap the rewards of his
> or her endeavors and an individual's right to earn a living. … major league baseball
> players are rewarded, and handsomely, too, for their participation in games and can
> earn additional large sums from endorsements and sponsorship arrangements.

505 F.3d at 824.  Here, by contrast, EA's decision to use plaintiffs' likenesses in *Madden NFL*

clearly implicates recognized economic interests, as evidenced by the case law discussing the use of

celebrities in video games, and EA's other licensing agreements that cover the game.  *Keller*, which

is again directly on point, comes to the same conclusion: *Madden NFL* does not pass the public

interest test under California courts' jurisprudence.  *Keller*, 2010 WL 530108, at *5-6

(distinguishing *C.B.C.* because the video game did not "depend on updated report of the real-life

players' progress during the college football season").

### d. Section 3344(d)

Finally, EA contends that its use of plaintiffs' likenesses is exempt from liability under

California Civil Code § 3344(d).  That section provides immunity for the "use of a name … or

likeness in connection with any news, public affairs, or sports broadcast or account…." Cal. Civ.

Code § 3344(d).  The Ninth Circuit has suggested that § 3344(d) immunity is intended to sweep

more broadly than the First Amendment.  *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d

United States District Court
For the Northern District of California

1   302, 310 n. 10 (9th Cir. 1992) (citing *Eastwood v. Superior Court,* 149 Cal. App. 3d 409, 421

2   (1983)) ("[The provision] is designed to avoid First Amendment questions in the area of

3   misappropriation by providing extra breathing space for the use of a person's name in connection

4   with matters of public interest"). Again, there is little room for debate as to whether the use of

5   photographs and videos of professional athletes, as well as statistics summarizing their performance,

6   concern "public affairs" within the meaning of § 3344(d). *See Gionfriddo,* 94 Cal. App. 4th at 319;

7   *Dora,* 15 Cal. App. 4th at 545 ("'public affairs' was intended to mean something less important than

8   news"); *accord Keller,* 2010 WL 530108, at *7 (college athletics, including NCAA football, qualify

9   as "public affairs"). Plaintiffs, however, contend § 3344(d) immunizes only reporting on, or

10  informative uses of, celebrity likenesses, as under the First Amendment's public interest test.[8]

11        In *Dora*, the California Court of Appeal held that although the term "public affairs" reaches

12  matters less significant than the news, nonetheless, "[p]ublic affairs must be related to real-life

13  occurrences. As has been established in the cases involving common law privacy and appropriation,

14  the public is interested in and constitutionally entitled to know about things, people, and events that

15  affect it." Cal. App. 4th at 545-46. Although EA argues *Madden NFL* relates to "public affairs,"

16  broadly understood, under *Dora*'s logic it is difficult to see how EA can prevail under § 3344(d).

17  Other than a minimal amount of preprogrammed statistical information concerning each player,

18  game play does not report or relate "real-life occurrences." It is, rather, entirely fictional. In *Keller*,

19  this Court reached the same conclusion: "Although NCAA Football is based on subject matter

20  considered 'public affairs,' EA is not entitled to the statutory defense because its use of Plaintiff's

21  image and likeness extends beyond reporting information about him." 2010 WL 530108, at *7. As

22  a result, EA's motion to dismiss must be denied on this reasoning as well.

23        2. Conversion & Trespass to Chattels

24        Given that plaintiffs' first two claims survive, EA's only remaining challenge to the third

25  and fourth claims, for conversion and trespass to chattels, respectively, is that plaintiffs have failed

26  to plead that EA dispossessed them of an interest in tangible personal property. Such an allegation

27  _____

28  [8] Section 3344(d) remains distinct from the public interest doctrine because the former specifically
    enumerates certain immunized activities for particular contexts. *New Kids on the Block*, 971 F.2d at
    310 n.10.

United States District Court
For the Northern District of California

1    is required, EA claims, to satisfy the merger requirement, which mandates that the intermeddled

2    interest be merged with some tangible property. *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559,

3    1565 (1996) ("Courts have traditionally refused to recognize as conversion the unauthorized taking

4    of intangible interests that are not merged with, or reflected in, something tangible").  As plaintiffs

5    properly point out, however, California courts no longer apply the merger requirement, and have

6    instead indicated a willingness to entertain conversion and trespass to chattels claims, even where

7    the alleged interference is to an intangible interest.  For example, in *Kremen v. Cohen*, plaintiff

8    asserted a conversion claim with respect to his intangible interest in a domain name. 337 F.3d 1024,

9    1034 (9th Cir. 2003).  Reversing the district court's dismissal based on the absence of a showing of

10   merger, the Ninth Circuit held: "We conclude that California does not follow the *Restatement*'s

11   strict merger requirement.  Indeed, the leading California Supreme Court case rejects the tangibility

12   requirement altogether." *Id.* (citing *Payne v. Elliot*, 54 Cal. 339 (1880)); *see also A&M Records,*

13   *Inc. v. Heilman*, 75 Cal. App. 3d 554, 570 (1977) (holding, without applying merger rule, that

14   "misappropriation and sale of the intangible property of another without authority from the owner is

15   conversion").  Accordingly, the merger requirement does not provide a basis to dismiss plaintiffs'

16   ancillary claims.

17        3. Unjust Enrichment

18        Finally, EA contends that plaintiffs' fifth claim for relief for unjust enrichment is not

19   recognized under California law absent independent grounds for imposing a constructive trust.

