No. 12-15737

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

MICHAEL E. DAVIS, aka Tony Davis, et al.,

Plaintiffs-Appellees,

v.

ELECTRONIC ARTS INC.,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District Of California
Case No. 10-cv-03328 RS

---

**BRIEF OF AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS-APPELLEES BY
SCREEN ACTORS GUILD-AMERICAN FEDERATION OF
TELEVISION & RADIO ARTISTS**

---

DUNCAN W. CRABTREE-IRELAND
DANIELLE S. VAN LIER
SCREEN ACTORS GUILD-AMERICAN
  FEDERATION OF TELEVISION AND RADIO
  ARTISTS
5757 Wilshire Blvd., 7th Fl.
Los Angeles, CA 90036
Telephone: (323) 549-6627
Facsimile: (323) 549-6624

*Counsel for Amicus*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ............................................................... iii

CORPORATE DISCLOSURE STATEMENT ...................................... V

STATEMENT OF COMPLIANCE WITH RULE 29(C)(5) ................. V

CONSENT OF THE PARTIES ............................................................ V

INTEREST OF THE *AMICUS* ........................................................... 1

SUMMARY OF ARGUMENT ............................................................ 3

ARGUMENT ....................................................................................... 4

A.    FOR OVER A CENTURY, COURTS HAVE CONSISTENTLY RECOGNIZED THE NEED TO BALANCE PROTECTIONS AFFORDED SPEECH WITH THE PROPERTY INTEREST IN ONE'S PERSONA. ........................................................... 4

    1.    Courts Have Recognized Proprietary Rights in One's Identity Since the Nineteenth Century............................................. 5

    2.    The Supreme Court Recognized a Property Right in One's Persona Setting Precedent for Subsequent State and Federal Decisions. ................................................................ 8

B.    THE TRANSFORMATIVE USE DEFENSE RESPECTS THE CAREFUL BALANCE BETWEEN AN INDIVIDUAL'S INTELLECTUAL PROPERTY RIGHTS AND FREE EXPRESSION ......10

    2.    The Transformative Use Test Focuses On Depictions of the Individual......................................................................12

    3.    Many Works That Are Not Protected Under the Transformative Use Test are Protected Under Other Tests.........................16

C.    AN ARTISTIC RELEVANCE TEST WOULD HAVE PERVERSE CONSEQUENCES, RENDERING THE RIGHT OF PUBLICITY MOOT IN ALL BUT THE MOST EGREGIOUS CASES ........................17

    1.    The Rogers Test Was Established to Address Titles of Works..........17

    2.    The Right of Publicity Protects Interests Different from Trademark Law That the Rogers Test Does Not Properly Address................................................................18

    3.    Few Courts Have Adopted the *Rogers* Test.......................19

i

D.    NEITHER THE PUBLIC INTEREST DEFENSE NOR THE PUBLIC AFFAIRS EXEMPTION ARE APPLICABLE TO SPORTS VIDEO GAMES .......................................................................................... 23

     1.    EA's Products Do Not Provide Information about Sports and Therefore Do Not Satisfy the Public Interest Defense ....................... 23

     2.    EA's Products Are Not Public Affairs Nor Sports Broadcasts or Accounts Exempt Under California's Right-of-publicity Statute ...... 25

E.    PUBLIC POLICY DICTATES THAT THE RIGHT OF PUBLICITY BE PROTECTED FROM THE KIND OF MISAPPROPRIATION AT ISSUE IN THIS CASE ........................................................................ 26

CONCLUSION ................................................................................... 29

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Allison v. Vintage Sports Plaques*, 136 F.3d 1443 (11th Cir. 1998)......................10

*American Economy Insurance Co. v. Reboans, Inc*, 852 F. Supp. 875 (N.D. Cal. 1994) ........................................................................................ 9

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959 (10th Cir. 1996)..................................................................................10

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001) .passim

*Corlis v. E. W. Walker Co*, 64 F. 280 (1894) .......................................................... 6

*Dora v. Frontline Video*,15 Cal.App.4th 536 (1993) ..............................................26

*Gionfriddo v. Major League Baseball, 94 Cal.App.4th 400 (2001)* ......................26

*Haelan Laboratories, Inc. v. Topps Chewing Gum*, 202 F.2d 866 (2nd Cir. 1953) ....................................................................................... 5

*Hart v. Electronic Arts*, *Inc.* 717 F.3d 141 (3rd Cir. 2013) ...............................10, 15

*Hilton v. Hallmark Cards,* 580 F.3d 874 (9th Cir. 2009)......................................... 9

*Keller v. Electronic Arts, Inc.,* 724 F.3d 1268 (9th Cir. 2013)........................passim

*Kirby v. Sega of America, Inc.*, 144 Cal.App.4th 47 (2006) ...........................13, 14

*KNB Enters. v. Matthews*, 78 Cal. App. 4th 362  (2000) ........................................ 4

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) ...................18, 19

*Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792 (9th Cir. 2003) .......18

*Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) ...............................20, 21, 22

*Michaels v. Internet Entertainment Group*, 5 F.Supp.2d 823 (C.D. Cal. 1998) ...................................................................................... 9

*Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790 (1995)...............26

*Montgomery v. Montgomery*, 60. S.W.3d 524 (Ky. 2001) ....................................20

*Munden v. Harris*, 134 S.W. 1076 (Mo. 1911)....................................................... 7

*New Kids on the Block v. News. Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992) .................................................................................18, 26

*No Doubt v. Activision Publishing*, 192 Cal. App. 4th 1018 (2011) .....................14

iii

*O'Brien v. Pabst Sales Co.*, 124 F.2d 167 (5th Cir. 1941).......................................8

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) ..............................20, 21

Pavesich v. New England Life Ins. Co., 50 S.E. 68 (1905) ...........................4, 5, 7

