No. 12-15737

_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

MICHAEL E. DAVIS, aka Tony Davis, *et al.*,

*Plaintiffs–Appellees,*

v.

ELECTRONIC ARTS INC.,

*Defendant–Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of California
The Honorable Richard Seeborg
Case No. 10-cv-03328 RS

_____

## APPELLANT'S REPLY BRIEF

_____

Alonzo Wickers IV (SBN 169454)
Kelli L. Sager (SBN 120162)
Karen Henry (SBN 229707)
Kathleen Cullinan (SBN 287604)
Brendan Charney (SBN 293378)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Robert Van Nest (SBN 84065)
R. James Slaughter (SBN 192813)
Adam Lauridsen (SBN 243780)
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, California 94111-1899
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant-Appellant
ELECTRONIC ARTS INC.

# TABLE OF CONTENTS

Page

1.  INTRODUCTION ...........................................................1

2.  EA HAS THE RIGHT TO PRESERVE ITS ARGUMENTS FOR EN
    BANC REVIEW OR A PETITION FOR CERTIORARI ............................1

3.  APPLIED TO EXPRESSIVE WORKS, THE RIGHT OF
    PUBLICITY IS A CONTENT-BASED REGULATION ON SPEECH
    THAT IS PRESUMPTIVELY INVALID......................................2

4.  THE FIRST AMENDMENT PROTECTS EA'S USE OF
    PLAINTIFFS' ALLEGED LIKENESSES IN *MADDEN NFL* ....................6

    A.   The Incidental-Use Defense ...................................6

    B.   The Public-Interest Defense .................................12

    C.   The Transformative-Use Test.................................22

5.  EA'S WORK IS PROTECTED UNDER THE STATUTORY
    PUBLIC-AFFAIRS EXEMPTION ..........................................30

6.  CONCLUSION.........................................................31

DWT 23818051v2 0058278-000029

## Cases

*Aligo v. Time Life Books*,
  1994 U.S. Dist. Lexis 21559 (N.D. Cal. Dec. 19, 1994) .............................6, 8, 9

*Ashcroft v. ACLU*,
  535 U.S. 564 (2002)......................................................................................3

*Authors Guild v. Google*,
  954 F. Supp. 2d 282 (S.D.N.Y. 2013) ...................................................30

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ..................................................................30

*Brown v. Entertainment Merchants Ass'n*,
  131 S. Ct. 2729 (2011)............................................................*passim*

*C.B.C. Distribution & Mktg. v. Major League Baseball Advanced Media*,
  505 F.3d 818 (8th Cir. 2007) ...................................................................7

*Campbell v. Acuff Rose Music*,
  510 U.S. 569 (1994)................................................................................29

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ..................................................................30

*Chaplinsky v. New Hampshire*,
  315 U.S. 568 (1942)..................................................................................3

*Christoff v. Nestlé USA*,
  47 Cal. 4th 468 (2009) ...........................................................................32

*Comedy III Prods. v. Gary Saderup, Inc.*,
  25 Cal. 4th 387 (2001) ...................................................................*passim*

*Dora v. Frontline Video*,
  15 Cal. App. 4th 536 (1993) ..................................................................19

*ETW Corp. v. Jireh Publ'g*,
  332 F.3d 915 (6th Cir. 2003) ............................................................26, 27

DWT 23818051v2 0058278-000029

*Florida Star v. B.J.F.*,
  491 U.S. 524 .........................................................................................4

*Frazier v. Boomsma*,
  2007 WL 2808559 (D. Ariz. Sept. 27, 2007) .....................................2

*Gionfriddo v. Major League Baseball*,
  94 Cal. App. 4th 410 (2001) ...............................................................19

*Guglielmi v. Spelling-Goldberg Prods.*,
  25 Cal. 3d 860 (1979) ...............................................................*passim*

*Hunt v. NBC*,
  872 F.2d 289 (9th Cir. 1989) ..............................................................12

*Johnson v. Harcourt, Brace, Jovanovich, Inc.*,
  43 Cal. App. 3d 880 (1974) ..................................................................6

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952)...........................................................12, 13, 19

*Keller v. Electronic Arts*,
  724 F.3d 1268 (9th Cir. 2013) ...................................................*passim*

*Kirby v. Sega of America*,
  144 Cal. App. 4th 47 (2006) ...............................................................30

*Ladany v. William Morrow & Co.*,
  465 F. Supp. 870 (S.D.N.Y. 1978) ...............................................10, 11

*Lohan v. Perez*,
  924 F. Supp. 2d 447 (E.D.N.Y. 2013) ..............................................6, 9

*Metro Lights v. City of Los Angeles*,
  551 F.3d 898 (9th Cir. 2009) ................................................................9

*Montana v. San Jose Mercury News Inc.*,
  34 Cal. App. 4th 790 (1995) .........................................................19, 31

*New Kids on the Block v. News America Publ'g*,
  971 F.2d 302 (9th Cir. 1992) ..............................................................31

iii

*Perfect 10 v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ..............................................................29

*Polydoros v. Twentieth Century Fox Film Corp.*,
  67 Cal. App. 4th 318 (1998) ..................................................................7

*Pooley v. Nat. Hole-in-One Ass'n*,
  89 F. Supp. 2d 1108 (D. Ariz. 2000) ...............................................9, 10

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ...........................................................................4, 5

*Rosemont Enterprises v. Random House*,
  294 N.Y.S.2d 122 (N.Y. Sup. 1968) .....................................................24

*Sarver v. The Hurt Locker LLC*,
  2011 U.S. Dist. Lexis 157503 (C.D. Cal. Oct. 13, 2011) ................5, 24

*Singh v. Gonzales*,
  502 F.3d 1128 (9th Cir. 2007) ................................................................2

*Sofa Entm't v. Dodger Prods.*,
  709 F.3d 1273 (9th Cir. 2013) ..............................................................30

*Time, Inc. v. Hill*,
  385 U.S. 374 (1967) ..............................................................................12

*U.S. v. Alvarez*,
  132 S. Ct. 2537 (2012) ............................................................................4

*U.S. v. Stevens*,
  559 U.S. 460 (2010) ............................................................................3, 4

*U.S. v. Waddle*,
  612 F.3d 1027 (8th Cir. 2010) ................................................................2

