NO. 12-15737

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MICHAEL E. DAVIS, AKA Tony Davis; et al.,

PLAINTIFFS-APPELLEES,

v.

ELECTRONIC ARTS INC.,

DEFENDANT-APPELLANT.

On Appeal from the United States District Court
for the Northern District of California
Case No. 10-cv-03328-RS

The Honorable Richard Seeborg, District Court Judge

**BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION
AND ORGANIZATION FOR TRANSFORMATIVE WORKS
IN SUPPORT OF DEFENDANT-APPELLANT'S
PETITION FOR REHEARING EN BANC**

Betsy Rosenblatt
Rebecca Tushnet
ORGANIZATION FOR
TRANSFORMATIVE WORKS
2576 Broadway, Suite 119
New York, NY 10025
Telephone: (703) 593-6759
Email: betsy_rosenblatt@post.harvard.edu

Daniel K. Nazer
Corynne McSherry
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Email: daniel@eff.org

*Counsel for Amici Curiae*

**DISCLOSURE OF CORPORATE AFFILIATIONS AND
OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST IN
LITIGATION**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* Electronic Frontier Foundation and Organization for Transformative Works state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES
WITH A DIRECT FINANCIAL INTEREST IN LITIGATION.....................i

STATEMENT OF INTEREST.................................................................1

INTRODUCTION ................................................................................2

ARGUMENT.......................................................................................3

    I.   The Panel Decision Presents Exceptional Circumstances That Merit
        Rehearing *En Banc*. ...............................................................3

    II.  The Court Should Revisit (and Reject) the Transformative Use Test
        Applied in *Keller*.................................................................6

        A.  The Transformative Use Test Is a Bad Fit for Publicity Rights........8

        B.  The Transformative Use Test Penalizes Realistic Speech. ..............11

        C.  The *Davis* and *Keller* Courts Compounded Their Error By Applying
           the Transformative Use Test in an Inflexible Manner. ...................13

    III. The *Rogers*/Restatement Test is a Much Better Standard. ......................14

    IV. Even if EA Can Afford to Pay, Many Other Speakers Will be Silenced
        By the Rule Established in This Case. ....................................16

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
PURSUANT TO FED. R. APP. P. 32(A)(7)(C) ............................................18

CERTIFICATE OF SERVICE ............................................................19

ii

# TABLE OF AUTHORITIES

## Federal Cases

Bi-Rite Enterprises, Inc. v. Bruce Miner Co.,
  757 F.2d 440 (1st Cir. 1985) ................................................................. 6

Bleistein v. Donaldson Lithographing Co.,
  188 U.S. 239 (1903) ........................................................................... 10

Campbell v. Acuff-Rose Music, Inc.,
  510 U.S. 569 (1994) ........................................................................ 9, 10

Cardtoons, L.C. v. Major League Baseball Players Ass'n,
  95 F.3d 959 (10th Cir. 1996) ............................................................ 3, 5

*Davis v. Elec. Arts Inc.*,
  No. 12-15737, 2015 WL 66510 (9th Cir. Jan. 6, 2015) .................... 7, 13

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003) .......................................................................... 8, 9

*ETW Corp. v. Jireh Publ'g, Inc.*,
  99 F. Supp. 2d 829 (N.D. Ohio 2000) ............................................... 15

*ETW Corp. v. Jireh Publ'g, Inc.*,
  332 F.3d 915 (6th Cir. 2003) ................................................................ 3

*Facenda v. N.F.L. Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008) ............................................................. 14

*Golan v. Holder*,
  132 S. Ct. 873 (2012) ........................................................................... 8

Grayned v. City of Rockford,
  408 U.S. 104 (1972) ........................................................................... 17

Harper & Row Publishers, Inc. v. Nation Enters.,
  471 U.S. 539 (1985) ............................................................................. 9

*Hart v. Elec. Arts, Inc.*,
  717 F.3d 141 (3d Cir. 2013) ............................................................... 12

