No. 12-15737

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

MICHAEL E. DAVIS, aka Tony Davis, et al.,

*Plaintiffs-Appellees,*

v.

ELECTRONIC ARTS INC.,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
The Honorable Richard Seeborg
Case No. 10-cv-03328-RS

---

**BRIEF OF *AMICI CURIAE* 27 INTELLECTUAL PROPERTY AND
CONSTITUTIONAL LAW PROFESSORS IN SUPPORT OF
DEFENDANT-APPELLANT'S
PETITION FOR REHEARING EN BANC**

---

Jennifer E. Rothman
Loyola Law School
919 Albany St.
Los Angeles, CA 90015
(213) 736-2776
jennifer.rothman@lls.edu

Eugene Volokh
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

Attorneys for *Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES ....................................................... ii

INTEREST OF *AMICI CURIAE* ................................................ 1

SUMMARY OF ARGUMENT ..................................................... 2

ARGUMENT .................................................................................. 5

    I.   Video Games That Refer to Real People Are Fully Protected
        by the First Amendment.............................................................5

        A.   The Panel Decision and the *Keller* Majority Decision
             Jeopardize a Wide Range of Films, Books, and Other
             Works .....................................................................................5

        B.   The Video Games in This Case and in *Keller* Satisfy the
             California Supreme Court's "Transformative Work" Test ..10

        C.   The En Banc Court Should Independently Determine
             the Appropriate First Amendment Analysis for the
             Right of Publicity ...............................................................13

    II.  The First Amendment Analysis Should be Consistent in
        Lanham Act and Right of Publicity Cases ................................17

CONCLUSION ........................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Brown v. Electronic Arts, Inc.*, 724 F.3d 1235 (9th Cir. 2013) ........ 5, 17, 20

*Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011) .......................... 3, 5

*C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media,* 505 F.3d 818 (8th Cir. 2007) ........................................ 4, 6, 15, 16

*Charles v. City of Los Angeles*, 697 F.3d 1146 (9th Cir. 2012) .................. 13

*Comedy III Prods. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001) ............................................................................... 10, 11, 12

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008) ................................................................... 18

*ETW Corp. v. Jireh Publ'g, Inc.* 332 F.3d 915 (6th Cir. 2003) .................... 6

*Faulkner Literary Rights, LLC v. Sony Pictures Classics Inc.*, 953 F. Supp. 2d 701 (N.D. Miss. 2013) ................................................................. 3

*Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001) ......... 16

*In re NCAA Student-Athlete Name & Likeness Licensing Litigation ("Keller v. Electronic Arts")*, 724 F.3d 1268 (9th Cir. 2013) ........... passim

*Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) ................................ 6

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) ............................ 19

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ............................... passim

*Sarver v. Hurt Locker LLC*, 2011 WL 11574477 (C.D. Cal. 2011) .............. 4

*Tyne v. Time Warner Entm't Co., L.P.*, 901 So. 2d 802 (Fla. 2005) ........ 4, 6

*White v. Samsung Electronics Am.*, 989 F.2d 1512 (9th Cir. 1993) ............ 5

## Statutes

Cal. Civ. Code § 3344(d) ............................................................... 7

## Other Sources

Restatement (Third) Unfair Comp. § 47 cmt. c (1995) ............................ 14

iii

## INTEREST OF *AMICI CURIAE*

*Amici* are law professors who teach or write about intellectual property or constitutional law (institutional affiliations are listed for identification purposes only):

