No. 12-15737

# United States Court of Appeals for the Ninth Circuit

MICHAEL E. DAVIS, AKA Tony Davis; VINCE FERRAGAMO; BILLY JOE DUPREE; SAMUEL MICHAEL KELLER,

*Plaintiffs-Appellees,*

v.

ELECTRONIC ARTS INC.,

*Defendant-Appellant.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 10-CV-03328-RS

**BRIEF *AMICI CURIAE* IN SUPPORT OF APPELLANT'S PETITION FOR REHEARING *EN BANC* BY ADVANCE PUBLICATIONS, A&E TELEVISION NETWORKS, DISARMING FILMS, ITV STUDIOS AMERICA, THE LOS ANGELES TIMES, NATIONAL PUBLIC RADIO, THE RADIO TELEVISION DIGITAL NEWS ASSOCIATION, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND THE WASHINGTON POST**

NATHAN SIEGEL
PATRICK KABAT
LEVINE SULLIVAN KOCH
  & SCHULZ, L.L.P.
1899 L Street, NW, Suite 200
Washington, DC 20036
(202) 508-1100
*Counsel for Amici Curiae Advance Publications, A&E Television Networks, Disarming Films, ITV Studios America, The Los Angeles Times, National Public Radio, The Radio Television Digital News Association, The Reporters Committee for Freedom of the Press and The Washington Post*

*Of Counsel:*

RICHARD A. BERNSTEIN
NEIL M. ROSENHOUSE
SABIN, BERMANT & GOULD LLP
One World Trade Center, 44th Floor
New York, New York 10007
(212) 381-7000

*Counsel for Advance Publications, Inc.*

ASHLEY MESSENGER
NATIONAL PUBLIC RADIO, INC.
1111 North Capitol Street, NE
Washington, DC 20002
(202) 513-2054

*Counsel for National Public Radio, Inc.*

JAMES A. MCLAUGHLIN
KALEA S. CLARK
THE WASHINGTON POST
1150 15th Street, NW
Washington, DC 20071
(202) 334-7988

*Counsel for The Washington Post*

DARCI J. BAILEY
A&E TELEVISION NETWORKS
235 East 45th Street
New York, New York 10017
(212) 850-9382

*Counsel for A&E Television
    Networks, LLC*

KATHLEEN KIRBY
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel for The Radio
    Television Digital News Assn.*

JEFF GLASSER
LOS ANGELES TIMES
    COMMUNICATIONS LLC
202 West 1st Street
Los Angeles, California 90012
(213) 237-5000

*Counsel for Los Angeles Times
    Communications LLC*

BRUCE D. BROWN
GREGG P. LESLIE
THE REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th Street, NW, Suite 1250
Washington, DC 20005
(202) 795-9300

*Counsel for Reporters Committee
    for Freedom of the Press*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rules 29(c) and 26.1 of the Federal Rules of Appellate Procedure, amici provide the following disclosures of corporate identity:

**Advance Publications, Inc.,** directly and through its subsidiaries, publishes 18 magazines with nationwide circulation, including *The New Yorker* and *Vanity Fair*, newspapers in over 20 cities and weekly business journals in over 40 cities throughout the United States. It also owns many Internet sites and has interests in cable systems serving over 2.3 million subscribers. Advance Publications has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

**A&E Television Networks** ("AETN") is comprised of television networks including A&E®, HISTORY®, Lifetime®, Bio.®, Military HISTORY™, and Crime & Investigation Network®, among others. AETN is a Delaware LLC and is owned by Hearst Communications, Inc., Disney/ABC International Television, Inc., and NBC A&E Holding, Inc.

**Disarming Films** is a film and documentary production company based in Venice, California. Its feature-length documentaries include the Academy Award-nominated *Deliver Us From Evil*, the critically acclaimed *West of Memphis* and *Prophet's Prey*, and the upcoming *Janis: Little Girl Blue* about Janis Joplin. Disarming Films is privately held, and does not have any outstanding securities in the hands of the public.

i

**ITV Studios America** is a leading producer of reality and scripted programming in the United States, with a slate of successful formats in production with major broadcast and cable television networks. ITV Studios America is wholly owned by ITV plc, based in the United Kingdom.