20   Importantly, plaintiffs' FAC does allege that "EA is an involuntary trustee holding all such sums in

21   its possession under a constructive trust for the benefit of Plaintiffs and the Class …." FAC ¶ 82.

22   Thus, EA's contention that plaintiffs have not alleged the propriety of a constructive trust is simply

23   incorrect.  EA further argues the unjust enrichment claim must be dismissed because California

24   courts do not recognize a standalone cause of action for unjust enrichment without an independent

25   basis for relief.  Here, however, plaintiffs have adequately pled an independent basis in stating that

26   EA was unjustly enriched by virtue of its unauthorized use of their likenesses. *See generally Monet*

27   *v. Chase Home Fin., LLC*, No. C 10-0135 RS, 2010 WL 2486376, at *3 (N.D. Cal. June 16, 2010)

28   (quoting *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213 (2002) and justifying a

United States District Court

For the Northern District of California

1   standalone unjust enrichment claim where property "identified as belonging in good conscience to

2   the plaintiff could clearly be traced to particular funds or property in the defendants' possession");

3   *Keller*, 2010 WL 530108, at *7. Accordingly, EA's motion to dismiss the fifth claim for relief must

4   be denied.

5   B. Anti-SLAPP

6          EA's Anti-SLAPP motion employs exactly the same analytical framework and arguments to

7   attack plaintiffs' various claims, albeit under a different legal standard. California's Anti-SLAPP

8   statute provides for early dismissal of any claims for relief that are primarily based on defendants'

9   activities taken in furtherance of their right to free speech or petition relating to an issue of public

10  concern. *Vess v. CIBA-GEIGY Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003). Specifically, the

11  law provides that a party may file a motion to strike a cause of action under § 425.16 if the

12  complaint "aris[es] from any act of that person in furtherance of the person's right of petition or free

13  speech under the United States Constitution or the California Constitution in connection with a

14  public issue." Cal. Code Civ. Proc. § 425.16(b)(1). The first step in evaluating an anti-SLAPP

15  motion is to determine whether the defendant has carried its burden in demonstrating that the

16  challenged cause of action is "arising from" activity taken "in furtherance" of the right to petition or

17  free speech. *Mindys*, 611 F.3d at 595-96. "In the anti-SLAPP context, the critical consideration is

18  whether the cause of action is *based on* the defendant's protected free speech or petitioning activity."

19  *Id.* at 597 (quoting *Navellier v. Sletten*, 29 Cal. 4th 82, 89 (2002)) (emphasis in original). The

20  statute expressly recognizes four categories of protected speech and petitioning activity, including,

21  in relevant part, any "conduct in furtherance of the exercise of the constitutional right of petition or

22  the constitutional right of free speech in connection with a public issue or an issue of public

23  interest." Cal. Code Civ. Proc. § 425.16(e).

24         If a defendant succeeds in making a *prima facie* showing, the burden then shifts to plaintiff

25  to demonstrate "a 'reasonable probability' of prevailing on the challenged claims." *Mindys*, 611

26  F.3d at 595. This "minimal merit" standard requires only that plaintiff "state and substantiate a

27  legally sufficient claim." *Id.* at 598-99, (quoting *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th

28  728 (2003)). This entails a "sufficient prima facie showing of facts to sustain a favorable judgment

1  if the evidence submitted by the plaintiff is credited." *Id.* at 599 (quoting *Wilson v. Parker, Covert*

2  *& Chidester*, 28 Cal. 4th 811, 821 (2002)). In evaluating the parties' positions, the court is to

3  consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the

4  liability or defense is based." Cal. Code. Civ. Proc. § 425.16(b)(2).

5  　　　　As applied here, there is no question that "[v]ideo games are expressive works entitled to as

6  much First Amendment as the most profound literature," *Kirby*, 144 Cal. App. 4th at 58, and

7  although, as the foregoing discussion clearly indicates, there remain serious doubts as to whether

8  EA's use of plaintiffs' likenesses is affirmatively immunized by the First Amendment, it may be

9  assumed for purposes of this motion that the challenged conduct "aris[es] from" activity taken "in

10  furtherance" of the right to petition or free speech," within the meaning of the statute. Cal. Code

11  Civ. Proc. § 425.16(b)(1). Nonetheless, given that EA has conceded for purposes of these motions

12  that *Madden NFL* uses plaintiffs' likenesses without authorization, and has not otherwise attacked

13  the adequacy of the FAC's allegations, for the reasons explained above, plaintiffs have satisfied

14  their burden under step two of the relevant analysis. The FAC, in conjunction with the evidence

15  presented in the form of the game itself, is sufficient to "state and substantiate a legally sufficient

16  claim." *Mindys*, 611 F.3d at 599-99. Accordingly, EA's motion to strike must be denied.

17  　　　　　　　　　　　　　　　　　　　　V. CONCLUSION

18  　　　　For the reasons stated above, defendant's motion to dismiss and motion to strike under §

19  425.16 are denied.

20

21  　　　　IT IS SO ORDERED.

22

23  Dated: 3/29/12

24  　　　　　　　　　　　　　　　　RICHARD SEEBORG
　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

25

26

27

28

United States District Court
For the Northern District of California

Ninth Circuit Case No.    12-15737

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court
for the United States Court of Appeals for the Ninth Circuit by using the appellate
CM/ECF system on November 25, 2013

I certify that all participants in the case are registered CM/ECF users and that
service will be accomplished by the appellate CM/ECF system.

Signature:  /s/ Carolina Solano _____