*Roberson v. Rochester Folding Box Co.*, 64 N.E. 442 (N.Y. 1902) ......................6

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)...........................................17, 18

*Romantics v. Activision Publ.*, 574 F. Supp. 2d. 758 (E.D. Mich. 2008)..........20, 22

*Ruffin-Steinback v. De Passe*, 82 F. Supp. 2d 723 (E.D. Mich. 2000) .............20, 21

*Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996).......................20, 21

*Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992) ........................................9

*Winter v. DC Comics*, 30 Cal. 4th 881 (2003).................................................12, 13

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977) ...........4, 8, 29

**Other Authorities**

http://www.chillingeffects.org/dmca512c/notice.cgi?NoticeID=1049234 .............27

http://www.chillingeffects.org/dmca512c/notice.cgi?NoticeID=853895 ..............27

http://www.chillingeffects.org/dmca512c/notice.cgi?NoticeID=862071 ..............27

http://www.chillingeffects.org/dmca512c/notice.cgi?NoticeID=973584 ..............27

**Treatises**

Thomas J. McCarthy, The Rights of Publicity & Privacy, §§ 8:39 (2011).............28

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rules 26.1 and 29(c) of the Federal Rules of Appellate Procedure, *Amicus* provide the following disclosures of corporate identity:

Screen Actors Guild-American Federation of Television and Radio Artists certifies that it is a Delaware non-profit corporation; it does not offer stock; and it has no parent corporation.

## <u>STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)</u>

Counsel for the parties did not author this brief. The parties have not contributed money intended to fund preparing or submitting the brief. No person other than amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

## <u>CONSENT OF THE PARTIES</u>

In accordance with Ninth Circuit Rule 29-3, Amici have sought the consent of the parties to file an amicus curiae brief. Counsel for the parties have consented to the filing of this brief.

## INTEREST OF THE *AMICUS*

Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") is the nation's largest labor union representing working media artists. SAG-AFTRA – formed through the historic merger of Screen Actors Guild ("SAG") and the American Federation of Television and Radio Artists ("AFTRA") in 2012 – represents more than 165,000 actors, announcers, broadcasters, journalists, dancers, DJs, news writers, news editors, program hosts, puppeteers, recording artists, singers, stunt performers, voiceover artists and other media professionals. SAG-AFTRA collectively bargains the wages, hours, and working conditions of its members, including in video games, and exists to secure strong protections for media artists.

The professionals represented by SAG-AFTRA invest their entire lives in building their careers.  While many may never be "famous," their names, voices, images or likenesses have or will attain commercial value. For some, this value will continue long after their death, providing an important source of income for their families and beneficiaries. These individuals and their beneficiaries rely on right of publicity laws to protect and prevent misappropriation of one of their greatest assets – their persona.

SAG and AFTRA, and now SAG-AFTRA, have long fought to preserve the rights of performers and others in their personas, including through nationwide

1

legislative efforts. They strongly supported the enactment of and amendments to California's right-of-publicity statutes and have filed amicus briefs in other right-of-publicity cases, including the *Keller* and *Hart* cases discussed herein.

Although this case involves athletes, SAG-AFTRA members are potentially affected by its outcome. If allowed unchecked, EA's infringing use of the athletes' personas opens the door for others to freely circumvent the statutory and common law right of publicity of any individual in the future. The result can be ruinous to performers' careers and financial interests.

Accordingly, SAG-AFTRA has a fundamental interest in ensuring these rights are not eroded and therefore has an interest in this litigation.

## SUMMARY OF ARGUMENT

At any point in time, there are tens, and possibly hundreds, of thousands of individuals whose livelihood derives from the authorized use of their personas. A cornerstone of their careers is the ability to exploit and carefully control their rights in these intangible but valuable assets. Right of publicity laws, which ensure that these public figures have the sole right to control how their rights are exploited, are critical to them.

The right of publicity is a form of intellectual property that society deems to have social utility, representing the inherent right of every individual to control the commercial use of his identity. *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001). For over a century, courts, including the United States Supreme Court, have carefully balanced this property right with the protections accorded speakers under the First Amendment.

Consistent with past precedent, the district court correctly balanced Tony Davis' right of publicity and the protections afforded Electronic Arts' products and dismissed the motion to strike. In reaching its conclusion, the court properly rejected the transformative use, artistic relevance, public interest, and statutory public affairs defenses finding that Electronic Arts ("EA") did not transform the athletes' likenesses nor did the game serve the public interest by providing information about sports. Additionally, the court declined to extend the *Rogers*

3

artistic relevance test to plaintiff's claims. As explained herein, the district court reached the proper decision.

## **ARGUMENT**

**A.    For Over a Century, Courts Have Consistently Recognized the Need to Balance Protections Afforded Speech with the Property Interest in One's Persona.**

The right of publicity is a form of intellectual property that rests in the inherent right of every human being to control the commercial use of his identity. *Comedy III*, 25 Cal. 4th 387. Although derived originally from laws protecting one's privacy, the right of publicity evolved into a form of intellectual property. *See, e.g., Comedy III*, 25 Cal. 4th 387; *KNB Enters. v. Matthews*, 78 Cal. App. 4th 362  (2000). In many instances, the courts have analogized its nature and goals to other intellectual property rights. See, e.g., *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977).

For over a century, courts have wrestled with the interplay between this property right and the First Amendment. As media evolved, the courts resolved the consequential intrusions on individual rights, by striking a careful balance between the competing interests. In *Pavesich v. New England Life Ins. Co*., 50 S.E. 68 (Ga. 1905), the Supreme Court of Georgia aptly described:

> "Liberty of speech and of the press is and has been a
> useful instrument to keep the individual within limits of

4

> lawful, decent, and proper conduct; and the right of
> privacy may be well used within its proper limits to keep
> those who speak and write and print within the
> legitimate bounds of the constitutional guaranties of such rights.
> One may be used as a check upon the other; but neither
> can be lawfully used for the other's destruction."