*Winter v. DC Comics*,
  30 Cal. 4th 881 (2003) .........................................................24, 25, 26, 30

*Winters v. New York*,
  333 U.S. 507 (1948) .........................................................................13, 19

iv

*Yeager v. Cingular Wireless*,
   673 F. Supp. 2d 1089 (E.D. Cal. 2009) ..........................................................9, 10

*Zacchini v. Scripps-Howard Broadcasting*,
   433 U.S. 562 (1977)...................................................................................5, 27, 28

**Statutes**

California Code of Civil Procedure § 425.16(c)......................................................2

Civil Code § 3344(d)..............................................................................................31

**Rules**

Fed. R. App. P. 38....................................................................................................2

**Constitutional Provisions**

U.S. CONST. amend. I .....................................................................................*passim*

**Other Authorities**

E. Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L.
   Rev. 903 (2003) ....................................................................................................2

T. McCarthy, 2 Rights of Publicity & Privacy § 8:64 (2d ed.) .............................15

W. Ford and R. Liezler, *Video Games Are Not Coffee Mugs*, 29 Santa
   Clara Computer & High Tech. L. J. 1 (2012)......................................................31

DWT 23818051v2 0058278-000029

# 1.

# INTRODUCTION

The tension between EA's constitutional right to free expression and Plaintiffs' economic right of publicity raises two fundamental questions:

- When applied to expressive works, is the right of publicity a content-based restriction on speech?

- Under any of the relevant constitutional tests, would the Court reach a different outcome if EA had used Plaintiffs' alleged likenesses in an historical novel, a docudrama, or a counterfactual essay about professional football, instead of a video game?

# 2.

# EA HAS THE RIGHT TO PRESERVE ITS ARGUMENTS FOR EN BANC REVIEW OR A PETITION FOR CERTIORARI.

According to Plaintiffs, EA cannot point out the inconsistencies between *Keller* and earlier precedents to preserve its arguments for en banc review or a petition for certiorari. Brief of Appellees ("BOA") 1, 17-20. Controlling authority and common sense dictate otherwise. This Court has recognized that an appellant has the right to make arguments "for purposes of preserving [them] for en banc or Supreme Court consideration while acknowledging that [they have] been rejected by [an earlier panel of this Circuit]." *Singh v. Gonzales*, 502 F.3d 1128, 1129 (9th

1

Cir. 2007). This passage from *Singh* is not dicta, as Plaintiffs assert (BOA 19); it is central to the Court's three-paragraph opinion. *See also U.S. v. Waddle*, 612 F.3d 1027, 1029 (8th Cir. 2010) (appellant permitted to raise arguments contradicting circuit precedent in order to preserve them for en banc or Supreme Court review). Thus, EA may raise the arguments addressed in *Keller* to preserve them, may raise other defenses that were not at issue in *Keller*, and should not be penalized under Fed. R. App. P. 38 or California Code of Civil Procedure § 425.16(c) for doing so, particularly in light of the substantial constitutional interests at stake and the enormous damages demanded by Plaintiffs.

**3.**

**APPLIED TO EXPRESSIVE WORKS, THE RIGHT OF PUBLICITY IS A CONTENT-BASED REGULATION ON SPEECH THAT IS PRESUMPTIVELY INVALID.**

The right of publicity regulates speech based on its content – specifically, whether it includes the names or likenesses of real-life people. Opening Brief ("OB") 18-21; E. Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903, 912 n.35 (2003) ("[t]he right of publicity is clearly content-based: It prohibits the unlicensed use of particular content (peoples' names or likenesses)"); *Frazier v. Boomsma*, 2007 WL 2808559 at *15 (D. Ariz. Sept. 27, 2007) (same). Plaintiffs and SAG-AFTRA ignore this principle entirely in their briefs, and the

2

*Keller* majority did not address it.  It is critical, however, to the Court's consideration of this appeal.

The Supreme Court has observed that "as a general matter, … government has no power to restrict expression because of its message, its ideas, its subject matter, *or its content*."  *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011), quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (emphasis added).  "There are of course exceptions: '[f]rom 1791 to the present,' … the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,'" but "has never 'include[d] a freedom to disregard these traditional limitations.'"  *Brown*, 131 S. Ct. at 2733, quoting *U.S. v. Stevens*, 559 U.S. 460, 468 (2010).  These limited areas, such as obscenity, incitement, fraud, defamation, and fighting words, "represent 'well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.'"  *Brown*, 131 S. Ct. at 2733, quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572 (1942).

Plaintiffs do not suggest that expressive works that incorporate celebrities' names or likenesses should be added to this list.  Nor could they, given the Supreme Court's recent refusal to expand the list to include depictions of animal cruelty (*Stevens*, 559 U.S. at 481-482), false statements about military achievements (*U.S. v. Alvarez*, 132 S. Ct. 2537, 2547 (2012)), and violent video

games (*Brown*, 131 S. Ct. at 2734). *See also Florida Star v. B.J.F.*, 491 U.S. 524, 541(1989) (holding that state could not punish newspaper for publishing truthful, but highly sensitive, information about crime victim found in government records absent a "state interest of the highest order").

Because expressive works that use celebrities' names and likenesses do not fall into the very narrow categories of speech that are subject to content-based regulation, any balancing test is of questionable constitutional validity. In *Stevens*, the government argued that it could enact content-based regulations against works that depicted animal cruelty by applying a "simple balancing test" that weighed the value of the speech against its social costs. 559 U.S. at 470. The Court rejected the government's argument as "startling and dangerous," and made clear that a balancing of interests was not sufficient to justify a content-based regulation. *Id.*

Recognizing that the right of publicity is a content-based restriction on speech has profound legal consequences. It renders the right of publicity – as applied to expressive works – subject to strict constitutional scrutiny and presumptively invalid. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Plaintiffs do not attempt to show that the right of publicity is supported by any compelling governmental interest, that it is narrowly tailored, or that there are no less restrictive alternatives, as would be required to overcome the presumption of invalidity. *Id.* at 395-396. And while SAG-AFTRA describes the right of

4

publicity as a property or intellectual-property right, relying primarily on cases involving commercial speech (Brief of Amicus Curiae SAG-AFTRA ("SAG") 4-9), it does not identify any compelling governmental interest that would justify giving historical figures, celebrities, or public officials the power to suppress expressive works that incorporate their names or likenesses without their approval.