*Hart v. Elec. Arts, Inc.*,
  808 F. Supp. 2d 757 (D.N.J. 2011) ................................................................. 17

Hoffman v. Capital Cities/ABC, Inc.,
  255 F.3d 1180 (9th Cir. 2001) ..................................................................... 5

*Keller v. Elec. Arts*,
  724 F.3d 1268 (9th Cir. 2013) ............................................................ *passim*

*Keller v. Electronics Arts, Inc.*,
  No. C 09-1967 CW, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010) ...................... 17

*Parks v. LaFace Records*,
  329 F.3d 437 (6th Cir. 2003) ........................................................................ 4

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ............................................................... 4, 14, 15

*Toffoloni v. LFP Publ'g Group*, LLC,
  572 F.3d 1201 (11th Cir. 2009) ..................................................................... 4

*United States v. Alvarez*,
  132 S. Ct. 2537 (2012) ........................................................................ 11, 12

**State Cases**

Comedy III Prods., Inc. v. Gary Saderup, Inc.,
  25 Cal. 4th 387 (2001) .......................................................................... *passim*

*Doe v. TCI Cablevision*,
  110 S.W.3d 363 (Mo. 2003) ..................................................................... 5, 16

No Doubt v. Activision Publ'g, Inc.,
  192 Cal. App. 4th 1018 (2011) ...................................................................... 7

*Winter v. DC Comics*,
  30 Cal. 4th 881 (2003) ............................................................................ 8, 11

**Other Authorities**

Diane L. Zimmerman, Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights, 50 B.C. L. Rev. 1503 (2009) ........................ 16

Eugene Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903 (2003) ...................................................................................................... 11

Michael A. Carrier, Cabining Intellectual Property Through a Property Paradigm, 54 Duke L.J. 1 (2004) ........................................................................................ 10

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ...... 9

Rebecca Tushnet, A Mask that Eats into the Face: Images and the Right of Publicity, 38 Colum. J.L. & Arts 1 (2015) ................................................. 8, 10, 12

Restatement (Third) Of Unfair Competition § 47 (1995) ............................ 4, 14, 15

Stacey L. Dogan & Mark A. Lemley, What the Right of Publicity Can Learn *from Trademark Law*, 58 Stan. L. Rev. 1161 (2006) ................................ 9, 10, 15

## STATEMENT OF INTEREST

*Amicus* Electronic Frontier Foundation is a member-supported, non-profit public interest organization dedicated to protecting digital civil liberties and free expression. Founded in 1990, EFF represents more than 25,000 contributing members. EFF has a strong interest in ensuring the First Amendment provides consistent and reliable protection to would-be speakers by placing a clear constitutional limit on the types of speech and expression subject to publicity rights claims.

*Amicus* Organization for Transformative Works ("OTW") is a 501(c)(3) nonprofit dedicated to protecting and preserving noncommercial works created by fans based on existing works, including popular television shows, books, and movies (often described as "fanworks"). OTW's nonprofit website hosting transformative noncommercial works, the Archive of Our Own ("AO3"), has over 400,000 registered users and receives upwards of 60 million page views per week. The OTW and its many users have a strong interest in a reliable First Amendment right to create and appreciate fanworks without interference from overreaching publicity rights.

Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no one, except for undersigned counsel, has authored the brief in whole or in part, or contributed money towards the preparation of this brief. Defendant-Appellant Electronic Arts

("EA") consented to the filing of this brief. Plaintiffs-Appellees Davis, Ferragamo, and Dupree informed *amici* that they object the filing of this brief. Thus, pursuant to Circuit Rule 29-2(a), *amici* have concurrently filed a motion for leave to file this brief.

## INTRODUCTION

The right of publicity potentially burdens a staggering range of speech. Originally construed as a limit on images in advertising, it has been asserted against biographies, comics, songs, computer games, movies, and magazines, and has come to encompass virtually anything that "evokes" a specific person. Moreover, in some states, those claims can be made decades after the subject has died. In light of this potential burden, finding the right balance between the right of publicity and the First Amendment is critical.