| | |
|---|---|
| Jack Balkin | Yale Law School |
| Barton Beebe | NYU School of Law |
| Stacey L. Dogan | Boston Univ. School of Law |
| Gregory Dolin | Univ. of Baltimore School of Law |
| Eric M. Freedman | Hofstra Univ. School of Law |
| Brian L. Frye | Univ. of Kentucky College of Law |
| William T. Gallagher | Golden Gate Univ. School of Law |
| Jon M. Garon | Nova Southeastern Univ. Law Center |
| Jim Gibson | Univ. of Richmond School of Law |
| Eric Goldman | Santa Clara Univ. School of Law |
| Stacey M. Lantagne | Univ. of Mississippi School of Law |
| Mark A. Lemley | Stanford Law School |
| Raizel Liebeler | John Marshall Law School |
| Lawrence Lessig | Harvard Law School |
| Barry P. McDonald | Pepperdine University School of Law |
| Tyler Ochoa | Santa Clara Univ. School of Law |
| Aaron Perzanowski | Case Western Reserve Univ. School of Law |
| Lisa P. Ramsey | Univ. of San Diego School of Law |
| Martin H. Redish | Northwestern Univ. School of Law |
| Betsy Rosenblatt | Whittier Law School |
| Jennifer E. Rothman | Loyola Law School, Los Angeles |
| Steven H. Shiffrin | Cornell Univ. School of Law |
| Christopher Jon Sprigman | NYU School of Law |
| Geoffrey R. Stone | Univ. of Chicago Law School |
| Rebecca Tushnet | Georgetown Univ. Law Center |
| Eugene Volokh | UCLA School of Law |
| David Welkowitz | Whittier Law School |

*Amici* are concerned about the danger that unduly broad readings of the right of publicity, such as the one in this case, pose to the constitutionally secured right of freedom of speech.[1]

## SUMMARY OF ARGUMENT

The panel decision in this case followed the majority opinion in *In re NCAA Student-Athlete Name & Likeness Licensing Litigation* ("*Keller v. Electronic Arts*"), 724 F.3d 1268 (9th Cir. 2013) (commonly known as *Keller*), which defines this Circuit's law on the right of publicity and the First Amendment. No petition for rehearing en banc was filed in *Keller*, so this is the first clear opportunity for the entire Circuit to consider whether *Keller* is correct.

*Keller*'s conclusion that references to real players in fantasy sports video games are not protected by the First Amendment is mistaken, and dangerously so. The *Keller* majority begins with the sentence, "Video games are entitled to the full protections of the First Amendment, . . . '[l]ike the protected books, plays, and movies that preceded them[.]'" 724

---

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money to fund preparing or submitting the brief. All expenses have been paid by UCLA School of Law and Loyola Law School, Los Angeles. Defendant has consented to the filing of this brief, but plaintiffs have declined.

F.3d at 1270-71 (quoting *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011)). It therefore follows that, to the extent video games may infringe the right of publicity for depicting or referring to real people, so may books, plays, songs, and films.

Thus, under the logic of *Keller*, the makers of the recent film *Selma* might be liable for a host of right of publicity violations unless they got permission from Coretta Scott King, Andrew Young, John Lewis, Harry Belafonte, and the heirs of Martin Luther King, Jr., J. Edgar Hoover, Lyndon Johnson, and others. The Academy Award-winning *Forrest Gump* might also have infringed historical figures' right of publicity unless the filmmakers got permission from the Elvis Presley, John Lennon, and Abbie Hoffman estates. Simon & Garfunkel's *Mrs. Robinson*, which asked "Where have you gone, Joe DiMaggio?," might have infringed Joe DiMaggio's right of publicity.

Likewise, the Faulkner estate's recent lawsuit over the use of Faulkner's name in *Midnight in Paris* could have succeeded. *See Faulkner Literary Rights, LLC v. Sony Pictures Classics Inc.*, 953 F. Supp. 2d 701, 713 (N.D. Miss. 2013) (noting estate's claim for "commercial misappropriation"—here another label for the right of publicity—and declining

supplemental jurisdiction over claim). Jeffrey Sarver's lawsuit against the producers of the movie *The Hurt Locker* for evoking his identity as a member of an army bomb squad in Iraq could likewise have succeeded. *See Sarver v. Hurt Locker LLC*, 2011 WL 11574477, at *6-*7 (C.D. Cal. 2011) (granting anti-SLAPP motion to strike right of publicity claim), *appeal pending*, Nos. 11-56986, 12-55429; *see also Tyne v. Time Warner Entm't Co., L.P.*, 901 So. 2d 802 (Fla. 2005) (rejecting similar claim as to film *The Perfect Storm*).