**Los Angeles Times Communications LLC** publishes the *Los Angeles Times,* which is the largest metropolitan daily newspaper in the country, with a daily readership of 2 million and 3 million on Sunday, and a combined print and interactive local weekly audience of 4.5 million. Its Times Community News division publishes the *Newport Beach-Costa Mesa Daily Pilot*, *Coastline Pilot*, *Huntington Beach Independent, Glendale News-Press*, *Burbank Leader*, *Valley Sun*, *Brand X*, and *Hoy*, which together with the *Los Angeles Times*, reach approximately 5.9 million or 44% of all adults in the Southern California marketplace. The *Los Angeles Times* maintains a number of websites, including www.latimes.com, a leading source of national and international news that draws over 10 million unique visitors monthly. Los Angeles Times Communications LLC is a subsidiary of Tribune Publishing Company, a publicly held company. Oaktree Tribune, L.P. owns 10 percent or more of Tribune Publishing Company's stock.

**National Public Radio, Inc. ("NPR")** is an award-winning producer and distributor of noncommercial news programming. A privately supported, not-for-profit membership organization, NPR serves a growing

audience of more than 26 million listeners each week by providing news programming to 285 members' stations that are independently operated, noncommercial public radio stations. In addition, NPR provides original online content and audio streaming of its news programming. NPR.org provides news and cultural programming including audio archives of past programming. National Public Radio, Inc. has no parent company and issues no stock.

**The Radio Television Digital News Association** ("RTDNA"), based in Washington, D.C., is the world's largest professional organization devoted exclusively to electronic journalism. RTDNA represents local and network news directors and executives, news associates, educators and students in broadcasting, cable and other electronic media in over 30 countries. RTDNA is committed to encouraging excellence in electronic journalism, and upholding First Amendment freedoms. RTDNA is a nonprofit organization that has no parent company and issues no stock.

**Reporters Committee for Freedom of the Press** is an unincorporated association of reporters and editors which works to defend First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance, and research in First Amendment litigation since 1970. The Reporters

Committee For Freedom of the Press is an unincorporated association with no parent corporation and no stock.

WP Company LLC (d/b/a **The Washington Post**) publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month. WP Company LLC (d/b/a The Washington Post) is a wholly owned subsidiary of Nash Holdings LLC. Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ......................................................i

TABLE OF AUTHORITIES ...................................................................vi

STATEMENT OF THE INTERESTS OF *AMICI* ....................................1

ARGUMENT ........................................................................................1

I.     REHEARING IS WARRANTED BECAUSE THIS
COURT'S RIGHT OF PUBLICITY JURISPRUDENCE
UNCONSTITUTIONALLY DEVALUES FREEDOM OF
EXPRESSION ...................................................................................1

     A.     THE FIRST AMENDMENT DOES NOT REQUIRE
THAT ALL EXPRESSIVE WORKS
"TRANSFORM" THEIR SUBJECTS .................................2

     B.     THE PANEL DECISION IMPOSES A HEAVY
BURDEN ON AN ENTIRE GENRE OF VIDEO
GAME MEDIA .................................................................3

II.     SEVERAL KEY PRINCIPLES THAT INFORM THIS
CIRCUIT'S PUBLICITY JURISPRUDENCE SHOUD BE
REVIEWED *EN BANC* ...................................................................7

     A.     *ZACCHINI* WAS NOT ABOUT NAME AND
LIKENESS RIGHTS ...........................................................9

     B.     RIGHTS OF PUBLICITY ARE NOT LIKE
COPYRIGHTS ...................................................................13

          1.     The Two Doctrines Concern Unrelated
Interests ..................................................................13

          2.     The Transformative Use Test Cannot
Reasonably Be Imported into The Right of
Publicity ..................................................................14

     C.     THE RIGHT OF PUBLICITY SHOULD BE
SUBJECT TO STRICT SCRUTINY.................................15

CONCLUSION....................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Entm't Merchants Ass'n,*
    131 S. Ct. 2729 (2011)......................................................................7

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994)...............................................................14, 15

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,*
    95 F.3d 959 (10th Cir. 1996) .....................................................13, 14