*Pavesich*, 50 S.E. at 74.

Over a century later, EA asks this court to cast aside these checks and balances to render the First Amendment a weapon to destroy individual rights of publicity. EA seeks, for itself and other multi-billion dollar entertainment companies, an unfettered license to freely use any individual's persona they deem relevant to sell their goods. But over a century of jurisprudence affirms the principles elucidated by the *Pavesich* court. While there exists an inherent tension between the protected property right in one's persona and the right to speak and create, that tension arises from the necessary and proper balance between two important rights – those protected by the First Amendment and the property rights in the fruits of an individual's endeavors, which are his own to control.

**1.    Courts Have Recognized Proprietary Rights in One's Identity Since the Nineteenth Century.**

In 1953, the Second Circuit coined the term "right of publicity," recognizing an economic and publicity value in one's photograph "in addition to and independent of [the] right of privacy." *Haelan Laboratories, Inc. v. Topps Chewing Gum*, 202 F.2d 866, 868 (2nd Cir. 1953).   While many trace the right of publicity's origin to

5

this case, the concept significantly predates it. Majority and dissenting opinions in both federal and state courts have acknowledged an economic and property interest in an individual's persona for well over a century.

In 1894, a Massachusetts federal court held "that a private individual has a right to be protected in the representation of his portrait in any form; that this is a property as well as a personal right; and that it belongs to the same class of rights which forbids the reproduction of a private manuscript or painting..." *Corlis v. E. W. Walker Co*, 64 F. 280, 282 (1894) (holding that the protection exists but publication of a photograph in connection with a deceased famous inventor's biography did not violate it). Judge Gray's 1902 dissent in *Roberson v.Rochester Folding Box Co.* advocated for the expansion of this right, stating that an individual "should be afforded… protection… against the display and use [of her likeness] for another's commercial purposes or gain." [1] *Roberson v. Rochester Folding Box Co.*, 64 N.E. 442, 450 (N.Y. 1902) (Gray, J. dissenting). Judge Gray further articulated "that this plaintiff has the same property in the right to be protected against the use of her face for defendants' commercial purposes as she would have if they were publishing her literary compositions… the value is hers exclusively; until the use be granted away to the public." *Id.*

---

[1] In *Roberson*, which pre-dated New York's right of privacy statute, the court determined that the use of a woman's picture on ads for flour was not a cognizable claim under the common law. *Roberson*, 64 N.E. 442, 447.

Thereafter, in 1905, the Supreme Court of Georgia expressly adopted Judge Gray's reasoning in a unanimous opinion. [2] *Pavesich*, 50 S.E. at 79. In recognizing the tension between the First Amendment and the property right in one's persona, the majority emphasized that "[t]he constitutional right to speak and print does not necessarily carry with it the right to reproduce the form and features of an individual." *Id*. The *Pavesich* court rejected the argument "that the man who makes himself useful to mankind surrenders any right to privacy thereby, or that [by permitting] his picture to be published by one person, and for one purpose… [he] is forever thereafter precluded from enjoying any of his rights." *Id.* at 80 (quoting *Atkinson v. Doherty*, 80 N.W. 285 (Mich. 1899)).

In 1911, the Missouri appellate court considered, "[i]f there is value in [one's likeness], sufficient to excite the cupidity of another, why is it not the property of him who gives it the value and from whom the value springs?" *Munden v. Harris*, 134 S.W. 1076, 1078 (Mo. 1911). The court confirmed that it is "a property right of value" exclusive to the individual. *Id.* at 1079. Three decades later, Circuit Judge Holmes recognized the right to control the commercial use of one's persona "is a property right that belongs to everyone; it may have much or little, or only nominal, value; but it is a personal right, which may not be violated

---

[2]   The *Pavesich* Court also notes the 1890 case of *Manola v. Stevens*, in which a Broadway actress sought and obtained an injunction restraining the use of a photograph of her performance.  *Pavesich*, 50 S.E. at 74 (citation omitted).

with impunity." *O'Brien v. Pabst Sales Co.*, 124 F.2d 167, 170 (5th Cir. 1941)

(Holmes, C.J. dissenting).

> ## 2. The Supreme Court Recognized a Property Right in One's Persona Setting Precedent for Subsequent State and Federal Decisions.

The Supreme Court confirmed the right of publicity is an individual's

proprietary right in his persona over three decades ago. In *Zacchini v. Scripps-*

*Howard Broadcasting Co.*, 433 U.S. 562, 573 (1977), the Court opined that the

right of publicity "protect[s] the proprietary interest of the individual" and is

"closely analogous to the goals of patent and copyright law, focusing on the right

of the individual to reap the reward of his endeavors and having little to do with

protecting feelings or reputation." The "rationale… is the straightforward one of

preventing unjust enrichment by the theft of goodwill. No social purpose is served

by having a defendant get free some aspect of the plaintiff that would have market

value for which he would normally pay." *Id*. at 576 (citations omitted).

Over eight decades of prior precedent makes clear that *Zacchini* is not an

anomaly.  Recognizing the significance of an individual's right of publicity, the

Court proclaimed that the infringement at issue – "the appropriation of the very

activity by which the entertainer acquired his reputation in the first place" –

presented "what may be the *strongest* case for a 'right of publicity'", but certainly

not the only one. *Id*. at 576 (emphasis added).