EA submits that expressive works should be afforded expansive First Amendment protections against right-of-publicity claims, with the exception of speech that falsely claims a celebrity's endorsement (a circumstance that is addressed under the *Rogers/Restatement* test), or that captures a performer's entire performance (akin to a copyright claim, which is addressed under *Zacchini v. Scripps-Howard Broadcasting*). It is questionable whether any of the existing tests are sufficiently protective of expression; it is clear, however, that strict scrutiny requires far more exacting constitutional safeguards than are provided by Plaintiffs' and SAG-AFTRA's narrow interpretations of the incidental-use, public-interest, and transformative-use tests.[1]

---

[1] Amicus organizations in *Keller* and *Sarver v. The Hurt Locker LLC*, 2011 U.S. Dist. Lexis 157503 (C.D. Cal. Oct. 13, 2011) (appeal pending; 9th Cir. Case No. 11-56986) have argued for a blanket rule that the First Amendment insulates expressive works against right-of-publicity claims. Amicus Brief of MPAA in *Keller* (Dkt. No. 25) at 13-21; Amicus Brief of MPAA in *Sarver* (Dkt. No. 25-3) at 14. That proposed rule would be consistent with strict scrutiny.

## 4.

## THE FIRST AMENDMENT PROTECTS EA'S USE OF PLAINTIFFS' ALLEGED LIKENESSES IN *MADDEN NFL.*

### A.  The Incidental-Use Defense

Plaintiffs claim that the Court cannot consider the incidental-use defense because it was not raised below and is "inherently factual."  BOA 42.  But they ignore the cases cited in EA's opening brief where courts resolved the defense on a motion to dismiss or a demurrer, [2] or on a motion for summary judgment.  OB 21-22.  Here, there is no dispute as to how EA used Plaintiffs' alleged likenesses.  Plaintiffs allege that their likenesses appear in *Madden NFL*, and the games and their alleged depictions of Plaintiffs are in the record.  In the same way that a court can examine the contents of a book, film, or other expressive work that is the subject of a lawsuit, so, too, can it examine the contents of EA's video game.

Plaintiffs also argue that *Keller* forecloses EA's reliance on the incidental-use defense.  BOA 46.  They pin their argument solely on a footnote in which the majority disputed Judge Sidney Thomas' view that the vast number of athletes depicted in EA's *NCAA Football* supported a finding that the work was

---

[2] *See, e.g., Aligo v. Time Life Books*, 1994 U.S. Dist. Lexis 21559 at *12 (N.D. Cal. Dec. 19, 1994); *Johnson v. Harcourt, Brace, Jovanovich, Inc.*, 43 Cal. App. 3d 880, 895 (1974); *Lohan v. Perez*, 924 F. Supp. 2d 447, 455-456 (E.D.N.Y. 2013).

6

transformative.  *Keller v. Electronic Arts*, 724 F.3d 1268, 1277 n.7 (9th Cir. 2013).

But incidental use was not raised as a defense in *Keller*, and was not addressed by

the panel.  Thus, *Keller* does not prevent this Court from finding that EA's use of

Plaintiffs' alleged likenesses was incidental.

Contrary to Plaintiffs' argument, EA's licensing relationship with the

National Football League Players Association also is no impediment to its

incidental-use defense.  BOA 43-44.  Plaintiffs confuse business choices with legal

obligations.  Courts have recognized that content creators have a constitutional

right to use persons' names and likenesses without their approval, even where the

content creator previously entered into voluntary licensing relationships for such

rights.  In *C.B.C. Distribution & Mktg. v. Major League Baseball Advanced Media*,

505 F.3d 818, 821, 823-24 (8th Cir. 2007), for example, the court held that a

fantasy-sports website had a First Amendment right to use baseball players' names,

statistics, and biographical data, even though the website previously had licensed

that information from Major League Baseball.  In *Polydoros v. Twentieth Century

Fox Film Corp.*, 67 Cal. App. 4th 318, 326 (1998), the court similarly noted that

"the industry custom of obtaining 'clearance' [from real-life persons depicted in

films] establishes nothing, other than the unfortunate reality that many filmmakers

may deem it wise to pay a small sum up front for a written consent to avoid later

having to spend a small fortune to defend unmeritorious lawsuits."

EA has chosen to enter into a license agreement with the NFLPA because that relationship provides significant business benefits, including promotional appearances from active players, pre-season access to active players and assistant coaches, and an assurance that active players will not cooperate with other video-game publishers in developing an NFL video game. SER 101-128, 2162, 2168-2169. EA does not receive those benefits from Plaintiffs: their names and likenesses do not appear on the game covers or in promotions for the game, they do not collaborate with EA's graphic artists, and they are free to negotiate with other publishers.

Plaintiffs also misstate a key prong of the incidental-use test. They assert that the incidental-use defense "require[s] EA to prove that its use of retired NFL players' likenesses has no commercial value." BOA 43. The case law does not impose that burden on a defendant. As Plaintiffs later acknowledge (BOA 45), the relevant prong of the *Aligo* court's incidental-use test instead asks whether the plaintiff's likeness "has a unique quality or value that would result in commercial profit to the defendant." 1994 U.S. Dist. Lexis 21559 at *7-8. And courts may answer that question "no" simply by examining how the plaintiff's name or likeness is used in the defendant's work. *See, e.g., id.* at *12; *Lohan*, 924 F. Supp. 2d at 455-456.

DWT 23818051v2 0058278-000029

The weakness of Plaintiff's incidental-use argument is highlighted by its heavy reliance on *Yeager v. Cingular Wireless,* 673 F. Supp. 2d 1089, 1100 (E.D. Cal. 2009), and *Pooley v. Nat. Hole-in-One Ass'n*, 89 F. Supp. 2d 1108, 1113 (D. Ariz. 2000). BOA 43-45. Those cases are readily distinguishable; in each, the court pointed out that the plaintiff's name and/or likeness had been used in "commercial speech" – marketing materials for AT&T's emergency cellular service in *Yeager*, and a promotional video for a golf-related fundraising service in *Pooley*. Commercial speech receives far less constitutional protection than expressive works like *Madden NFL. See Metro Lights v. City of Los Angeles*, 551 F.3d 898, 903 (9th Cir. 2009).