*Amici* believe that the panel's decision in this case, specifically its embrace of the transformative use test announced in *Keller v. Elec. Arts*, 724 F.3d 1268 (9th Cir. 2013), got that balance wrong. The transformative use test considers whether the challenged work adds creative elements to a given likeness such that it becomes "something more" than a mere imitation or replica. Unfortunately, while transformativeness may make sense for copyright and fair use, it is a bad fit for publicity rights. Many creative works that might include a likeness of a person, like biographies and documentaries, seek to offer accurate portrayals of those persons.

Thus, their producers may make a sensible artistic choice *not* to add creative elements. That artistic choice should not subject them to legal liability.

What is worse, the decision (paired with *Keller*) has added to an already confused legal landscape. Courts have adopted a variety of inconsistent tests when considering First Amendment limits on the right of publicity. Some have borrowed from copyright law, others from trademark law, and others have applied *ad hoc* balancing tests. The result is dangerous uncertainty for filmmakers, visual artists, and other creators. The Court should grant the petition for rehearing *en banc* and, on rehearing, bring this Court's approach in line with the sensible approach adopted by the Second and Sixth Circuit, as well as the Restatement of Unfair Competition.

## ARGUMENT

### I.  The Panel Decision Presents Exceptional Circumstances That Merit Rehearing *En Banc*.

Given the wide range of speech potentially subject to right of publicity claims, and the censorial impact such claims can have on that speech, many courts agree that publicity rights are subject to the First Amendment limits. *See, e.g.*, *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 936 (6th Cir. 2003); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 962 (10th Cir. 1996); *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 396 (2001)

(acknowledging the "tension between the right of publicity and the First Amendment").

However, courts around the country take widely disparate approaches to determining those limits. Some courts have adopted the so-called "Rogers test," which asks whether the defendant's use is "wholly unrelated" to the content of the accused work or was "simply a disguised commercial advertisement for the sale of goods or services." *See Parks v. LaFace Records*, 329 F.3d 437, 461 (6th Cir. 2003) (citing *Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989)). The Restatement (Third) Of Unfair Competition § 47 (1995) applies a similar standard. The Restatement limits the application of publicity rights to only those uses made "for purposes of trade"—that is, uses that appear "in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user." Restatement § 47. It further explains that "for purposes of trade" does not include "news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses." *Id.*

Other courts have applied other First Amendment doctrines, invoking a "newsworthiness" standard or the "actual malice" test to define First Amendment limits on publicity rights. *See Toffoloni v. LFP Publ'g Group*, LLC, 572 F.3d 1201, 1208 (11th Cir. 2009); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186-

88 (9th Cir. 2001). Still others apply an amorphous balancing test. For example, the Tenth Circuit weighed one party's "right to free expression and the consequences of limiting that right" against "the effect of infringing" the other party's publicity rights. *Cardtoons*, 95 F.3d at 972; *see also Doe v. TCI Cablevision*, 110 S.W.3d 363, 374 (Mo. 2003) (considering whether "a product is being sold that predominantly exploits the commercial value of an individual's identity").

Wading into the fray, this Court rejected its earlier "actual malice" approach in favor of yet another standard, a "transformativeness" test borrowed from the fair use doctrine in copyright. This test assesses the extent to which a defendant's work "adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." *Comedy III*, 25 Cal. 4th at 391.

As explained below, this last test is a dangerous one for free speech. Granting rehearing will give this Court a much-needed opportunity to clarify the right balance between the publicity rights and free speech, and consider carefully the costs of diverging from the sensible balance struck by the Sixth and Second Circuits, as well as the Restatement.