Fortunately, the law does not require such results. The Ninth Circuit is, of course, not bound by a state court's interpretation of the First Amendment; but even under the California Supreme Court's "transformative work" test, all these works, including the fantasy football video games involved in *Keller* and in this case, are constitutionally protected. Likewise, under the two other First Amendment tests commonly applied by federal courts to the right of publicity—the Second Circuit's test in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), and the Eighth Circuit's test in *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media,* 505 F.3d 818 (8th Cir. 2007)—all these works, including the fantasy sports games, are constitutionally protected. And the

4

logic of this Court's decision in *Brown v. Electronic Arts, Inc.*, 724 F.3d 1235 (9th Cir. 2013), which holds that such works are protected from trademark law claims, counsels in favor of the same result in right of publicity cases.

The conclusion that the First Amendment does not protect depictions of real people in expressive works, whether in fictional or non-fictional settings, cannot be right. Yet this is the world that the panel decisions in *Davis* and *Keller* risk creating. Whether to preserve, reverse, or modify the circuit law created by *Keller* thus merits this Court's en banc attention—especially since this Court is the "Court of Appeals for the Hollywood Circuit," *White v. Samsung Electronics Am.*, 989 F.2d 1512, 1521 (9th Cir. 1993) (Kozinski, J., dissenting from denial of rehearing en banc), and for the Silicon Valley Circuit as well.

## ARGUMENT

### I. Video Games That Refer to Real People Are Fully Protected by the First Amendment

#### A. The Panel Decision and the *Keller* Majority Decision Jeopardize a Wide Range of Films, Books, and Other Works

Video games merit full First Amendment protection. *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011). Like novels, films, biographies,

and newspapers, video games regularly refer to real people in their accounts of both current and historical events. Such references have long been thought protected by the First Amendment. *See*, *e.g.*, *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media,* 505 F.3d 818 (8th Cir. 2007) (use of athletes' identities in fantasy sports leagues protected by First Amendment); *ETW Corp. v. Jireh Publ'g, Inc.,* 332 F.3d 915 (6th Cir. 2003) (use of professional golfer's likeness in prints sold for profit protected by First Amendment); *Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) (use of undercover police officer's identity in film protected by First Amendment); *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) (use of Fred Astaire's and Ginger Rogers' first names in movie title protected by First Amendment); *cf. Tyne v. Time Warner Entm't Co., L.P.*, 901 So. 2d 802, 808 (Fla. 2005) (concluding that allowing right of publicity claim based on use of events from plaintiff's life in film would "raise[] a fundamental constitutional concern"). Indeed, *Keller*, on which the *Davis* panel relied, expressly acknowledged that video games are as protected as these other creative media.

Yet the *Keller* and *Davis* decisions erroneously concluded that the use of athletes' identities in historically-based expressive video games is

6

not constitutionally protected.[2] *Davis*, slip op. at 4, 16. The implications of such holdings jeopardize large classes of works long thought to be robustly protected by the First Amendment. The threat to biographies, historical fiction, and films based on real people and real events from these decisions is staggering. As Judge Thomas warned, the logic of the majority decision in *Keller* "jeopardizes the creative use of historic figures in motion pictures, books, and sound recordings." *Keller*, 724 F.3d at 1290 (Thomas, J., dissenting).

One need only glance at this year's Academy Award nominees to see the vast array of real-life stories with depictions of real people, from Martin Luther King Jr., Coretta Scott King, and J. Edgar Hoover in *Selma*, to Stephen Hawking in *The Theory of Everything*, to Alan Turing in *The Imitation Game*.[3] And many other purely fictional works

---

[2] The *amici* do not take a position on whether the athletes' identities were in fact used in the video games, given that neither the images nor names of the athletes were used.