*CMG Worldwide Inc. v. Maximum Family Games LLC,*
    Case No. 3:14-cv-05124-JST (N.D. Cal.) ........................................5

*Comedy III Productions, Inc. v. Gary Saderup, Inc.,*
    25 Cal. 4th 387 (2001)............................................................7, 8, 15

*Finger v. Omni Publ'ns Int'l, Ltd.,*
    566 N.E.2d 141 (N.Y. 1990) ..........................................................16

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974).........................................................................3

*Harper & Row Publishers, Inc. v. Nation Enters.,*
    471 U.S. 539 (1985).............................................................8, 13, 14

*Hilton v. Hallmark Cards,*
    599 F.3d 89 (9th Cir. 2010) .............................................................8

*Keller v. Electronic Arts Inc.,*
    724 F.3d 1268 (9th Cir. 2013) ..................................................*passim*

*McFarland v. Miller,*
    14 F.3d 912 (3d Cir. 1994) .............................................................13

*Nat'l Exhibition Co. v. Fass,*
    143 N.Y.S.2d 767 (N.Y. Sup. Ct. 1955)...........................................11

*No Doubt v. Activision Publ'g, Inc.*,
  192 Cal. App. 4th 1018 (2011) ............................................................2

*Noriega v. Activision Blizzard, Inc.*,
  No. BC 551747 (Cal. Super. Ct., L.A. Cnty.) ....................................5

*Okla. Sports Props., Inc. v. Indep. Sch. Dist. No. 11*,
  957 P.2d 137 (Okla. Civ. App. 1998) .................................................12

*Pittsburgh Athletic Co. v. KQV Broad. Co.*,
  24 F. Supp. 490 (W.D. Pa. 1938) .......................................................11

*Post Newsweek Stations-Conn., Inc. v. Travelers Ins. Co.*,
  510 F. Supp. 81 (D. Conn. 1981)........................................................12

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ........................................................16, 17

*Smith v. Daily Mail Publ'g Co.*,
  443 U.S. 97 (1979).................................................................................3

*Sw. Broad. Co. v. Oil Ctr. Broad. Co.*,
  210 S.W.2d 230 (Tex. Civ. App. 1947)..............................................11

*Wis. Interscholastic Athletic Ass'n v. Gannett Co.*,
  658 F.3d 614 (7th Cir. 2011) .............................................................12

*Zacchini v. Scripps-Howard Broad. Co.*,
  1975 WL 182619 (Ohio Ct. App. July 10, 1975).........................9, 10

*Zacchini v. Scripps-Howard Broadcasting Co.*,
  433 U.S. 562 (1977)....................................................................*passim*

## Statutes & Other Authorities

Cal. Civ. Code § 3344.1.........................................................................5

Fed. R. App. P. 29 ...................................................................................1

*Restatement (Third) of Unfair Competition* § 47 cmt. c ........................16

## STATEMENT OF THE INTERESTS OF *AMICI*

*Amici* are organizations that create and disseminate expressive speech, including news, entertainment, and interactive content, and are directly affected by this Circuit's right-of-publicity jurisprudence.  Pursuant to Fed. R. App. P. 29, this brief is submitted with a motion for leave to file.  No party or its counsel authored this brief in whole or part.  No party, their counsel, or any person other than the *amicus curiae* and its counsel contributed funds for the preparation or submission of this brief.

## ARGUMENT

## I.    REHEARING IS WARRANTED BECAUSE THIS COURT'S RIGHT OF PUBLICITY JURISPRUDENCE UNCONSTITUTIONALLY DEVALUES FREEDOM OF EXPRESSION

The Petition presents the question of whether the First Amendment requires that more scrutiny be applied to right of publicity claims challenging expressive works than was applied by the panel in this case, which in turn relied on *Keller v. Electronic Arts Inc.*, 724 F.3d 1268 (9th Cir. 2013).  That question is one of exceptional importance, and should be addressed because this Circuit's current jurisprudence is inconsistent with core First Amendment principles.  Most importantly, "transformative use" is not a constitutionally adequate test to apply to expressive works.  Moreover, as it was applied here, the test imposes a burden on the creation of these video games that is far too high to satisfy First Amendment scrutiny.