Following *Zacchini*, the right of publicity continued to evolve as a property right. This court's own precedent is clear on that point. *See, e.g., Hilton v. Hallmark Cards,* 580 F.3d 874, 889 fn.12, (9th Cir. 2009)*, amended,* 599 F.3d 894 (9th Cir. 2010) ("The cousinage between copyright liability and the right to publicity has long been recognized."); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1100 (9th Cir. 1992) ("Waits' voice misappropriation claim is one for invasion of a personal property right: his right of publicity to control the use of his identity as embodied in his voice") (emphasis added). Additionally, federal and state courts in California have treated the right of publicity as a property right. *See, e.g., Michaels v. Internet Entertainment Group*, 5 F.Supp.2d 823, 838 (C.D. Cal. 1998) (recognizing that "a celebrity's property interest in his name and likeness is unique ... "); *American Economy Insurance Co. v. Reboans, Inc*, 852 F. Supp. 875, 879-80 (N.D. Cal. 1994), *reconsidered on different grounds*, 900 F. Supp. 1246 (N.D. Cal. 1994) (stating that dilution and right-of-publicity-claims involved property rights); *Comedy III,* 25 Cal. 4th at 399 ("The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility"). Federal courts in other circuits have also noted that the right of publicity is a form of property.[3] Just recently, the Third Circuit opined that "the goal of maintaining a

---

[3] Nearly two decades ago, the Tenth Circuit noted that the right of publicity is an "intellectual property right" and "[l]ike trademark and copyright… [it] involves a cognizable property interest". *Cardtoons, L.C. v. Major League Baseball*

right of publicity is to protect the property interest that an individual gains and enjoys in his identity through his labor and effort." *Hart v. Electronic Arts, Inc.* 717 F.3d 141, 150 (3rd Cir. 2013). Thus courts must duly balance this property right against the protections afforded by First Amendment.

## B. The Transformative Use Defense Respects the Careful Balance Between an Individual's Intellectual Property Rights and Free Expression

The California Supreme Court crafted the transformative use test as a way to carefully balance the intellectual property rights in one's persona with the free expression rights of content creators. Recognizing similarities between the goals of copyright and the right of publicity in protecting the fruits of intellectual and artistic labor, the court looked to copyright law's fair use test to craft a balance. *Comedy III,* 25 Cal. 4th at 404. While not a perfect correlation, the court found that "the purpose and character of the use… [factor] seem[ed] particularly pertinent to the task of reconciling the rights of free expression and publicity." *Id.* at 404 (citing 17 U.S.C. §107(1)). In formulating and applying this test, the court's aim

---

*Players Ass'n,* 95 F.3d 959, 967 (10th Cir. 1996) (holding that where trading cards parodied baseball players, balance between the right of publicity and First Amendment tipped in favor of the card manufacturers). In *Allison v. Vintage Sports Plaques*, 136 F.3d 1443 (11th Cir. 1998), the Eleventh Circuit applied copyright's "first-sale doctrine" to a right-of-publicity claim. The Sixth Circuit has held that "[t]he right of publicity is an intellectual property right of recent origin which has been defined as the inherent right of every human being to control the commercial use of his or her identity." *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 928 (6th Cir. 2003).

was not to arm "the right of publicity holder [with] a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame…" *Id.* at 403.

The *Comedy III* court thereby formulated a test that balances the equities between the artist and the individual, granting the artist protection when the art does not conflict with the economic value in the individual's persona. *Id.* at 391 ("We formulate… what is essentially a balancing test between the First Amendment and the right of publicity…"). In doing so, the court noted that, "[a]lthough the distinction between protected and unprotected expression will sometimes be subtle, it is no more so than other distinctions triers of fact are called on to make in First Amendment jurisprudence." *Id.* at 409 (citing *Miller v. California*, 413 U.S. 15 (1973)). It recognized that "when a work contains significant transformative elements… it is also less likely to interfere with the economic interest protected by the right of publicity" positing that "distortions of the celebrity figure are not… good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets… that the right of publicity is designed to protect." *Id.* at 405. That is not the case here – EA's products directly threaten a market the right of publicity is designed to protect. By depicting the retired players in their games, EA has effectively robbed them of some part of the economic value in their likenesses.

11

The California Supreme Court revisited the test two years later and reaffirmed that only "some… uses of celebrity likenesses are entitled to First Amendment protection." *Winter v. DC Comics*, 30 Cal. 4th 881, 888 (2003). It reiterated that it intended the test to grant First Amendment protection to "alternative versions of celebrity images that are iconoclastic, irreverent, or otherwise attempt to redefine the [person's] meaning," not literal depictions of the type for which the individual would normally be compensated. *Id*. (citing *Comedy III*, 25 Cal. 4th at 405). "The right of publicity derived from public prominence does not confer a shield to ward off *caricature, parody and satire*. Rather, prominence invites *creative comment*." *Id*. at 887(citing *Comedy III*, 25 Cal. 4th at 397(emphasis added).

### 2. The Transformative Use Test Focuses On Depictions of the Individual

As the district court noted, literal depictions of an individual within a work are not transformative, regardless of the medium or the inclusion of creative elements external to the individual.[4] ER 19. Any other interpretation would defeat the test's very purpose. This court had occasion to examine and apply the transformative test recently in a case that was substantially similar to this one. *See,*

---

[4] While the transformative use test does not protect literal depictions, where appropriate, many find protection under other defenses, such as the statutory public affairs or common law public interest tests. None are applicable in this case, however, as discussed *infra*.

*Keller v. Electronic Arts*, *Inc.,* 724 F.3d 1268 (9th Cir. 2013). In reaching its conclusion that EA's use of the athletes' likenesses was not transformative, the *Keller* Court looked at four prior California cases, including two involving video games, representing opposite ends of a spectrum. *Id.*at 1273 - 76.