Moreover, the defendants' featured uses of the plaintiffs' names and/or likenesses in *Yeager* and *Pooley* contrast sharply with EA's use of Plaintiffs' alleged likenesses in *Madden NFL*. Chuck Yeager was the only historical figure whose name was used in the AT&T press release, and the executive who prepared it admitted that he sought to capitalize upon Yeager's heroism "to create positive associations in people's mind with the AT&T brand." 673 F. Supp. 2d at 1094. In particular, he wanted consumers "to make an association between [Yeager] breaking the sound barrier and [AT&T] breaking new barriers" with its cell service. *Id.* In *Pooley*, the defendant's marketing video for its "Million Dollar Hole-in-One" fundraising service used the name and likeness of professional golfer

9

Don Pooley, who won $1 million for making a hole-in-one at a PGA event. 89 F. Supp. 2d at 1111. The court noted that the footage of Pooley's feat "prominently stands out as the highlight of [the d]efendant's advertisement." *Id.* at 1113.

There is no comparable use of Plaintiffs' alleged likenesses in *Madden NFL*. Their personalities have no unique elements – like the public's association of Yeager with speed or of Pooley with holes-in-one – that result in commercial profit to EA. Nor are their alleged likenesses even remotely the highlight of EA's work. EA's Motion for Leave to Submit Video-Game Consoles, Controllers and Video Game ("Motion") at Exs. 1-2. Judge Thomas' observation in *Keller* that a user could play EA's *NCAA Football* video game "thousands of times without ever encountering a particular avatar" (724 F.3d at 1288) applies with equal force here. Plaintiffs' alleged likenesses appear in the game because they were participants in real-life events: specifically, they were among the many players on eight of the 177 historical NFL teams depicted in the work. ER 2, 72; Motion at Exs. 1-2.

Almost every incidental-use case from a court within this Circuit – including both *Yeager* and *Pooley* – cites with approval *Ladany v. William Morrow & Co.*, 465 F. Supp. 870 (S.D.N.Y. 1978), a case that also arose from the depiction of an historical figure in an expressive work relating to real-life events. Plaintiffs, however, fail to mention *Ladany*, although it is discussed at length in EA's opening brief and is on point. OB 23, 25, 27. This oversight is telling. The primary

10

difference between *Ladany* and the present case is that the defendant-author used the plaintiff-athlete's name and likeness in a book (465 F. Supp. at 872), while EA used Davis, Ferragamo, and Dupree's alleged likenesses in a video game. As *Brown* made clear, that distinction is constitutionally irrelevant, and should not erode EA's legal protections against right-of-publicity claims. 131 S. Ct. at 2737 n.4. The only way to distinguish between these two types of expressive works is to treat them differently under the First Amendment, which is impermissible. *Id.*

Plaintiffs' interpretation of incidental use would have a perverse effect on the ability of authors, filmmakers, and others to create expressive works that incorporate real people who were involved in historically significant events. Under Plaintiffs' view that a content creator cannot use an individual's name or likeness if it in any way enhances the marketability of a work (BOA 43), the author in *Ladany* would have had to negotiate a license with most of the individuals who played a part in the 1972 Munich massacre. Such an undue burden on expression would be unwarranted and unconstitutional, and might have confined Steven Spielberg to creating movies about extraterrestrials, instead of making the Academy Award-nominated film *Munich*.

To ensure that the right of publicity does not chill depictions of real-life individuals who were involved in historical events, the Court should find that EA's use of Plaintiffs' alleged likenesses in *Madden NFL* is incidental.

**B.     The Public-Interest Defense**

Plaintiffs and SAG-AFTRA offer several purported rationales for denying

*Madden NFL* protection under the constitutional public-interest test.  BOA 36-41;

SAG 23-28.  SAG-AFTRA urges the Court to circumscribe EA's right to use

athletes' names and likenesses in its expressive work on the grounds that "the

video game industry is a highly profitable enterprise," and EA is a "multi-billion

dollar" company.  SAG 26.  This is a red herring.  Decades ago, the Supreme Court

rejected the theory that "motion pictures do not fall within the First Amendment's

aegis because their production, distribution, and exhibition is a large-scale business

conducted for private profit."  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501

(1952).  That the creator of an expressive work sells it for a profit has absolutely no

bearing on its constitutional protections.[3]

SAG-AFTRA also contends that *Madden NFL* is not protected under the

public-interest defense because it "do[es] not educate" users about football.  SAG

24.  That conclusory characterization of EA's work is both constitutionally

irrelevant and factually wrong.  As discussed below and in EA's opening brief, the

game conveys a great deal of information about professional football.  *See* OB 7,

---

[3] *See, e.g., Time, Inc. v. Hill*, 385 U.S. 374, 397 (1967); *Hunt v. NBC*, 872
F.2d 289, 295 (9th Cir. 1989); *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d
860, 868-869 (1979) (Bird, C.J., concurring, with a majority of the court)
(superseded on other grounds).

32.  But even if it did not, the Supreme Court long ago determined that the "line between the informing and the entertaining is too elusive" to serve as the basis for the disparate constitutional treatment of expressive works.  *Winters v. New York*, 333 U.S. 507, 510 (1948).  The Court later reaffirmed that a work's constitutional protection "is not lessened by the fact that [it is] designed to entertain as well as to inform."  *Joseph Burstyn*, 343 U.S. at 501.  And in rejecting a right-of-publicity claim, the California Supreme Court agreed that "entertainment is entitled to the same constitutional protection as the exposition of ideas."  *Guglielmi*, 25 Cal. 3d at 867.  At bottom, SAG-AFTRA wants this Court to ignore these precedents and treat video games differently from other expressive works.

In a similar vein, Plaintiffs claim that the public-interest defense is not available because *Madden NFL* does not re-create historical football games and thus does not "pertain to 'real-life' events."  BOA 39.  But Plaintiffs are wrong to conclude that merely because a work does not *re-create* real-life events, it necessarily does not *relate to* such events.  Consider, for example, the film *Apocalypse Now*.  Although most of its characters were fictional, and it did not faithfully re-create actual historical events that took place in Vietnam, the film is widely considered the seminal film about the Vietnam War,[4] and unquestionably

---

[4] *See* R. Ebert, *Great Movies: Apocalypse Now*, Chicago Sun-Times (Nov. 28, 1999), at http://www.rogerebert.com/reviews/great-movie-apocalypse-now-1979.