That consideration is sorely needed, given the current split among the circuits. Today, an artist creating a work about a real person has little idea how a court might evaluate liability for use of that person's likeness, particularly if she

5

cannot be certain which jurisdiction's rules might govern the analysis. *See, e.g.*, *Bi-Rite Enterprises, Inc. v. Bruce Miner Co.*, 757 F.2d 440, 443 (1st Cir. 1985) (applying complex multi-factor choice of law analysis to determine which state's right of publicity law applied). Would the court apply the relatively speech-protective *Rogers*/Restatement test? Or would the court apply an unpredictable balancing test? Or would the court consider whether the artist "transformed" the celebrity likeness somehow? Given the stakes, and the uncertain landscape, careful review by the full court (a court which, not coincidentally, has jurisdiction over regions that are intensely engaged in creative arts) is necessary and appropriate..

Importantly, this is the Court's first opportunity to reconsider whether this Circuit should embrace the transformativeness test. This Court adopted the test in *Keller*, but that case settled, preventing further review. Given the huge range of expression at issue, and the uncertain legal landscape, there is an acute need for that very review.

## II.    The Court Should Revisit (and Reject) the Transformative Use Test Applied in *Keller.*

The transformative use test originates with the California Supreme Court's decision in *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001). In that case, the court considered whether a t-shirt bearing a charcoal drawing depicting The Three Stooges infringed the Stooges' right of publicity. *See* 25 Cal. 4th at 393. In considering how the First Amendment might apply, the court

suggested that the right of publicity was an "intellectual property right" similar to copyright and, therefore, copyright's fair use doctrine should inform the analysis. *Id.* at 399. In particular, the court reasoned that while it did not make sense to import fair use "wholesale" into right of publicity law, it nonetheless could apply the first fair use factor and ask whether the use is "transformative." *Id.* at 404. Thus, the central inquiry became whether or not the "artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain." *Id.* at 405.

*Davis* (following *Keller*) directly applied the rule and reasoning of *Comedy III.* Thus, this case squarely presents the question of whether the transformative use test is the appropriate standard. The answer to that question is no. *First*, the copyright's concept of transformativeness, while facially appealing, cannot be easily adapted to the very different context of publicity rights. *Second*, and relatedly, the transformative use test has had the unintended consequence of creating collateral damage for all kinds of creative works. Fairly interpreted, a "transformation" requirement could means literal depictions of celebrities (and other persons) may be subject to liability, no matter how necessary that literal quality may be to the purpose of the work, while parodic or otherwise fanciful depictions will likely be protected. *Compare No Doubt v. Activision Publ'g, Inc.*, 192 Cal. App. 4th 1018, 1034-35 (2011) (realistic depiction of musicians not

protected by First Amendment) *with Winter v. DC Comics*, 30 Cal. 4th 881, 890 (2003) (depiction of musicians as half-man/half-worm creatures was transformative and thus protected). Such an arbitrary distinction puts a vast swath of legitimate speech at risk.

Those two problems were compounded in this case, and *Keller*, by the court's refusal to look at the secondary work as a whole. By focusing instead on the particular use, the panel lost sight of the overall purpose of the work – the very essence of a transformativeness analysis in copyright.

### A. The Transformative Use Test Is a Bad Fit for Publicity Rights.

The rule announced in *Comedy III* is founded on an analogy between copyright and the right of publicity. But fundamental differences between these legal interests suggest that copyright was the wrong place to look. First, the right of publicity lacks copyright's constitutional pedigree. In considering free speech limits to copyright, the Supreme Court has repeatedly emphasized that the First Amendment and the Copyright Clause were adopted "close in time." *Golan v. Holder*, 132 S. Ct. 873, 889 (2012) (quoting *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003)). In contrast, the right of publicity is a relatively recent offshoot of state privacy torts. *See* Rebecca Tushnet, *A Mask that Eats into the Face: Images and the Right of Publicity*, 38 Colum. J.L. & Arts 1, 3-4 (2015)[1]; Stacey L. Dogan &

---

[1] Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2557985

8

Mark A. Lemley, *What the Right of Publicity Can Learn from Trademark Law*, 58 Stan. L. Rev. 1161, 1168-75 (2006). So while courts have treated copyright as broadly "compatible with free speech principles," *Eldred*, 537 U.S. at 219, there is no reason to make the same assumption for the right of publicity. Courts should therefore be hesitant to apply copyright standards to the much more recent restriction on speech.