[3] Though some state right of publicity statutes expressly exclude certain classes of works, especially as to claims brought by the heirs of deceased celebrities, other state right of publicity statutes have only limited exceptions, *see, e.g.*, Cal. Civ. Code § 3344(d) (excluding, as to living people, only "news, public affairs, or sports broadcast or account, or any political campaign," and thus allowing the right to cover fiction, songs,

nonetheless incorporate real people as characters, or at least use their names; consider *Forrest Gump*, *Midnight in Paris*, *Ginger and Fred*, E.L. Doctorow's novel *Ragtime*, Steve Martin's play *Picasso at the Lapin Agile*, and many more.[4]

The *Keller* majority suggests in a footnote that the decision will not jeopardize such works. The proper analysis, the majority urges, is that courts should distinguish works based on "whether a likely purchaser's primary motivation is to buy a reproduction of the celebrity, or to buy the expressive work of that artist." 724 F.3d at 1279 n.10 (internal quotation marks and citations omitted). And in the context of the Electronic Arts video game, the majority reasons, "we have emphasized EA's pri-

---

and documentaries that do not qualify as "news" or "public affairs" "account[s]").

[4] *Forrest Gump* (1994) (includes depictions of Elvis Presley, Richard Nixon, John Lennon, and Abbie Hoffman, among others); *Midnight in Paris* (2011) (includes depictions of F. Scott Fitzgerald, Zelda Fitzgerald, Ernest Hemingway, Gertrude Stein, Pablo Picasso, and Cole Porter, among others); *Ginger and Fred* (1986) (evokes Ginger Rogers and Fred Astaire); E.L. Doctorow, *Ragtime* (1975) (includes Harry Houdini, Evelyn Nesbit, Jacob Riis, and Emma Goldman, among others); Steven Martin, *Picasso at the Lapin Agile* (1993) (features Albert Einstein and Pablo Picasso and a character who, while not named, is obviously Elvis Presley).

mary emphasis on reproducing reality," which suggests that such reproductions of reality are especially likely to be unprotected. *Id.*

But consumers of video games *are* likely to value "the expressive work" of the video game manufacturer—the interactive quality of the game as entertainment—more than "a reproduction of the celebrity." *See, e.g.*, Jeff Haynes, *NCAA Football 08 Review*, IGN (formerly Imagine Game Network) (July 17, 2007), http://www.ign.com/articles/2007/07/18/ncaa-football-08-review-2?page=1 (reviewing game's features without mentioning any specific players' identities). And consumers of unauthorized biographies (*e.g.*, *Elizabeth Taylor: An Unauthorized Biography* or *Tom Cruise: An Unauthorized Biography*) or docudramas (say, *Gandhi* or *Malcolm X*) may well seek a "primary emphasis on reproducing reality," and may be much more interested in "the celebrity" whose story is being told—and the historical facts of the story—than in any "artist[ic]" quality of the work.

Applying the analysis in the *Keller* footnote on its own terms, then, documentaries should be even less protected than video games. Indeed, the more realistic the documentary, the less protection it should get.

9

The footnote's proposed distinction is thus either incorrect, or, at best, extremely hard to apply in any predictable way.

To avoid stripping constitutional protection from the works we describe—not only video games but films, books, songs, and more—this Circuit should either (1) interpret the transformative work test to protect the uses of players' identities in the video games at issue, or (2) discard the transformativeness test in favor of another approach that better protects First Amendment rights.

## B.    The Video Games in This Case and in *Keller* Satisfy the California Supreme Court's "Transformative Work" Test

The panel decision in this case and the majority opinion in *Keller* not only violate the First Amendment; they are also inconsistent with the California Supreme Court's own definition of the limits on California's right of publicity laws. Under the logic of *Comedy III Prods. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001), uses of real people's identities in a game should be deemed transformative.