1

A.    THE FIRST AMENDMENT DOES NOT REQUIRE THAT ALL EXPRESSIVE WORKS "TRANSFORM" THEIR SUBJECTS

This Court's current jurisprudence has the paradoxical effect of encouraging producers of creative media to misrepresent real people, and/or the historical context in which they live, in expressive works.  The principal First Amendment defense to right of publicity claims that this Court recently has applied is the "transformative use" test recognized by California state courts.  But in applying that test, both the panel decision and *Keller* held that Petitioner's video games are not transformative because the athletes they depict are "'literal recreations'" doing "'the same activity by which the band achieved and maintains its fame.'"  Opinion at 9 (quoting *No Doubt v. Activision Publ'g, Inc.*, 192 Cal. App. 4th 1018, 1034 (2011)).  Moreover, this Court rejected EA's First Amendment defense even though "'the avatars appear in the context of a video game that contains many other creative elements.'"  *Id.*

The inevitable effect of these rulings is to suggest that producers of creative media who depict people more "literally" and accurately are more likely to be penalized, while those who "creatively" change or fictionalize their subjects' lives, personas or historical context will be on safer ground. That conclusion is further reinforced by this Court's narrow construction of its own "public interest" test, which is the other principal First Amendment

2

defense to right of publicity claims that this Circuit has recognized. Both the panel decision and *Keller* hold that the "public interest" defense only applies when names, images or likenesses are used in the context of "publishing or reporting factual data." *Id.* at 11. Specifically the panel defined that concept narrowly, to include only literal non-fiction such as "a documentary, a newspaper photograph, [or] a [baseball] game program." *Id.*

Taken together, these rulings appear to incentivize producers of more creative genres of media that are not strictly news or documentaries – such as movies, docudramas and video games – to misrepresent some aspects of real people in order to reduce their potential legal exposure. This stands the First Amendment on its head because more than anything else it protects publishing the truth. *See, e.g., Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). The fact that creators of expressive works and lawyers advising them now feel compelled to interpret First Amendment jurisprudence in this way illustrates why *en banc* review is warranted.

### B. THE PANEL DECISION IMPOSES A HEAVY BURDEN ON AN ENTIRE GENRE OF VIDEO GAME MEDIA

The real-world consequences of *Davis* and *Keller* are even more starkly apparent with respect to video games. All three of the video games at issue in the two cases – *NCAA Football*, *NCAA Basketball*, and a version

3

of *Madden NFL* with "historic teams" – are no longer produced at all as a result of litigation, to the detriment of millions of people who enjoyed them. In effect, the "balance" struck between the right of publicity and the First Amendment has been to eliminate the speech. That is not surprising, because the practical effect of this Court's decisions renders it difficult to produce any video game that simulates historical events involving large numbers of people.

Importantly, there is an entire genre of such video games, including many unrelated to sports. For example, the company Kuma Wars publishes games that simulate actual military missions by United States armed forces. Many contain highly realistic avatars of historical figures ranging from American enemies like Osama Bin Laden and Saddam Hussein to U.S commanders such as General James Abizaid. Other games, like *Political Machine 2012* and *President Forever 2016*, simulate presidential elections going back a half century, sometimes with avatar-like representations of the real candidates. People immerse themselves in such games for the same reasons they have long been attracted to other interactive forms of historical simulation competitions, like model United Nations or legislative proceedings tournaments. The number of real people who may be depicted in today's reality-simulation video game can range from dozens to the thousands.

4

Yet the panel decision holds that if a content creator like EA wants to create any future game like its "historic" versions of *Madden NFL*, it must first obtain the individual permission of thousands of athletes or, for those deceased, their heirs or assigns, since the right of publicity is descendible in many states. *See. e.g,* Cal. Civ. Code § 3344.1. Other historical personalities will no doubt contend that video game creators must do the same for presidential candidates and many others. For example, since this Court's decision in *Keller*, former Panamanian dictator Manuel Noriega and the estate of General George Patton have both filed lawsuits against creators of video games that simulate military operations. *See CMG Worldwide Inc. v. Maximum Family Games LLC*, Case No. 3:14-cv-05124-JST (N.D. Cal.); *Noriega v. Activision Blizzard, Inc.*, No. BC 551747 (Cal. Super. Ct., L.A. Cnty.). Noriega's case was dismissed, but only because the California state trial court noted that it expressly declined to follow *Keller*. The dismissal order also noted that the game contained many other historical figures. *See* http://online.wsj.com/public/resources/documents/2014_1028_noriega.pdf, at 6 n.4. The "historic" *Madden NFL* games cannot be distinguished and should receive the same protection.