In *Comedy III*, the court found that, despite an artist's "undeniable skill," that skill was "manifestly subordinated to the overall goal of creating literal, conventional depictions" of the Three Stooges. *Comedy III*, 25 Cal. 4th at 409. Across the spectrum, the *Winter* court noted that, "[t]o the extent the drawings of the [characters] *resemble plaintiffs* at all, they are *distorted for purposes of lampoon, parody, or caricature* [a]nd the Autumn brothers are but *cartoon characters* – half-human and half-worm – in a larger story, which itself is quite expressive." *Winter*, 30 Cal. 4th at 890 (emphasis added). The court went on to further clarify that "[t]he *characters and their portrayals* do not greatly threaten plaintiffs' right of publicity. Plaintiffs' fans who want to purchase pictures of them would find *the drawings of the Autumn brothers* unsatisfactory as a substitute for conventional depictions." *Id*.

California courts have applied the transformative use test in two cases involving video game characters. In *Kirby v. Sega of America, Inc.*, 144 Cal.App.4th 47 (2006), the appellate court undertook a thorough comparison of a singer and a character – a singing, dancing reporter from outer space – alleged to

depict her. The court concluded that "notwithstanding certain similarities, [the character of] *Ulala* is *more than a mere likeness or literal depiction*… [and] contains sufficient expressive content to constitute a 'transformative work' under the test…" *Id.* at 59 (emphasis added). To support its conclusion, the court described several ways in which the *character* was transformative. *Id.*

On the opposite end of the spectrum, and more similar to this case, is *No Doubt v. Activision Publishing*, 192 Cal. App. 4th 1018 (2011). Citing *Comedy III*, the court held that "nothing in the creative elements of [the game] elevates the depictions of [the band] to something more than 'conventional, more or less fungible, images' of its members that [the band] should have the right to control and exploit." *Id.* at 1034 (citing *Comedy III*, 25 Cal.4th at 405). The court noted that in *Kirby* "the pop singer was portrayed as an entirely new character" while in the *Band Hero* game, No Doubt's avatars were literal depictions that "perform rock songs, the same activity by which the band achieved and maintains its fame." *Id.* at 1034.

In *Keller*, this court noted that the case was "clearly aligned with *No Doubt*, not with *Winter* and *Kirby*," and that "*No Doubt* offer[ed] a persuasive precedent that cannot be materially distinguished from Keller's case." *Keller*, 724 F.3d at 1277. The *Keller* court correctly held that EA's use of athletes' likenesses, in a game similar to *Madden NFL*, did "not contain significant transformative elements

such that EA is entitled to the defense as a matter of law." *Id.* at 1276. The Third Circuit reached the same conclusion. Rejecting EA's argument that the inclusion of other creative elements should render the work transformative, it noted that "[a]cts of blatant misappropriation would count for nothing so long as the larger work, on balance, contained highly creative elements in great abundance." *Hart.* at 169.

EA's video games feature true and precise depictions of the players and the settings in which they played. This is done to ensure realism, not to transform the environments. These are not the outer space fantasy worlds of *Kirby* or the phantasmagorical setting of *Winters*, they are realistic depictions of NFL football. This case clearly illustrates why the analysis must focus on the individual and not the work as a whole. As the Third Circuit noted, any other interpretation would eradicate the careful balance the transformative use defense was intended to recognize, rendering claims for all but the most egregious infringements moot. An infringer would only need to add minimal creative expression to avoid liability, even with painstakingly literal depiction of the individual. Under that formulation, by simply adding a decorative background, even Mr. Saderup could have escaped liability.

### 3.    Many Works That Are Not Protected Under the Transformative Use Test are Protected Under Other Tests

Like its virtual football players, EA attempts to run a fake play to distract from the central issue. To devalue the transformative use test, EA argues that "[d]ocumentarians, biographers, filmmakers, novelists, photographers, songwriters, and many others do exactly what the district court said is not protected: they create expressive works that realistically depict individuals and/or refer to them by their actual names." Appellant's Opening Brief ("AOB") at 39. It creatively argues that the formulation set forth in *Keller* and *Hart*, and adopted by the district court, would "have perverse consequences for freedom of expression across the board." AOB p 39.

It is true that the works EA mentions may not find protection under the transformative use test. What EA fails to acknowledge, however, is that the where the transformative-use test is inappropriate, a different test may apply. Many works will be protected under other recognized defenses, such as the common law "public interest" defense or the statutory "public affairs" exception, which EA has argued should apply to its games. Just as there is precedent protecting the property interest in one's persona, there is precedent holding that the scales may tip in favor of the First Amendment where a work satisfies a public interest in its subject matter.

16

**C.     An Artistic Relevance Test Would Have Perverse Consequences, Rendering the Right of Publicity Moot in All But the Most Egregious Cases**

EA suggests that this court should apply the two-part test from *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), because it "is more predictable, and more protective of free expression." AOB 41. This "artistic relevance" test would grant a *carte blanche* license to use individuals' likenesses in all but the most blatantly exploitative contexts. When a content creator has made an artistic choice to include an individual in a work, it is extraordinarily difficult to prove that it does not have artistic relevance in any but the most egregious cases. Despite EA's invitations, neither the *Keller* court nor the district court opted to expand this test to right of publicity claims. *Keller*, 724 F.3d at 1282; ER 10. ("Although EA invokes several California district court cases that have applied *Rogers'* analysis to the use of trademarks… no California federal courts have extended its application to California's statutory right of publicity.").

The *Rogers* test arose from specific circumstances, bearing criticism even from the court that created it, and is not well suited for right-of-publicity claims, particularly involving the misappropriation of an individual's likeness.