DWT 23818051v2 0058278-000029

enjoys full constitutional protection.  *Citizen Kane*, *Primary Colors*, and *The Help* are other examples of important films that undeniably related to real-life events – so-called "yellow journalism," the 1992 Clinton campaign, and race relations in the American South in the early 1960s – without re-creating actual historical occurrences.  In *Guglielmi*, the California Supreme Court explicitly recognized that expressive works that blend fact and fiction are entitled to no less constitutional protection than purely factual works.  25 Cal. 3d at 867-68.

*Madden NFL* clearly pertains to real-life events:  particular NFL seasons, the league's "best and/or most popular two to four teams from a given year" (BOA 47) – including Plaintiffs' Tampa Bay Buccaneers, Los Angeles Rams, and Dallas Cowboys teams from the 1970s and 1980s, and the league's players.  *See* Motion at Exs. 1-2.  Plaintiffs allege that they are three of approximately 6,000 real-life players depicted in the game's historic-teams function, and their alleged likenesses appear *only* because they played on real-life historic NFL teams.  BOA 47; Motion at Exs. 1-2.

Plaintiffs' insistence that *Madden NFL* does not relate to real-life events also is contradicted by their own allegations.  In their complaint, Plaintiffs claim that EA violated their right of publicity by using accurate biographical information, including their actual playing "position, years in the NFL, height, weight, 'skin tone,' as well as each player's relative skill level in different aspects of the game."

14

ER 83.[5] Each player's skill level in *Madden NFL* derives initially from his real-life performance in real-life games. *Id.* Plaintiffs also repeatedly emphasize that *Madden NFL* publishes the same factual information that is found in their NFL teams' media guides (BOA 9; ER 84-85; SER 188-190, 287-289, 319-400) – information that presumably relates to their real-life attributes and accomplishments.[6] Indeed, *Madden NFL* communicates Plaintiffs' skill attributes and other biographical information in a similar manner:



---

[5] To be clear, Plaintiffs do not allege (nor could they) that EA's works that are at issue use their names, actual uniform numbers, or photographic likenesses.

[6] Plaintiffs seek to use the right of publicity to control the use of historical information about themselves, a proposition that surely violates the First Amendment. *See Comedy III Prods. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 398 (2001); T. McCarthy, 2 Rights of Publicity & Privacy § 8:64 (2d ed.).

DWT 23818051v2 0058278-000029





(*Avatar alleged to be Vince Ferragamo, '79 Rams.*  SER 339; Motion at Exs. 1-2.)

Plaintiffs' last argument is that the public-interest defense does not apply because "*Madden NFL* neither reports nor broadcasts" information about professional football.  BOA 36, citing *Keller*, 724 F.3d at 1282.  As *Winters*, *Joseph Burstyn*, and *Brown* all demonstrate, constitutional protections do not turn on labels like "reporting" or "broadcasting."  343 U.S. at 501; 333 U.S. at 510; 131 S. Ct. at 2733.  California courts have held the public-interest defense shielded a poster that advertised a newspaper's Super Bowl coverage (*Montana v. San Jose Mercury News Inc.*, 34 Cal. App. 4th 790, 795, 797 (1995)); a film featuring

DWT 23818051v2 0058278-000029

"footage of famous surfers" and "reminiscences" about their past exploits (*Dora v. Frontline Video,* 15 Cal. App. 4th 536, 540, 543 (1993)); and baseball game programs and web features celebrating retired baseball players (*Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 410 (2001)).

Yet, Plaintiffs seek to draw the constitutional line at video games, treating them differently than all other expressive works. Their "reporting" or "broadcasting" restriction singles out video games and other non-traditional forms of expression for disfavored treatment, a result that *Brown* forbids absent a compelling governmental interest. 131 S. Ct. at 2733, 2737-2738. This would jeopardize not only works like *Madden NFL*, but also video games that allow users to simulate past military battles, political campaigns, and other real-life events. *See* OB 7-8. Like EA's work, those games do not "recount actual events." BOA 40. Instead, they use the names and realistic likenesses of historical figures to create interactive worlds in which users experience what it would be like to command troops in the Battle of North Africa or to manage John Kerry's 2004 presidential campaign, or explore how those historical events might have turned out differently had different strategies been employed. Such games undoubtedly

17

inform users about military and political history, just as *Madden NFL* educates

users about football strategy, franchise management, and NFL history.[7]

Plaintiffs' cramped interpretation of the public-interest test presumably

would apply to these non-sports-related video games, as well as *Madden NFL*.

Under their interpretation, would a publisher who created a game that simulated

---

[7] The development of educational and informative video games is burgeoning. Todd Martens, *Game Changers: A New Generation Of Designers Re-Imagine Video Games With Realistic Stories And Sophisticated Choices*, L.A. Times, February 9, 2014 at A1. Game designers recently have created games that highlight abusive industrial practices, explain civil rights, educate about science, and illuminate world events. Mark Brown, *Apple Bans Phone Story Game That Exposes Seedy Side of Smartphone Creation*, Wired (Mar. 25, 2014, 3:45 PM), http://www.wired.com/gamelife/2011/09/phone-story/; *McDonald's Video Game,* Molleindustria, http://www.mcvideogame.com/why-eng.html (last visited Mar. 25, 2014); Doug Cornelius, *So Your Kid Wants to be a Civil Rights Lawyer*, Wired (Mar. 25, 2014, 3:46 PM), http://www.wired.com/geekdad/2009/12/so-your-kid-wants-to-be-a-civil-rights-lawyer; Ryan Rigney, *The Best Amendment* Indie Game Takes on the NRA, Wired (Mar. 25, 2014, 3:47 PM), http://www.wired.com/gamelife/2013/04/nra-the-best-amendment/; Andrew Groen, *8 Videogames to Get Your Kid Into Engineering*, Wired (Mar. 25, 2014, 3:48 PM), www.wired.com/gamelife/2012/12/videogames-engineering-kids/; *Climate Challenge Game*, BBC Science & Nature http://www.bbc.co.uk/sn/hottopics/climatechange/climate_challenge/aboutgame.sh tml (last visited Mar. 25, 2014); Liat Clark, *Apple Rejects iOS Game Exploring Syria's Civil War*, Wired (Mar. 25, 2014, 3:47 PM), http://www.wired.com/gamelife/2013/01/endgame-syria-ios/. Many news organizations have begun using interactive applications to convey information and allow readers to explore hypothetical or counterfactual scenarios. *See, e.g.,* Z. Krieger, *Crowdsourcing an Israeli-Palestinian Border:  A New Interactive Tool Allows You to Decide How Many Israeli Settlers to Annex and What Constitutes a Viable Palestinian State*, The Atlantic (Mar. 11, 2014), http://www.theatlantic.com/international/archive/2012/12/crowdsourcing-an-israeli-palestinian-border/265967/.