Second, unlike the right of publicity, copyright's fair use doctrine balances *competing* free speech interests. As the Supreme Court has noted, copyright provides an incentive to create speech. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985) (describing copyright as an "engine of free expression"). At the same time, without appropriate limitations, exclusive rights can impede the creation and dissemination of new works. *See* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1109 (1990). The fair use doctrine allows copyright to balance this tension between competing speech interests. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575-76 (1994) (the need to protect authors while allowing others to build on their work is an "inherent tension" as old as copyright itself).

While copyrights reward the creation of new speech and expression, publicity rights serve no such function. To the extent the right of publicity provides an incentive for speech, or even an incentive to become a celebrity, any

9

inducement is weak and attenuated. *See* Michael A. Carrier, *Cabining Intellectual Property Through a Property Paradigm*, 54 Duke L.J. 1, 43-44 (2004). Applying a test that is designed to help balance competing speech interests to a situation where one side has no speech interest makes very little sense.

Finally, an emphasis on "transformativeness" makes little sense in the right of publicity context given that there is no *original work* to be "transformed." Not surprisingly, when applied the test tends to turn on the court's evaluation of artistic or social merit – precisely the kind of artistic judgment that the Supreme Court has counseled against in the copyright context. *See, e.g.*, *Campbell*, 510 U.S. at 582-83; *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251-52 (1903).

Indeed, the incoherence of the test is seen in the *Comedy III* decision itself. There, the California Supreme Court attempted to distinguish Saderup's charcoal drawing of The Three Stooges from Andy Warhol's famous silkscreens of Marylyn Munroe. *See* 25 Cal. 4th at 408-09. The court suggested that Warhol's work was transformative because "through distortion and the careful manipulation of context, Warhol was able to convey a message that went beyond . . . commercial exploitation." *Id.* But, as many commentators have noted, there is "little difference between Warhol's depictions and Saderup's, except that Warhol is already a recognized artist." Dogan & Lemley, *supra*, 58 Stan. L. Rev. at 1178 n.77; *see also* Tushnet*, supra*, 38 Colum. J.L. & Arts at 12-13; Eugene Volokh, *Freedom of*

*Speech and the Right of Publicity*, 40 Hous. L. Rev. 903, 913-25 (2003). Since "transformative use" cannot distinguish Warhol from Saderup, the court's own artistic judgment does all the work.

The California Supreme Court's reliance on "transformative use" was based on deeply faulty premises. With respect, *amici* submit that this Court should not have adopted the *Comedy III* test for this reason alone,

### B. The Transformative Use Test Penalizes Realistic Speech.

Since it imports its test from such a different context, it is hardly surprising that the *Comedy III* approach fails to adequately protect free expression, in particular largely factual expression that depends on realistic depictions or real people. Indeed, an enormous range of expression derives its value from realism. Should a biography be less protected because it is accurate? Should a biopic be less protected because the actors and makeup artists do an uncannily good job of imitating the movie's real-life inspiration? If qualifying for free speech protection requires an artist to turn her subject into a half-man/half-worm creature, as was the case in *Winter*, then something has gone very seriously wrong.

In fact, in most contexts our courts provide less protection for inaccurate speech. *See generally United States v. Alvarez*, 132 S. Ct. 2537, 2553-55 (2012) (Breyer, J., concurring). Even then, the Supreme Court has made it clear that falsehoods can be regulated only in narrow circumstances—such as perjury, fraud,

and defamation. *See id.* (noting that laws prohibiting false statements impose strict *mens rea* requirements and require proof of harm). The rule applied in *Comedy III*, *Keller*, and this case, which instead penalizes realistic portrayals, upends the Supreme Court's free speech jurisprudence. *See* Tushnet, *supra*, 38 Colum. J.L. & Arts at 37  (right of publicity jurisprudence has become "a body of law out of step with the rest of First Amendment doctrine" because it "discriminates against visual realism for no articulated reason").