In *Comedy III*, the California Supreme Court suggested that the key inquiry is "whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in

10

question." *Id.* at 406. This focuses not on whether a person's name or likeness is itself altered, but on whether the name or likeness is combined with other materials: "*whether the work in question adds significant creative elements* so as to be transformed into something more than a mere celebrity likeness or imitation." *Id.* at 391 (emphasis added).

The focus is thus on whether the defendant's *entire work* consists of more than just the plaintiff's identity; indeed, *Comedy III* used the adjective "transformative" to refer to "work[s]" much more often than it used it to refer to "use[s]." *Compare id.* at 404, 407, 408 (at least seven references to transformative works) *with id.* at 404 (one reference to transformative uses). As the California Supreme Court elaborated, "We ask, in other words, whether *a product* containing a celebrity's likeness is so transformed that it *has become primarily the defendant's own expression rather than the celebrity's likeness.*" *Id.* (emphasis added). The question is whether the overall work is transformative in the sense of containing something beyond the celebrity's identity, not whether the particular use of the celebrity's identity distorts or transforms that identity.

11

Indeed, this is why straight-up biographies or docudramas (such as *Selma*), fictional works that incorporate a real character (such as *Midnight in Paris*), or even songs that mention a celebrity's name (such as *Mrs. Robinson*)—all of which use attributes of a person's identity without parodying or otherwise distorting them—are protected against a right of publicity claim. As the California Supreme Court noted, "We emphasize that the transformative elements or creative contributions that require First Amendment protection are not confined to parody and can take many forms, from factual reporting to fictionalized portrayal." *Comedy III Productions*, 25 Cal. 4th at 406 (citations omitted). Factual reporting and fictionalized portrayal "add[] significant creative elements" beyond a celebrity's identity, *id.* at 408, even if they deliberately try *not* to distort or transform that identity.

And the transformative work test, properly understood, is satisfied here. As Judge Thomas noted,

> The athletic likenesses are but one of the raw materials from which the broader game is constructed. The work, considered as a whole, is primarily one of EA's own expression. The creative and transformative elements predominate over the commercial use of likenesses. The marketability and economic value of the game comes from the creative elements within, not from the pure commercial exploitation of a celebrity image. The game is not a con-

ventional portrait of a celebrity, but a work consisting of many creative and transformative elements.

*Keller*, 724 F.3d at 1286 (Thomas, J., dissenting).

There is no First Amendment justification for forcing creators to alter depictions of real people to meet *Keller*'s narrow vision of transformative use. Electronic Arts should not have to turn each player into a fantastical creature to create its fantasy football game. The transformative work test protects the use of real players' identities in expressive video games that seek to recreate historical teams and players—just as it protects the use of such identities in documentaries, fiction, or songs.

## C. The En Banc Court Should Independently Determine the Appropriate First Amendment Analysis for the Right of Publicity

This Court, of course, is not bound by the California Supreme Court's view of the First Amendment limits on right of publicity law. Indeed, there are at least two other approaches that may sensibly be used in right of publicity cases (focusing on cases that do not involve commercial advertising, which continues to be less constitutionally protected, *see Charles v. City of Los Angeles*, 697 F.3d 1146, 1151 (9th Cir. 2012)).

1. **The *Rogers*/Restatement Approach.** The Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), concluded that even an

expressive work's title—and certainly the work's content—may include a person's identity, unless the use is "'wholly unrelated' to the individual [or] used to promote or endorse a collateral commercial product." *Id.* at 1004 (noting the need to "limit the right [of publicity] to accommodate First Amendment concerns"). In *Rogers*, the Second Circuit upheld Federico Fellini's right to use Ginger Rogers' identity in a fictional work called *Ginger and Fred*, a film about two entertainers who patterned their lives on Ginger Rogers and Fred Astaire.