The burden this Court's jurisprudence now imposes on the creation of such works is enormous, and may well be prohibitive. Most historical subjects, be they college athletes, presidential candidates, or military

5

commanders, are not organized into professional athletes' unions that can engage in collective bargaining for group licenses with video game companies. So if a content creator wishes to simulate games or events from a decade like the 1940s, merely identifying, locating and negotiating with every person who may have played, or figuring out who their heirs (if they are deceased) or assigns might be, would be a cost-prohibitive task if it could be accomplished at all.

Moreover, the right of publicity is a personal right to license one's name or image before it is used, not merely a right to seek damages after content has already been created. As a result, the broad scope of publicity rights recognized in this Circuit effectively confers on every individual athlete (or analogous celebrity) a personal right to exercise censorial control over how history may be depicted in a video game for everyone else. For example, an athlete could choose not to participate in a game at all, or condition participation on being depicted as faster than he really was, or demand that disfavored rivals be slower. Likewise, a former politician could condition a license on being better-financed or a more effective debater.

The result would make it impossible for the game creator to accurately depict history or for consumers of the game to realistically simulate it. Yet video games are expressive works that are fully protected by the First Amendment. *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729

6

(2011). No sound construction of the First Amendment permits states to grant property rights that enable individuals to effectively censor how historical events may be depicted in an expressive work – regardless of how realistic or "transformative" the work might be.

## II. SEVERAL KEY PRINCIPLES THAT INFORM THIS CIRCUIT'S PUBLICITY JURISPRUDENCE SHOUD BE REVIEWED *EN BANC*

The reason that the law manifests these anomalies is that it is based on two erroneous assumptions, both of which derive from this and other courts' mistaken interpretation of *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977). Those assumptions are: (1) that state-law rights of publicity and the First Amendment must always be balanced, and (2) that the right of publicity is a form of intellectual property that is closely related to copyrights, and serves similar state interests. Those assumptions are set out most starkly by the California Supreme Court in *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001), the case that produced the "transformative use" test:

> [T]wo principles enunciated in *Zacchini* apply to this case: (1) state law may validly safeguard forms of intellectual property not covered under federal copyright and patent law as a means of protecting the fruits of a performing artist's labor; and (2) . . . the state law interest and the interest in free expression must be balanced, according to the relative importance of the interests at stake.

*Id*. at 401. The same construction of *Zacchini* has been adopted by this Court as well. *See, e.g., Keller*, 724 F.3d at 1271 (citing *Zacchini* for the proposition that "we must balance the right of publicity of a former college football player against the asserted First Amendment right of a video game developer to use his likeness in its expressive works."); *Hilton v. Hallmark Cards*, 599 F.3d 89, 909 n.12 (9th Cir. 2010) (citing *Zacchini* for the proposition that "[t]he cousinage between copyright liability and the right to publicity has long been recognized.").

Taken together these two principles have produced balancing "tests" that give great weight to state-law publicity rights. That is so because federal copyright laws are subject to little, if any, First Amendment scrutiny beyond the speech-protective provisions embodied in the Copyright Act itself, such as the fair use defense. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556-57 (1985). As a result, courts have adopted fair use-like balancing "tests" that similarly relegate the First Amendment to the status of an "affirmative defense" in the right of publicity context as well. *Hilton*, 599 F.3d at 909. The "transformative use" test is the starkest example, because it is expressly borrowed directly from the first prong of the fair use defense in copyright law. *Comedy III*, 25 Cal. 4th at 404.

However, *Zacchini* did not require or even speak to either principle, because the case was not about state-law publicity rights to control the use of

8

a person's name, image or likeness. Once the assumption that *Zacchini* requires copyright-like balancing in all right of publicity cases is set aside, it becomes clear that both propositions are fundamentally inconsistent with First Amendment doctrine. This brief therefore first discusses *Zacchini*, and then addresses *vel non* the question of reconciling the First Amendment and the right of publicity.