**1.     The Rogers Test Was Established to Address Titles of Works**

The *Rogers* artistic relevance defense arose in response to a Lanham Act claim involving the title of a work. The court concluded that, "[w]here a title with

at least some artistic relevance to the work is not explicitly misleading as to the content of the work, it is not false advertising under the Lanham Act." *Rogers*, 875 F.2d at 1000. A concurring opinion cautioned that "this unique case would seem to be an inappropriate vehicle for fashioning a general rule," advising that the test was not well founded and "[i]t should be left to future courts… to determine if there are to be exceptions to the First Amendment protection… generally afforded to artistically relevant *titles*." *Id*. at 1006-7 (Griesa, D.J., concurring) (emphasis added).

2.     **The Right of Publicity Protects Interests Different from Trademark Law That the Rogers Test Does Not Properly Address**

The *Rogers* test may be sensible in relation to the interest protected by the Lanham Act. A trademark is a limited property right in a particular word, phrase or symbol that identifies the manufacturer or sponsor of a product or the provider of a service. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002); *New Kids on the Block v. News. Am. Publ'g, Inc.*, 971 F.2d 302, 305 (9th Cir. 1992). The Act's purpose is to "'avoid confusion in the marketplace' by 'prevent[ing]… others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner.'" *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 806 (9th Cir. 2003) (quoting *MCA Records*, 296 F.3d at 900). When "[l]imited to this core purpose – avoiding confusion in the

marketplace – a trademark owner's property rights play well with the First Amendment" because First Amendment rights in using another's trademark "'are easily outweighed by the buyer's interest in not being fooled….'" *MCA Records*, 296 F.3d at 900 (citations omitted).

But the interest protected by the right of publicity is quite different from that protected by the Lanham Act, rendering the *Rogers* test an inappropriate standard in most right-of-publicity cases. As the *Keller* court noted, unlike a trademark, which designates the source and origin of a good or service "[t]he right of publicity protects the *celebrity*, not the *consumer*." *Keller,* 724 F.3d at 1280-81 (emphasis in original). Like Davis, Keller alleged that EA had "appropriated, without permission and without providing compensation, his talent and years of hard work on the football field." *Keller*, 724 F.3d at 1281. Neither Keller nor Davis alleged any sort of unfair competition, like consumer confusion or wrongful promotion. Accordingly, the "reasoning of the *Rogers* and *Mattel* courts – that artistic and literary works should be protected unless they explicitly mislead consumers – is simply not responsive to [the] asserted interests here." *Id.*

### 3.   Few Courts Have Adopted the *Rogers* Test

EA contends that the *Rogers* test "has been adopted by numerous courts as a defense to right-of-publicity claims, string citing several cases that purport to support its position. AOB at 42. A review of the cited cases, however, provides no

support for expanding the *Rogers* test to cases that involve the misappropriation of an individual's likeness.

It is important to note that all but one of the cited cases were before federal courts in states that did not have statutory rights of publicity, three of which arose under Michigan common law.[5] *See*, *Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) (applying Michigan common law to use of plaintiff's name in a song title); *Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) (applying Texas common law to fictionalized account of events in plaintiff's life); *Romantics v. Activision Publ.*, 574 F. Supp. 2d. 758 (E.D. Mich. 2008) (applying Michigan common law to use of plaintiffs' "distinctive sound" within a licensed song used in a video game); *Ruffin-Steinback v. De Passe*, 82 F. Supp. 2d 723 (E.D. Mich. 2000) (applying Michigan common law to use of events in plaintiff's life story); *Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996) (applying Pennsylvania common law to depictions of plaintiff and his life events in a historical-fiction film, a book about the film, and the soundtrack CD/cassette). As the *Keller* court noted, *Rogers*, itself, involved a federal court attempting to apply a

---

[5]   Only *Montgomery v. Montgomery*, 60. S.W.3d 524 (Ky. 2001), involved application of a statutory right of publicity. In *Montgomery* a sharply divided court applied *Parks* (relying on language later reversed by the Sixth Circuit) to protect a son's use of his deceased father's name and likeness in a music video tribute. In a strongly worded dissent, Justice Keller argued that the transformative use test "reconciles the competing interests more appropriately than the one utilized by the majority." *Id.* at 536 (Keller, J. dissenting).

state common law right, a problem not present in *Keller* or this case. *Keller*, 724 F.3d at 1281.

Additionally, *Wozencraft*, *Seale* and *Ruffin-Steinback* involved biographical or fictionalized accounts that, under California law, would likely be protected as a matter in the "public interest." *See*, *Ruffin-Steinback*, 82 F. Supp. 2d 723 (holding that use of an individual's name or likeness in promoting a story about the individual does not implicate the right of publicity); *Wozencraft*, 15 F.3d at 437 (holding that fictionalized account of events in the plaintiff's life story that, "while interesting to readers and film-goers, is not a 'name or likeness' for purposes of applying the misappropriation doctrine"); *Seale*, 949 F. Supp. at 337-8 (E.D. Pa. 1996) (holding that use of plaintiff's name and likeness, as depicted by an actor, and his life events in a historical-fiction film, a book about the film, and the soundtrack CD/cassette did not infringe his right of publicity).

In addressing these right-of-publicity claims, several of the courts reiterated the importance of protecting the individuals' rights and balancing them against the defendant's speech. For example, the *Parks* court recognized that it "must conduct [a] balancing of interests -- Parks' property right in her own name versus the freedom of artistic expression." *Parks,* 329 F.3d at 461 (citations omitted) (holding "that Parks' right of publicity claim presents a genuine issue of material fact regarding the question of whether the title to the song is or is not 'wholly

unrelated' to the content of the song"). Particularly apropos this case, the *Wozencraft* court recognized that "[i]f the appropriation of an individual's goodwill were left untrammelled, it soon would be overused, as each user will not consider the externality effect his use will have on others. Each use of the celebrity's name or face will reduce the value that other users can derive from it." *Wozencraft*, 15 F.3d at 438 fn.2 (citations omitted). Additionally, the *Romantics* court had no need to reach an analysis of *Rogers* because "Michigan never has recognized… a right of publicity in the sound of a voice, even if distinctive, nor has it recognized a right of publicity in a combination of voices." 574 F. Supp. 2d at 764.