DWT 23818051v2 0058278-000029

the 2012 presidential election have to pay a license fee to Newt Gingrich to include his name or likeness?  Would the creator of a game about the Civil Rights movement have to obtain permission from the estate of Malcolm X (or the estate of George Wallace)?  The answers to those questions should be "no."  The First Amendment should protect expressive works that disseminate information about issues of public interest, even if the works are entertaining, interactive, or fixed in new media.  *Brown,* 131 S. Ct. at 2733; *see also Comedy III*, 25 Cal. 4th at 398.

Even applying the *Keller* "reporting" or "publishing" standard, *Madden NFL* should be protected because the game disseminates a substantial amount of information about NFL football:  team rosters, player profiles, team playbooks, the league's rules, methods of training, types of equipment, and the individual player attributes necessary for success on the field.  EA's work also teaches users coaching and on-field strategy, and includes diagrams and descriptions of: offensive and defensive formations that can be set at the start of a down; plays that guide the movement of both defensive and offensive players during a down; and audibles that allow users to change the play in response to the other team's movement at the beginning of a down.  This information is not conveyed simply through gameplay; it is expressed through diagrams that would be equally at home on a television commentator's telestrator or in a book about football strategy:

DWT 23818051v2 0058278-000029









(*Screen shots of game functions.  See* Motion at Exs. 1-2.)

DWT 23818051v2 0058278-000029

Even Plaintiffs point out that *Madden NFL* "contains substantially more information" than the games at issue in *Keller*.  BOA 29 n.8.  That information is not printed on a broadsheet; it is virtually published in the medium of a video game, through conventional static charts and innovative interactive features. Motion at Exs. 1-2.  But that distinction is irrelevant to the work's constitutional protection.  *Brown*, 131 S. Ct. at 2733, 2737.[8]

Each of the Plaintiffs has been mentioned in books about football history.[9] If EA had discussed Plaintiffs in a book about professional football, their claims clearly would fail.  The result cannot be different just because EA depicted them in a video game.

## C.   The Transformative-Use Test

Plaintiffs' and SAG-AFTRA's transformative-use arguments underscore how far the test has strayed from its origins in copyright law and *Comedy III*.

---

[8] Plaintiffs accuse EA of "brazenly omitting any mention of the *Keller* case" from its discussion of the public-interest test in its opening brief.  BOA 38.  That is incorrect.  OB 32 n.7.

[9] *See, e.g.,* C. Hilburn*, The Mystique of Tiger Stadium: 25 Greatest Games: The Ascension of LSU Football* (WestBow Press 2012) at 51 (recounting Vince Ferragamo's role in historic Nebraska-Louisiana State football game in 1974); G.R. Mills, *A View from the Bench: The Story of an Ordinary Player on a Big-Time Football Team* (University of Illinois Press 2004) at 36, 44, 45, 55, 65 (discussing Tony Davis' exploits as a college player); Michael Emmerich, *100 Things Michigan State Fans Should Know & Do Before They Die* (Triumph Books 2013) at 306 (summarizing Billy Joe Dupree's career at Michigan State).

DWT 23818051v2 0058278-000029

SAG-AFTRA asserts, without qualification, that "the transformative use test does not protect literal depictions" of real-life individuals.  SAG 12 & n.4.  But in *Comedy III* and *Winter*, the California Supreme Court instructed that "*factual reporting*" about and "*fictionalized portrayals*" of real-life individuals often will be transformative.  *Comedy III Prods., v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 406 (2001) (emphases added); *Winter v. DC Comics*, 30 Cal. 4th 881, 888 (2003).  Indeed, the court specifically pointed to a biography of Howard Hughes and a docudrama about Rudolph Valentino as examples of transformative uses.  *Comedy III*, 25 Cal. 4th at 406, citing *Rosemont Enterprises v. Random House*, 294 N.Y.S.2d 122, 129 (N.Y. Sup. 1968); *Guglielmi*, 25 Cal. 3d at 871-872.

The *Keller* majority, Plaintiffs, and SAG-AFTRA instead advocate what is more accurately characterized as an "altered-likeness" test.  The flaws in the altered-likeness test are apparent when one tries to apply it to a right-of-publicity claim arising from the use of an historical figure's realistic likeness in a documentary or a docudrama, or a person's actual name in an unauthorized biography.  That is the predicament that a panel of this Court soon faces in *Sarver v. The Hurt Locker LLC*.  There, the plaintiff asks the Court to declare that a docudrama about the Iraq War violates his right of publicity, and to find that such works cannot be made unless each person approves his or her depiction and is paid.  Notably, six of the eight nominees for Best Picture at the 2014 Academy Awards

23

were just like *The Hurt Locker* – they included characters based on real people, doing the sort of things they actually did, in the settings where they did them in real life.[10]  Under the *Keller* majority's no-literal-depictions test that Plaintiffs rely on, how do such films qualify as transformative?  And how do they qualify for protection under Plaintiffs' public-interest test, since they do not merely "report" or "broadcast" facts?