The dissents in *Keller* and *Hart v. Elec. Arts, Inc.*, 717 F.3d 141 (3d Cir. 2013)[2] forcefully illustrate the problem. As then Circuit Judge Thomas explained:

> The stakes are not small. The logical consequence of the majority view is that all realistic depictions of actual persons, no matter how incidental, are protected by a state law right of publicity regardless of the creative context. This logic jeopardizes the creative use of historic figures in motion pictures, books, and sound recordings.

*Keller*, 724 F.3d at 1290 (Thomas, J. dissenting). Considering the same issues, a panel of the Third Circuit similarly split 2-1. The dissent explained that the majority's approach was "at odds with the First Amendment protection afforded to expressive works incorporating real-life figures [because t]hat. protection does not depend on whether the characters are depicted realistically or whether their inclusion increases profits." *Hart*, 717 F.3d at 174 (Ambro, J. dissenting).

---

[2] Cert. dismissed, 135 S. Ct. 43 (2014) (denying certiorari pursuant to Supreme Court Rule 46.1 after the parties settled the dispute).

**C.** **The *Davis* and *Keller* Courts Compounded Their Error By Applying the Transformative Use Test in an Inflexible Manner.**

For the reasons given above, the transformative use test is poorly suited to the right of publicity context. The test becomes even more problematic if courts that apply it fail to analyze a work as a whole. The majority decision in *Keller* illustrates this problem. The court wrote, "EA's use does not qualify for First Amendment protection as a matter of law because it literally recreates Keller in the very setting in which he has achieved renown." *Id.* at 1271. The court focused narrowly on the specific depiction of Keller. *See id.* at 1276 n.7 (suggesting that Electronic Arts cannot "hide behind the numerosity of its potential offenses or the alleged unimportance of any one individual player"); *Davis v. Elec. Arts Inc.*, No. 12-15737, 2015 WL 66510, at *6 (9th Cir. Jan. 6, 2015) (same). This effectively ignores EA's broader creative enterprise, such as the recreation of dozens of locations, hundreds of players, and the complex programing that allows players to create entirely new narratives.

The danger of this approach can be seen by considering how it would apply to other works such as a historical reenactment in documentaries. A documentarian might go to great lengths to accurately represent a large number of historical figures. *But cf. Keller*, 724 F.3d at 1276 n.7 ("If EA did not think there was value in having an avatar designed to mimic each individual player, it would not go to the lengths it does to achieve realism in this regard."). Any consideration of the use

13

of a particular likeness, image, etc., must look to that context, i.e., the *purpose* of the use, not simply the use itself. Indeed, that it precisely how transformativeness is analyzed in copyright; one looks to the overall transformative purpose of the work, not a mere snippet of that work.

### III. The *Rogers*/Restatement Test is a Much Better Standard.

On rehearing, the Court should revisit its analysis of the alternate standard that originates with *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). Of the various tests used by the courts, only the *Rogers*/Restatement test appropriately balances free speech and the right of publicity. Under this test, the right of publicity trumps a speaker's First Amendment right when the speaker falsely represents that a celebrity has endorsed a product or service. *See* Restatement § 47; *see also Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1032 (3d Cir. 2008) (the right of publicity "is meant to protect is a citizen's prerogative not to have his or her name, likeness, voice, or identity used in a commercial advertisement"). This approach draws a clean line based on the well-established distinction between commercial speech and noncommercial speech. It protects celebrities and consumers from unauthorized commercial speech. At the same time, the test shields creative expression that happens to be about a celebrity (including books, movies, and news reporting).