Rogers' identity played a much larger role in the film than any particular player's identity plays in the Electronic Arts games considered by this Circuit; even so, the Second Circuit held that the use of Rogers' identity was allowed. The Restatement (Third) of Unfair Competition has endorsed this test. *See* Restatement (Third) Unfair Comp. § 47 cmt. c (1995) (proposing that "entertainment or other creative works" be exempted from all liability for uses of others identities unless a "name or likeness is used solely to attract attention to a work that is not related to the identified person").

The *Keller* majority distinguished *Rogers* on the theory that *Rogers* only tried to predict state law "in the absence of clear state-law prece-

dent." *Keller*, 724 F.3d at 1281. The *Rogers* discussion of the right of publicity, however, expressly stressed that courts must "recogniz[e] the need to limit the right to accommodate First Amendment concerns" and a "concern for free expression." *Rogers*, 875 F.2d at 1004. The *Rogers* court's analysis is therefore helpful in analyzing the First Amendment issues.

And given the *Keller* majority's acknowledgment that video games are as protected as films, the *Rogers* test should apply to video games as much as to films. If *Rogers* were applied to the present case, defendants' use of the players' identities would be protected, because the use was relevant to the underlying expressive work and was not "used solely to attract attention" to an unrelated commercial product.

2. **The *C.B.C.* Approach.** In *C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced Media*, 505 F.3d 818 (8th Cir. 2007), the Eighth Circuit concluded that there is a First Amendment right to use "information . . . readily available in the public domain" even within fantasy sports games. *Id.* at 823. Under the *C.B.C.* test, Electronic Arts' work would be protected, because all the information about the players was "readily available in the public domain."

15

The *Keller* panel majority tried to distinguish *C.B.C.* on the grounds that the games in *C.B.C.* "merely 'incorporate[d] the names along with performance and biographical data of actual major league baseball players,'" while *NCAA Football* "uses virtual likenesses of actual college football players." 724 F.3d at 1283 n.12. But the right of publicity covers names, likenesses, and other attributes of identity equally. Likewise, the First Amendment equally protects the use of each of these attributes of identity. *See, e.g.*, *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001) (holding that the First Amendment protects the uses of baseball players' likenesses as well as names in a variety of videos authorized by Major League Baseball).

Indeed, the proposed distinction provided in *Keller* would disfavor not just videogames, but also films, television programs, illustrated books, and graphic novels—which *visually* depict real people—relative to unillustrated books, traditional novels, and songs, which use people's names and factual details about their lives. That distinction has no basis either in right of publicity law or in First Amendment law.

16

## II. The First Amendment Analysis Should be Consistent in Lanham Act and Right of Publicity Cases

The *Keller* majority opinion treats the right of publicity as stronger than trademark law, when it comes to trumping First Amendment rights. This too merits *en banc* review.

In *Brown v. Electronic Arts*, 724 F.3d 1235 (9th Cir. 2013), the same panel that considered *Keller* held that the First Amendment protects fantasy football video games—including the very game involved in *Keller*—against trademark liability. "Section 43(a) protects the public's interest in being free from consumer confusion about affiliations and endorsements," *Brown* held, "but this protection is limited by the First Amendment, particularly if the product involved is an expressive work." *Id.* at 1239. "Even if *Madden NFL* is not the expressive equal of *Anna Karenina* or *Citizen Kane,* the Supreme Court has answered with an emphatic 'yes' when faced with the question of whether video games deserve the same protection as more traditional forms of expression." *Id.* at 1241. "The *Rogers* test is applicable when First Amendment rights are at their height—when expressive works are involved—so it is no surprise that the test puts such emphasis on even the slightest artistic relevance." *Id.* at 1245. Indeed, the *Brown* panel applied the same *Rog-*

17

*ers* any-expressive-relevance analysis for trademark law that the *Keller* majority rejected for right of publicity law.[5] *See also E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008) (using the same test).