> A. *ZACCHINI* WAS NOT ABOUT NAME AND LIKENESS RIGHTS

The plaintiff in *Zacchini* was Hugo Zacchini, a member of the legendary family of circus performers who performed his own human cannonball act at venues such as local fairs. A local Ohio television station covering one county fair filmed and broadcast the entire stunt, which lasted a mere 15 seconds, as part of a news story. *Zacchini*, 433 U.S. at 562.

Notably, for most of the case's judicial life it was not even formally viewed as related to the right of publicity. The Ohio Court of Appeals construed the complaint to assert potentially viable claims for conversion and common-law copyright infringement, which it called "a concept protecting property rights in intellectual *productions* conferred by the common law." *Zacchini v. Scripps-Howard Broad. Co.*, 1975 WL 182619, at *4 (Ohio Ct. App. July 10, 1975) (emphasis added). The Ohio Supreme Court, however, somewhat inartfully dubbed the claim to be the "'right to

the publicity value of [a] performance,'" and so that was the parlance the
Supreme Court used when considering whether that state-law theory
survived a First Amendment challenge. *Zacchini*, 433 U.S. at 565 (quoting
*Zacchini*, 351 N.E.2d 454,455 (Ohio 1976)).

But however it might be denominated, it was clear throughout the case
that Zacchini was asserting a very different cause of action than the "right of
publicity" as it is generally used in state law, *i.e.,* a personal right to control
one's identity, name or likeness. *Id.* at 574 n.10 ("the case before us is more
limited than the broad category of lawsuits that may arise under the heading
of 'appropriation.' Petitioner does not merely assert that some general use,
such as advertising, was made of his name or likeness . . . .").  Rather,
Zacchini's claim was about recognizing proprietary rights in the *production*
of his "entire *act*," not his identify or persona.  *Id.* at 569 (emphasis added).
His complaint was that the television station "'showed and commercialized
the film of his *act* without his consent,' and that such conduct was an
'unlawful appropriation of plaintiff's *professional property*.'"  *Id.* at 564
(citation omitted, emphasis added).

Zacchini's cause of action was essentially the same one asserted in a
long line of unfair competition cases dating back to the 1930s, which
consistently held that an entity that puts on an entertainment event enjoys a

proprietary right to license the right to broadcast the entire event.[1]  Because that cause of action protects proprietary rights in *the production of entire events*, not personal fame or individual performances, it incentivizes the creation of entertainment events of interest to the public much like copyright law incentivizes the creation of expressive works.[2]  The same state-law proprietary rights are the principal reason why to this day television and radio networks negotiate with event producers like the NFL or NCAA for exclusive rights to broadcast entire games.

The Supreme Court in *Zacchini* simply applied those principles of broadcasting law to the less common scenario of a one-man show, which was put on and performed by the same person.  But the Supreme Court's rationale for protecting Zacchini's proprietary rights is clearly grounded in his role as the *producer* of his show, not because his image appeared on television.  The Court emphasized that Zacchini was entitled to the same basket of rights as other event producers, including not only the right to license broadcasting rights to his entire event, but also the right to charge admission fees—something plainly only event producers can do.  433 U.S.

---

[1] *See, e.g., Pittsburgh Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490 (W.D. Pa. 1938); *Nat'l Exhibition Co. v. Fass*, 143 N.Y.S.2d 767 (N.Y. Sup. Ct. 1955); *Sw. Broad. Co. v. Oil Ctr. Broad. Co.*, 210 S.W.2d 230 (Tex. Civ. App. 1947) .

[2] *See, e.g., Pittsburgh Athletic Co.*, 24 F. Supp. at 492; *Nat'l Exhibition Co.*, 143 N.Y.S.2d at 770.

at 576.  Put another way, if Zacchini had shot an animal out of the cannon

and never appeared on television himself, he would have had the same cause

of action because his ability to profit from the *entire act* would have been

equally impaired.