For the reasons described, all of the cases are readily distinguishable from *Keller*, *Hart*, and from the instant matter and do not provide a basis for extending the *Rogers* test. Application of the *Rogers* test to appropriations of an individual's likeness would take us down a slippery slope, exposing individuals to exploitation, not only by manufacturers who disguise products behind the veil of "artistic expression" but, also, to purveyors of pornography or other exploitive works. Individuals with editing software can already easily transpose images of celebrities, including SAG-AFTRA members, with those of unclothed models and make them available on the Internet, which can be devastating to their careers and reputation.  As technology improves and its costs decrease it seems almost

inevitable this will progress to motion pictures or video games.[6] If it is artistically relevant to include Davis' likeness in a game based on NFL football, it would be hard to argue that it is not artistically relevant should someone create a game that uses detailed likenesses of celebrities to recreate titillating scenes from motion pictures, literature, or even pornography. As the courts have been loath to declare any but the most obscene or blatantly commercial works unprotected under the First Amendment, it would be virtually impossible for a plaintiff to overcome the two prongs of the *Rogers* test, even for these uses.

**D.    Neither the Public Interest Defense nor the Public Affairs Exemption are Applicable to Sports Video Games**

**1.    EA's Products Do Not Provide Information about Sports and Therefore Do Not Satisfy the Public Interest Defense**

EA unsuccessfully argues that its products satisfy the public interest in information about sports and athletes such that they are entitled to full First Amendment protection. In doing so, it compared its product to works ranging from

---

[6]    The upcoming Lars von Trier movie, *Nymphomaniac*, reportedly uses similar technology. During production, adult film actors reportedly served as body doubles, engaging in explicit sex acts in lieu of the movie's stars. The stars likenesses were then digitally transposed onto the body doubles' bodies. *See, e.g.,* Clemens Bomsdorf, *Life As a 'Nymphomaniac' Body Double*, WALL ST. J., Jan 28, 2014, available at http://blogs.wsj.com/speakeasy/2014/01/28/life-as-a-nymphomaniac-body-double/ (last visited Feb. 18, 2014); Megan Gibson, *NC-17 Rating Wouldn't Necessarily Spell Financial Doom For Nymphomaniac*, TIME, Nov. 27, 2013, available at http://entertainment.time.com/2013/11/27/nc-17-rating-wouldnt-necessarily-spell-financial-doom-for-nymphomaniac/ (last visited Feb. 18, 2014).

baseball programs to documentaries to fantasy sports games, which have previously been accorded protection. EA's attempt to compare its games with a laundry list of works is specious, at best.

While it is hardly in dispute that sports are in the public interest, EA's products do not attempt to report on sports; they do not educate about them; they do not comment on it or parody it; they do not provide updated statistics or video highlights. Unlike the cases cited by EA, such as *Gionfriddo* and *C.B.C.*, where professional baseball players' names and statistics were used on promotional materials and in fantasy football games, respectively, the district court correctly found EA's game goes well beyond merely reporting statistics on players or allowing players to track statistics in a fantasy league. ER 10-11 (citing *Gionfriddo v. Major League Baseball*, 94 Cal.App.4th 400 (2001) and *C.B.C. Distribution & Marketing v. Major League Baseball Advanced Media*, 505 F.3d 818 (8th Cir. 2007)). As he district court noted:

> "[w]hile EA's publication of plaintiffs' biographical facts and performance statistics might warrant protection… the game play of *Madden NFL*, for all its realism, does not 'report,' or even recreate, recent or historical games… When a gamer selects one of *Madden NFL*'s 'historic teams,' the only historical aspect of the game... are the plaintiff's likenesses." ER 11.

If this use was sufficient under the public interest defense, it would create absurd results where few uses of an individual's persona would fall outside the

public interest. The mere inclusion of limited factual data about an individual on a product bearing his likeness would be sufficient to avoid liability. Under EA's formulation a manufacturer who creates t-shirts bearing the image of an actor or musician, showing even less creativity than those rejected in *Comedy III*, would be accorded protection under this defense by simply adding some limited factual information such as a filmography or discography.  Such a formulation of the public interest defense would upset the very balance it is intended to maintain by tipping the scales too far in favor of those who seek to take, without consent or compensation, and profit from the value of another's persona.

### 2.    EA's Products Are Not Public Affairs Nor Sports Broadcasts or Accounts Exempt Under California's Right-of-publicity Statute

EA further attempts to convince the court that its use of the players' personas in its products falls under the public affairs exemption in California's right-of-publicity statute, Cal. Civ. Code §3344(d). Although it cites several examples of cases in which the exemption has been applied and cites policy reasons for liberally construing the exemption, its argument is unfounded as to why this exemption applies to its particular use of athletes' personas. *See*, AOB 45.

The public affairs exemption in Civil Code §3344(d) provides protection for uses of individuals' personas in connection with the factual reporting on or of matters in the public interest. *See*, ER 12 (citing Cal. Civ. Code §3344(d) ("That

section provides immunity for the 'use of a name… or likeness in connection with any news, public affairs, or sports broadcast or account…").  The authority cited by EA is consistent with the statute and distinguishable from this case.  See, *New Kids on the Block*, 971 F.2d 302 (use of popular band's and its members' names for a phone poll about the band's popularity in connection with articles about the band); *Gionfriddo*, 94 Cal.App.4th 400 (use of former baseball players' personas in connection with website containing historical content about baseball); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790 (1995) (use of football player's likeness on posters that were reproduction of front page of newspaper after newsworthy Super Bowl win); *Dora v. Frontline Video*,15 Cal.App.4th 536 (1993) (use of famed surfer's name and likeness in documentary about surfing).  While there is no dispute that professional sports are "public affairs," unlike the examples given in EA's brief, EA's products do not attempt to inform the public or otherwise report on sports.  Rather, EA uses players' personas to enhance the realism of the games, and thereby gain a competitive advantage over its competitors.