Plaintiffs and SAG-AFTRA misapprehend other aspects of the *Comedy III* and *Winter* opinions.  They argue, for example, that the transformative-use "analysis must focus on the individual and not the work as a whole."  SAG 15; BOA 31.  In fact, the California Supreme Court stated nine times in *Comedy III* and fifteen times in *Winter* that the inquiry should encompass "the work."  *Comedy III*, 25 Cal. 4th at 391, 406, 407, 409; *Winter,* 30 Cal. 4th at 885, 888-891.  Notably absent from Plaintiffs' or SAG-AFTRA's brief is any mention of the crucial passage from *Comedy III* where the court explains that the key to the transformative-use "inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work in synthesized, or whether the depiction or imitation of the celebrity is the *very sum and substance of the work in question*." *Id.* at 406 (emphasis added).

---

[10] The Best Picture nominees included *American Hustle*, *Captain Phillips*, *Dallas Buyers Club*, *12 Years a Slave*, *The Wolf of Wall Street*, and *Philomena*. *See* http://oscar.go.com/nominees.

In *ETW Corp. v. Jireh Publ'g*, 332 F.3d 915 (6th Cir. 2003), the Sixth

Circuit correctly applied the transformative-use test announced in *Comedy III*.

*ETW* does not remotely support Plaintiffs' position (*see* BOA 33-34); in fact, it

contradicts Plaintiffs' and SAG-AFTRA's arguments that realistic likenesses are

not transformative and that the Court may consider only Plaintiffs' alleged

likenesses and not the other creative elements in EA's work.  Although the artist-

defendant in *ETW* painted a realistic likeness of Tiger Woods at the 1997 Masters

tournament – right down to his Nike golfwear and legendary swing, and depicting

him at the iconic Augusta National Golf Club where he first catapulted to fame –

the Sixth Circuit nonetheless found that the use was transformative.  332 F.3d at

937.  And it did so in large part because of other elements – "in addition to Woods'

image" – that the artist incorporated into the work.  *Id.* at 938.

Plaintiffs also mistakenly argue that the transformative-use defense

generally cannot be decided as a matter of law.  BOA 24.  In fact, the California

Supreme Court emphasized in *Winter* that "courts can *often* resolve the question

[of transformative use] *as a matter of law* simply by viewing the work in

question," and that "an action presenting this issue is *often* properly resolved on

summary judgment or, if the complaint includes the work in question, *even

demurrer*."  30 Cal. 4th at 891-92 (finding transformative use as a matter of law)

(emphases added).

*Zacchini v. Scripps-Howard Broadcasting*, 433 U.S. 562 (1977), does not support Plaintiffs' transformative-use argument either.  Indeed, the narrow holding in *Zacchini* is of little guidance in this case.  There, the Court merely held that "[w]herever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media *when they broadcast a performer's entire act without his consent*."  433 U.S. at 574-575 (emphasis added).  The California Supreme Court has recognized that "*Zacchini* was not an ordinary right of publicity case" because it involved "a species of common law copyright violation[,]" *Comedy III*, 25 Cal. 4th at 401, and the Sixth Circuit has noted that *Zacchini* "is quite distinguishable from the unauthorized use of a person's identity, particularly when the unauthorized use is in the form of an expressive work[.]"  *ETW*, 332 F.3d at 956-957.

In *Zacchini*, a television station filmed and broadcast the entirety of an entertainer's 15-second "'human cannonball' act in which he [wa]s shot from a cannon into a net some 200 feet away."  *Id.* at 563.  In an unpersuasive attempt to suggest that this case resembles *Zacchini*, Plaintiffs claim that EA "created impersonations of retired NFL players playing football, in the same positions, on the same teams, with the same teammates, and in the same league as made them famous."  BOA 23.  But this case is decidedly not *Zacchini*, and the differences

26

underscore the predominance of EA's constitutional interests. To begin with, if it can even be said that Plaintiffs had an "act" that they performed, EA has not reproduced it, because *Madden NFL* contains no real historic games – a point that Plaintiffs make repeatedly in their brief. BOA 15, 37, 40. More broadly, EA has not prevented Plaintiffs from collecting money from people willing to buy tickets to watch them play football. Hugo Zacchini was in the middle of a two-month run at the county fair, performing an act that people were paying to see, when a local reporter filmed it against his wishes. *Id.* at 563-564. The television station then broadcast the entirety of his act for free to potential ticket-buyers. *Id.* at 564. Copyright law did not cover Zacchini's act, and unjust enrichment was not at issue, but the Court saw that his injury sounded in both: If the news station could broadcast the entire act for free to an audience that otherwise would pay to see it, he would lose his only financial reward. If he lost that reward, he would have no financial incentive to create more performances. It was crucial to the Court that the television station appropriated "*the very activity*" by which the entertainer made his living. 433 U.S. at 576 (emphasis added).

On the other hand, the Court emphasized that a "very different case" would have resulted if the station had "merely reported that petitioner was performing at the fair, and described or commented on his act, with or without showing his picture on television." *Id.* at 569. That is, an expressive work *based on* the human

27

cannonball's act, describing it, even with a depiction of him, would have been constitutionally insulated from a right-of-publicity claim. That "very different case" is this one. *Madden NFL* is an expressive work, based in exceedingly small part on Plaintiffs' career achievements. Motion at Exs. 1-2. Even if Plaintiffs still were active players, no one would forego buying tickets to watch them play because of EA's video game.

Finally, at some point, courts must address the issue of how transformative use has come to be defined so narrowly in right-of-publicity cases, while its definition in copyright cases has become ever broader. In *Comedy III*, the California Supreme Court borrowed the concept of transformative use directly from copyright law, and relied heavily on the U.S. Supreme Court's landmark transformative-use decision in *Campbell v. Acuff Rose Music*, 510 U.S. 569 (1994). There, the Court held that the defendant's rap song would be "transformative" of the plaintiff's original ballad, and not infringing, if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* at 579. Far from cabining the transformative-use test to parodies or other works that alter or distort an original work, courts in copyright cases have expanded the definition of transformativeness to encompass a broad range of uses. These include the use of: unaltered thumbnail photographs in a search engine (*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir.