Importantly, although the Restatement allows right of publicity claims to reach some merchandising, it recognizes that "creative works" require First Amendment protection. Restatement § 47, comment c. Many items sold for profit—be they posters, trading cards or t-shirts—include expressive content and thus are protected as creative works. *See, e.g.*, *ETW Corp. v. Jireh Publ'g, Inc.*, 99 F. Supp. 2d 829, 836 (N.D. Ohio 2000), aff'd 332 F.3d 915 (6th Cir. 2003) (the "print at issue herein is an artistic creation").

The majority in *Keller* argued that the *Rogers* test should not apply because it "was designed to protect consumers from the risk of consumer confusion—the hallmark element of a Lanham Act claim." 724 F.3d at 1280. The court instead borrowed a test from copyright law. But, to the extent the right of publicity can be analogized to an intellectual property right, it is much more similar to trademark than copyright. *See* Dogan & Lemley, *supra*, 58 Stan. L. Rev. at 1220 (arguing that the "best justifications for a right of publicity are trademark-based justifications, and trademark law, unlike the right of publicity, has developed a generally coherent set of rules designed to promote those purposes"). Far from weighing against the *Rogers*/Restatement test, its trademark origins support its adoption in the right of publicity context. At the very least, this Court should hear this case *en banc* to address these important and fundamental questions.

**IV.    Even if EA Can Afford to Pay, Many Other Speakers Will be Silenced By the Rule Established in This Case.**

The stakes of this case go far beyond its effect on one gaming company's bottom line. EA is a corporation with a market capitalization in the billions. It can afford to litigate this case and, if it loses, might still be able to afford to produce the *Madden NFL* series of games. But very few speakers have these kinds of resources. For most individuals, even most companies, just the threat of a lawsuit can be enough to chill speech.

These concerns are not hypothetical. In *Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003), the Missouri Supreme Court upheld a right of publicity claim against a comic book that used hockey player's nickname as the name of a fictional character. The much-criticized judgment in that case drove the publisher out of business, providing a dramatic example of the speech-silencing power of the right of publicity. *See* Diane L. Zimmerman, *Money as a Thumb on the Constitutional Scale: Weighing Speech Against Publicity Rights*, 50 B.C. L. Rev. 1503, 1507 (2009).

The transformative use test applied in this case is likely to chill a wide range of protected expression. As already noted, it fails to protect speech that includes realistic depictions. This could include Hollywood biopics that seek to portray large numbers of actual persons realistically, such as *Hoffa* (1992), *The Insider* (1999), or *Casino* (1995). It could also include the speech of less wealthy speakers

16

such as documentary producers or independent journalists. The danger to speech is amplified by the unpredictability of the transformative use test. Federal judges have reached different results applying the test to identical works. *Compare Hart v. Elec. Arts, Inc.*, 808 F. Supp. 2d 757, 762 (D.N.J. 2011) with *Keller v. Electronics Arts, Inc.*, No. C 09-1967 CW, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010). The Supreme Court has long warned that unpredictable or unclear restrictions are an acute danger to speech. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

## CONCLUSION

For the above reasons, *amici* urge the Court to rehear this case *en banc*.

Dated: January 30, 2015

By: /s/ Daniel K. Nazer
Daniel K. Nazer
Corynne McSherry
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
daniel@eff.org

Betsy Rosenblatt
Rebecca Tushnet
ORGANIZATION FOR
TRANSFORMATIVE WORKS
2576 Broadway, Suite 119
New York, NY 10025
Telephone: (703) 593-6759
betsy_rosenblatt@post.harvard.edu

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.      This Brief of Amici Curiae Electronic Frontier Foundation and Organization for Transformative Works In Support of Defendant-Appellant complies with the type-volume limitation, because this brief contains 3,880 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: January 30, 2015                    By: /s/ Daniel K. Nazer __
                                                Daniel K. Nazer

                                           *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 30, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: January 30, 2015                    By:   /s/ Daniel K. Nazer__
                                                Daniel K. Nazer

                                           *Counsel for Amici Curiae*

19