The right of publicity should be no less constitutionally constrained than trademark law, at least as to speech outside the special context of commercial advertising. The right of publicity, because it has no likelihood of confusion requirement, is "potentially more expansive than the Lanham Act," *Rogers*, 875 F.2d at 1004. The interests furthered by the right of publicity are also less significant than those furthered by trademark law—the right of publicity mainly protects the private interests of celebrities, whereas trademark law protects the interests of the entire consuming public as well as of trademark holders.

Harmonizing First Amendment defenses to trademark law and right of publicity law whenever possible is also practically valuable, because the same use of a person's identity will often lead to claims being made

---

[5] The *Rogers* test primarily considers, for both Lanham Act and right of publicity claims, whether the use is "artistically relevant." It then considers for Lanham Act cases whether the use is "explicitly misleading" and for right of publicity cases whether the use is really a "disguised commercial advertisement." *Rogers*, 875 F.2d at 1000, 1004.

18

under both laws. The Second and Sixth Circuits have indeed harmonized trademark law and right of publicity law in this respect. *See Rogers*, 875 F.2d at 1001, 1004, 1005; *Parks v. LaFace Records*, 329 F.3d 437, 453, 461 (6th Cir. 2003).

*Rogers* and *Parks* conclude that, when a defendant is sued for using a plaintiff's identity in an expressive work, the heart of the First Amendment analysis for both trademark and right of publicity claims should be the *expressive relevance* of the use to the work. In *Rogers* the trademark analysis asks whether the use of the plaintiff's name in a film title "is relevant to the film's content," 875 F.2d at 1001. In the right of publicity discussion, the court asks whether the use is not "wholly unrelated" to the film, *id.* at 1004.

Similarly, in the trademark discussion in *Parks*, the court asks whether the use of a celebrity's name in a song title is "relevant to the content [or lyrics] of the song." 329 F.3d at 453, 456. The right of publicity discussion considers whether the use is not "'wholly unrelated' to the content of the work," *id.* at 461 (quoting *Rogers*).

Thus, if the use is relevant to the underlying expression in the work, the First Amendment should almost always protect the use (except

19

when a use explicitly misleads consumers as to origin or sponsorship, *Brown*, 724 F.3d at 1239; *Rogers*, 875 F.2d at 999, which might well constitute constitutionally unprotected fraud).[6] Adopting this Second and Sixth Circuit approach can clarify the law for the benefit of video game makers, film producers, songwriters, and other creators.

## CONCLUSION

As the *Keller* majority acknowledged, references to real people, whether in novels, plays, songs, books, or video games, are on equal footing under the First Amendment. When that opinion, and the panel decision in this case, held that fantasy football video games are constitutionally unprotected against right of publicity claims, a wide range of speech was put in danger. This Court should rehear the *Davis* decision en banc, to clarify this important area of the law and provide creators the protection that they deserve under the First Amendment.

---

[6] Again, *amici* focus here on speech other than commercial advertising, given that commercial advertising receives less robust First Amendment protection. *Amici* express no opinion on whether the right of publicity could apply more broadly to commercial advertising, including speech that, in the words of *Rogers*, is simply a "disguised commercial advertisement for the sale of goods or services," 875 F.2d at 1004.

Respectfully Submitted,


s/ Jennifer E. Rothman
s/ Eugene Volokh
Attorneys for *Amici Curiae*
Law Professors

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,177 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2010 in 14-point New Century Schoolbook.

Dated: Jan. 29, 2015

s/ Jennifer E. Rothman
Attorney for *Amici Curiae*
Law Professors

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on Jan. 29, 2015.

All participants in the case are registered CM/ECF users, and will be served by the appellate CM/ECF system.

Dated: Jan. 29, 2015

s/ Eugene Volokh
Attorney for *Amici Curiae*
Law Professors