   As applied to professional or college sports, *Zacchini* would be

relevant if, after the NFL or NCAA licensed broadcasting rights to entire

games to a television network, a competing network were to claim a First

Amendment right to air the same game or were to simply find a way to air

its own competing broadcast.  Those scenarios have in fact occurred from

time to time, both before and after *Zacchini,* and courts have applied the

decision accordingly. *See, e.g., Wis. Interscholastic Athletic Ass'n v. Gannett

Co.*, 658 F.3d 614, 628 (7th Cir. 2011) (pursuant to *Zacchini*, "the *producer*

of the entertainment—the NFL, FIFA, or the NCAA—normally signs a

lucrative contract for exclusive, or semi-exclusive, broadcast rights for the

performance.").[3]

   *Zacchini*, however, does not purport to speak at all to the question of

whether a particular athlete's name, image or likeness may be depicted in

another expressive work – be it a game broadcast, a movie like *Brian's*

---

[3] *See also Okla. Sports Props., Inc. v. Indep. Sch. Dist. No. 11*, 957 P.2d 137, 139 (Okla. Civ. App. 1998); *Post Newsweek Stations-Conn., Inc. v. Travelers Ins. Co.*, 510 F. Supp. 81, 84-85 (D. Conn. 1981) ("It is clear that the ISU [International Skating Union] has a legitimate commercial stake in this event, and they, like Zacchini, are entitled to contract regarding the distribution of this entertainment product.").  *See also Note 2, supra.*

*Song*, a fight song, or a video game. *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 973 (10th Cir. 1996). Nonetheless, some subsequent case law has misconstrued *Zacchini* and applied it as if it were a case about personal name and likeness rights, and as if it required that publicity rights be treated like copyrights and always balanced with the First Amendment. There is no such requirement, however, and when considered on their own merits, neither proposition is warranted.

      B.    RIGHTS OF PUBLICITY ARE NOT LIKE COPYRIGHTS

          1.    The Two Doctrines Concern Unrelated Interests

First, rights of publicity and copyrights are fundamentally different. Most importantly, the entire purpose of copyright law is to incentivize the creation of more original speech. Thus, copyright law penalizes people for using another's copyrighted expression only when doing so serves that larger goal. *See Harper & Row*, 471 U.S. at 556-57.

By contrast, the purpose of the right of publicity is not to incentivize expression. To the contrary, its effect on speech is entirely censorial. It protects "[t]he right to exploit the value of [an individual's] notoriety or fame." *McFarland v. Miller*, 14 F.3d 912, 923 (3d Cir. 1994). And it applies regardless of whether fame was achieved by accident or design, or serves any useful social purpose. Thus, for its purposes winning the lottery

13

or robbing a bank could be more valuable than winning an obscure Nobel Prize.

Publicity rights are therefore not really "intellectual property" at all, because people are born with their names and faces and their potential value has no *necessary* relationship to any intellectual creativity or effort. Name and likeness rights are thus quite unlike the proprietary right at issue in *Zacchini*, whose existence was premised on actually creating something like an entertainment event. *Cardtoons*, 95 F.3d at 973. Whatever state interest there may be in rewarding personal fame for its own sake is not at all comparable to the importance the Constitution itself places on protecting copyrights in order to create more original speech.

 2. The Transformative Use Test Cannot Reasonably Be Imported into the Right of Publicity

Importing the "transformative use" test into the right of publicity is especially unfounded. Copyright law incorporates multiple speech-protective doctrines, of which "transformativeness" is just one element. For example, even before considering the fair use doctrine, copyright law does not protect ideas, facts, or *scenes a faire*. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 n.5 (1994); *Harper & Row*, 471 U.S. at 560 (noting "the First Amendment protections already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas"). Moreover, the fair use defense is itself a multi-factor, nonexclusive

test, for which the Supreme Court affirmatively proscribes focusing on any single factor in isolation. *Campbell*, 510 U.S. at 578 ("Nor may the four statutory factors be treated in isolation, one from another").

Yet that is exactly what this Circuit does by making "transformativeness" the ultimate test for publicity rights in at least certain forms of expressive works. Ironically, the reason that the California Supreme Court only borrowed the "transformative use" doctrine from copyright law was because it concluded that all other fair use factors cannot sensibly apply at all to the right of publicity. *Comedy III*, 25 Cal. 4th at 404. The more appropriate conclusion would have been that the two doctrines are therefore simply not analogous.