**E.    Public Policy Dictates That the Right of Publicity Be Protected From the Kind of Misappropriation at Issue In This Case**

While EA sounds the bells of doom for the creative arts, it is important to remember that the video game industry is a highly profitable enterprise. Games like *Madden NFL* are created by multi-billion dollar companies who aggressively

defend their own intellectual property against those who misappropriate it[7], including those who claim their use is fair. While the context and the nature of the works differ, and EA is certainly entitled to enforce its rights, there is some irony to their misappropriation of Davis' rights.

There is an inherent market value in the use of performer and athlete personas in video games, which is exploited by industry to continue the commercial success and viability of its products. Understanding this commercial value and seeking to minimize the costs associated with it, EA now comes to this court requesting a categorical license to appropriate these personal property rights in a way that ultimately may eviscerate individual rights of publicity altogether. Just as EA does not approve of individuals using game content for their own

---

[7] A search for "Electronic Arts" at the Chilling Effects Clearinghouse (chillingeffects.org) produces hundreds of examples of takedown notices (most including multiple alleged infringements) sent by EA. While most appear to be involve websites that are illegally distributing copies of EA's games, some are based merely upon use of logos or screenshots of the games. *See, e.g.,* http://www.chillingeffects.org/dmca512c/notice.cgi?NoticeID=1049234 ("Description of the copyrighted work: The Sims 4 logo with three faces followed by two screen shots from EA's The Sims 3 game."); http://www.chillingeffects.org/dmca512c/notice.cgi?NoticeID=862071 ("Description of the copyrighted work: Images from EA's video game "SimCity" are displayed on this blog without authorization from EA."); http://www.chillingeffects.org/dmca512c/notice.cgi?NoticeID=973584 ("Description of the copyrighted work: The copyrighted work is artwork from EA's Battlefield 4 video game.); http://www.chillingeffects.org/dmca512c/notice.cgi?NoticeID=853895 ("Description of original work: The copyrighted image is a screen shot from EA's Real Racing 3 game" in a Twitter account avatar) (all links last visited on Feb. 10, 2014).

benefit, this court should not grant EA the freedom to use these athletes' likenesses to their own benefit, without consent and compensation.

In gaming terms, EA, like many gamers who purchase their products, want to find an easy way to conquer the game. They ask this court to give them the "cheat codes" to misappropriate the valuable property of others, which could not otherwise be obtained without playing the game fairly. In this case, they seek to use the First Amendment as both a shield and a sword to pilfer the treasure in individuals' personas.

But this is not one of their games and the continuing battle between the right of publicity and the First Amendment is not a battle of good versus evil that can be bypassed with a few keystrokes. As one prominent commentator opined:

> In some cases of media use of human identity, there is indeed a conflict with the First Amendment. It is real. It will not go away. Finding the proper balance is sometimes a very difficult job. There is no neatly packaged general rule that can be waved like a magic wand to make the solution any easier. The balance must be laboriously hacked out case by case.
>
> Thomas J. McCarthy, The Rights of Publicity & Privacy, §§ 8:39 (2011)

While each individual, each form of media, and each use is unique, some cases provide clear and established precedent. The use of Davis' persona in the instant matter differs from Mr. Montana's or Mr. Gionfriddo's, despite the fact that they are all athletes. On the other hand, the use of Davis' persona is nearly

28

identical to the uses of Messrs. Hart and Keller. Accordingly, the *Keller* court has provided clear and compelling precedent.

As the Supreme Court expressed, an individual's right of publicity is worthy of protection from misappropriation because "[n]o social purpose is served by having a defendant get free some aspect of the plaintiff that [has] market value for which he would normally pay." *Zacchini*, 433 U.S. at 576. For over a century, courts have found ways to strike a fair balance between these competing interests, without resorting to categorical exemptions or weighing artistic relevance. Public policy and precedent mandate they continue to do so.

## CONCLUSION

For the foregoing reasons and those in Appellee's Brief, this Court should affirm the decision below.

DATE: February 18, 2014                    Respectfully submitted,

                                           By:      /s/ Duncan Crabtree-Ireland
                                           DUNCAN CRABTREE-IRELAND

                                           DUNCAN CRABTREE-IRELAND
                                           DANIELLE S. VAN LIER
                                             SCREEN ACTORS GUILD-AMERICAN
                                             FEDERATION OF TELEVISION AND RADIO
                                             ARTISTS
                                           *Attorneys for Amicus*

## <u>CERTIFICATE OF COMPLIANCE.</u>

I certify pursuant to Federal Rules of Appellate Procedure 32(a)(7)(C) that the

attached brief is proportionately spaced, has a typeface of 14 points, and contains

6922 words, excluding those parts of the brief that the Rule exempts from the

word-count limitation, which is less than the 7,000 words permitted by Fed. R.

App. P. 29(d).

DATE: February 18, 2014                    By: <u>/s/ Duncan Crabtree-Ireland</u>
                                           DUNCAN CRABTREE-IRELAND

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of *Amicus Curiae* in Support of Plaintiffs-Appellees by Screen Actors Guild - American Federation of Television & Radio Artists with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 18, 2014.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


/s/ Duncan Crabtree-Ireland
DUNCAN CRABTREE-IRELAND