DWT 23818051v2 0058278-000029

2007)); an unaltered clip from a 1960s television program in a play about that era (*Sofa Entm't v. Dodger Prods.*, 709 F.3d 1273, 1278-1279 (9th Cir. 2013)); unaltered portions of literary works in a searchable online library (*Authors Guild v. Google*, 954 F. Supp. 2d 282, 291-292 (S.D.N.Y. 2013)); unaltered photographs in works of appropriation art that did not comment on, critique, or parody the originals (*Cariou v. Prince*, 714 F.3d 694, 706-708 (2d Cir. 2013)); and unaltered concert posters in a biography of the Grateful Dead (*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608-612 (2d Cir. 2006)). In contrast, Plaintiffs, SAG-AFTRA, and the *Keller* majority suggest that transformative use "focuses on distortion or manipulation." BOA 33; SAG 13; *Keller*, 724 F.3d at 1276. Given transformative use's origins in copyright law, that simply cannot be right, and its application in right-of-publicity law cannot be limited to fantastical characters like the half-worm, half-human creatures in *Winter*, or the 25th-century intergalactic journalist in *Kirby v. Sega of America*, 144 Cal. App. 4th 47 (2006). As the California Supreme Court emphasized in *Guglielmi*, "[n]o author should be forced into creating mythological worlds or characters wholly divorced from reality" to avoid right-of-publicity claims. 25 Cal. 3d at 869.[11]

---

[11] EA continues to believe that the *Rogers/Restatement* test provides broader, constitutionally-required protections for right-of-publicity claims that target expressive works. This test is easier to apply and thus is more predictable, but it stills denies protection to works that falsely suggest an endorsement. *See* OB 41-44. EA recognizes, however, that the *Keller* majority rejected that test. 724 F.3d

## 5.

## EA'S WORK IS PROTECTED UNDER THE STATUTORY

## PUBLIC-AFFAIRS EXEMPTION.

Plaintiffs do not distinguish between the constitutional public-interest defense and the statutory public-affairs exemption. *See* BOA 36-41. As with the constitutional defense, they contend that Civil Code section 3344(d) does not apply because *Madden NFL* does not "report" or "publish" information about real-life events. *Id.* They do not attempt to reconcile *Keller*'s restrictive interpretation of Section 3344(d) with *New Kids on the Block v. News America Publ'g*, 971 F.2d 302, 310 n.10 (9th Cir. 1992), which interpreted the exemption broadly. Nor do they point to any language in the statute itself or in its legislative history that would support limiting the exemption to "reporting" or "publishing."

Instead, Plaintiffs cull this limitation from a single sentence in *Montana* that uses the term "reporting." BOA 39, citing 34 Cal. App. 4th at 795. But the court in *Montana* used that term merely to describe one aspect of the use of Joe Montana's image in that case. 34 Cal. App. 4th at 794. Nothing in *Montana* suggests that the court intended to limit application of the public-affairs exemption

---

at 1281. Some commentators have proposed a test that combines the *Rogers/Restatement* approach with *Zacchini*'s protection against the wholesale appropriation of a plaintiff's performance. *See* W. Ford and R. Liezler, *Video Games Are Not Coffee Mugs*, 29 Santa Clara Computer & High Tech. L. J. 1, 80-81, 95 (2012).

only to uses of a celebrity's image that qualify as "reporting" or "publishing."

Even under that standard, however, EA still should prevail on the public-affairs

defense because, as discussed in Section 4(B), *Madden NFL* does publish

information about a matter of public affairs:  professional football.  Motion at

Exs. 1-2.[12]

### 6.

### CONCLUSION

Sidestepping the issue of whether the right of publicity is a presumptively

invalid, content-based regulation on speech, Plaintiffs and SAG-AFTRA ask this

Court to treat video games differently than other expressive works and to banish

EA's works to a constitutional no-man's land:  too realistic to be protected under

the *Keller* majority's interpretation of the transformative-use test, yet too creative

to be protected under its interpretation of the public-interest test or public-affairs

defense.  Such an analysis is purely ends-driven and should be rejected.  Under

---

[12] Contrary to Plaintiffs' suggestion, the Court need not examine 46 different editions of *Madden NFL*.  BOA 47.  As a threshold matter, claims arising from annual editions before *Madden NFL 09* are barred by the two-year statute of limitations.  *Christoff v. Nestlé USA*, 47 Cal. 4th 468, 476 n.7 (2009); SER 2152. In addition, to avoid burdening the Court with a host of game consoles, controllers, discs, cartridges and other accessories, EA chose to present the court with the most easily accessible versions of *Madden NFL 09* – those available on the Playstation 2 and Xbox consoles.  Plaintiffs do not identify any legally relevant differences between *Madden NFL 09* for Playstation 2 or Xbox, and any other *Madden NFL* game.

DWT 23818051v2 0058278-000029

each of the potentially applicable constitutional defenses – which may be adjudicated simply by reviewing the contents of EA's game and its depiction of Plaintiffs' alleged likenesses – EA's constitutional right to free expression should prevail over Plaintiffs' economic right of publicity. EA, therefore, respectfully requests that this Court reverse the district court's ruling, grant EA's anti-SLAPP motion, and dismiss Plaintiffs' claims against EA with prejudice.

RESPECTFULLY SUBMITTED this 27th day of March, 2014.

DAVIS WRIGHT TREMAINE LLP
ALONZO WICKERS IV
KELLI L. SAGER
KAREN HENRY
KATHLEEN CULLINAN
BRENDAN CHARNEY


By: /s/ Alonzo Wickers IV
       Alonzo Wickers IV

Attorneys for Defendant-Appellant
ELECTRONIC ARTS INC.

## ADDENDUM (Circuit Rule 28-2.7)

Any relevant statutes or constitutional provisions are contained in the addendum included in EA's November 25, 2013 opening brief.

DWT 23818051v2 0058278-000029

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1.  The brief is proportionately spaced in Times New Roman 14-point type.  According to the word processing system used to prepare the brief, the word count of the brief is 6,803 words, not including the caption page, table of contents, table of authorities, addendum, and certificate of compliance.

DATED this 27th day of March, 2014.

DAVIS WRIGHT TREMAINE LLP
ALONZO WICKERS IV
KELLI L. SAGER
KAREN HENRY
KATHLEEN CULLINAN
BRENDAN CHARNEY


By: /s/ Alonzo Wickers IV
        Alonzo Wickers IV

Attorneys for Defendant-Appellant
ELECTRONIC ARTS INC.

Ninth Circuit Case No.    12-15737


CERTIFICATE OF SERVICE


I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 27, 2014


I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Signature:  /s/ Carolina Solano