It is not surprising, therefore, that the result of this artificial exercise is the strange proposition that fictionalized depictions of real people should be encouraged in expressive media, while more realistic depictions should be discouraged. That principal has no basis in First Amendment doctrine, and it warrants re-examination by this Court sitting *en banc*.

## C. THE RIGHT OF PUBLICITY SHOULD BE SUBJECT TO STRICT SCRUTINY

This Court has explicitly left open the question of whether the transformative use and public interest tests adequately protect First Amendment interests, *see Keller*, 724 F.3d at 1273 n.5, and this case presents an opportunity to recognize that they do not. Given that the right of

publicity is not an intellectual property right akin to copyrights, the First Amendment requires more than merely balancing the right of publicity and the First Amendment. Rather, as the Petition sets forth, the right of publicity is a content-based restriction on speech and therefore should be subject to strict scrutiny. *See* Petition at 5-9. These *amici* also agree with the Petitioner that the test articulated by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) is an appropriate means of applying strict scrutiny.

The point of the *Rogers* test is that expressive works should be actionable only where a plaintiff's name or likeness is merely used as a ploy to market some unrelated content or product. *Restatement (Third) of Unfair Competition* § 47 cmt. c ("use in entertainment and other creative works" is permitted, unless "the name or likeness is used solely to attract attention to a work that is not related to the identified person."). That is the only potentially compelling state interest in enforcing rights of publicity in the context of expressive works, and the *Restatement* and other authorities have recognized that by adopting slight-reformulations of the same test. *See, e.g.*, *Finger v. Omni Publ'ns Int'l, Ltd.*, 566 N.E.2d 141, 144 (N.Y. 1990) (expressive works are not actionable under New York's misappropriation statute unless the plaintiff's likeness has "no real relationship" to the underlying content or the content itself is really an "advertisement in

16

disguise.").[4]  Clearly, in this case, defendant does not use player likenesses to sell unrelated products.

Moreover, in this case, even if strict scrutiny were not applied and the competing interests of right of publicity and the First Amendment were merely balanced, the balance should overwhelmingly favor the First Amendment interests of video game creators and their customers.  For the reasons discussed previously in Part I.B of this brief, the panel decision disincentivizes the creation of a whole genre of video games simulating real or historical events.  As a result, the "balance" struck by the panel is really no balance at all.  Rather it enforces the interests of these particular plaintiffs regardless of the potential impact on free expression.  Yet, as Judge Thomas noted, the publicity interests they assert here are comparatively minor because each plaintiff is merely one of thousands of avatars in a video game, rather than the sole focus of a work as is more often the case when publicity disputes arise.  *See Keller*, 724 F.3d at 1289 (Thomas, J., dissenting) ("even apart from consideration of transformative elements, examination of the right of publicity in question also resolves the balance in favor of the First Amendment.").  Because it focused solely on the inapposite doctrine of

---

[4] But even if this Court were to decline to adopt *Rogers* as the means to apply strict scrutiny, the larger point is that strict scrutiny is the appropriate approach.

"transformative use," the panel did not properly consider the First

Amendment interests actually presented here.

## CONCLUSION

*Amici* respectfully request that the Petition be granted.


Respectfully submitted,

 /s/ Nathan E. Siegel
Nathan E. Siegel
Patrick Kabat
LEVINE SULLIVAN KOCH &
SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC  20036
202-508-1100

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      I certify that this brief complies with the type-volume limitation of Rules 29(d) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 3,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


2.      I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface – Times New Roman, 14-point – using Microsoft Word 2003.


Dated:   January 30, 2015


                              Respectfully submitted,


                               s/ Nathan Siegel
                              Nathan Siegel

                              LEVINE SULLIVAN KOCH & SCHULZ, LLP
                              1050 17th St., N.W., Suite 800
                              Washington, D.C.  20036
                              202-508-1100
                              *Attorneys for Amici*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 30, 2015. Participants in the case who are registered CM/ECG users will be served by the appellate ECF system.

 s/ Nathan Siegel
Nathan Siegel
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 17th St., N.W., Suite 800
Washington, D.C.  20036
202-508-1100
*Attorneys for Amici*